H7jnbrah

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4            v.                          15 Cr. 537 (VEC)

5   WILLIAM BRACY,

6            Defendant.                  Hearing and Sentence

7   ------------------------------x

8                                        New York, New York
                                         July 19, 2017
9                                        10:15 a.m.

10
    Before:
11
                     HON. VALERIE E. CAPRONI,
12
                                         District Judge
13

14                        APPEARANCES

15  JOON H. KIM
         Acting United States Attorney for the
16       Southern District of New York
    BY:  SAMSON ENZER
17       GINA CASTELLANO
         Assistant United States Attorneys
18
    DONALD D. DuBOULAY
19  MARLON G. KIRTON
         Attorneys for Defendant
20

21

22

23

24

25

H7jnbrah

1              (Case called)

2              MR. ENZER:  Good morning, your Honor.  Samson Enzer

3    and Gina Castellano, for the government, and with us at counsel

4    table is our paralegal, Nicholas Pavlis.

5              MR. KIRTON:  Marlon Kirton, for William Bracy.

6              MR. DuBOULAY:  Good morning, your Honor.  Donald

7    DuBoulay, for Mr. Bracy.

8              THE COURT:  OK.  Please be seated, everyone.

9              I need to sign on to my computer, so just bear with me

10   for just a second.

11             (Pause)

12

13             THE COURT:  Mr. Enzer, we are here for a *Fatico*

14   hearing.

15             MS. CASTELLANO:  That's correct, your Honor.  The

16   government is prepared to proceed.

17             THE COURT:  OK.

18             MS. CASTELLANO:  Before we call our first witness, we

19   would like to read two stipulations into the record.

20             THE COURT:  OK.

21             MS. CASTELLANO:  Your Honor, I am going to do that.  I

22   will do it from the podium, if that's OK.

23             THE COURT:  That is fine.

24             MS. CASTELLANO:  I will start by reading what's been

25   marked for identification as Government Exhibit 37.  I will ask

H7jnbrah

1    Mr. Pavlis to publish that as I read it.

2         "It is hereby stipulated and agreed by and between the

3    United States of America by Joon H. Kim, Acting United States

4    Attorney, Samson Enzer, Gina Castellano, and Andrew Adams,

5    assistant United States Attorney, and the defendant William

6    Bracy a/k/a Rel, by and through his counsel Donald DuBoulay,

7    Esq., and Marlon Kirton, Esq., that:

8         "1.  The photographic exhibits or faceplates listed

9    below true and accurate photographs of the individual

10   associated with each photograph.

11        "1.  Photo of William Bracy, a/k/a Rel.

12        "2.  Photo of Juther Perez.

13        "3.  Photo of Ramel Matthews a/k/a Ra.

14        "4.  Photo of Terrance Williams a/k/a TA.

15        "5.  Photo of Nathaniel Fludd a/k/a JunTao.

16        "6.  Photo of Tykeem Berry.

17        "7.  Photo of Davaughn Matthews, a/k/a Juice.

18        "8.  Photo of Tykiem Ewing, a/k/a Moolah.

19        "9.  Photo of Anthony Scott a/k/a Tyson.

20        "10.  Photo of Donovan Reynolds, a/k/a Donnie Gz.

21        "11.  Photo of Kareem Lanier, a/k/a Reem.

22        "12.  Photo of Michael brown, a/k/a Mighty.

23        "13.  Photo of Charlie Colon, a/k/a Charlie Rock.

24        "14.  Photo of Paul Gilbert, a/k/a Too Fly.

25        "15.  Photo of Wendell Belle, a/k/a Delly.

H7jnbrah

1              "16.  Photo of Anthony Reddick, a/k/a Ant Flocka.

2              "17.  Photo of Jerril Shepherd, a/k/a Rel.

3              "18.  Photo of Kamel Warren, a/k/a Mel.

4              "19.  Photo of Devon Parsons.

5              "20.  Photo of Jamal Costello.

6              "21.  Photo of Moises Lora, a/k/a Noah.

7              22.  Photo of Richmond Appiah, a/k/a Polo.

8              "It is further stipulated and agreed that this

9      stipulation and Government Exhibits 1 through 22 may be

10     received into evidence as government exhibits."

11             It is signed by the parties.

12             The government now offers Government Exhibit 37 and

13     Exhibits 1 through 22.

14             THE COURT:  OK.  1 through 22 and 37 are received.

15             (Government's Exhibits 1 through 22 and 37 received in

16     evidence)

17             MS. CASTELLANO:  Now I will read what's been marked

18     for identification as Government Exhibit 36.

19             Mr. Pavlis, can you publish that.

20             "It is hereby stipulated and agreed by and between the

21     United States of America by Joon H. Kim.

22             THE COURT:  You don't have to read the intro.

23             MS. CASTELLANO:  OK, your Honor.

24             "1.  The following exhibits were produced to the

25     defendant and his counsel by the government as discovery in

H7jnbrah

this case, pursuant to Rule 16(a) of the Federal Rules of

Criminal Procedure prior to the defendant's guilty plea on

January 4, 2017.

"A.  Government Exhibit 31, which is a document

prepared by a member of the New York City Police Department

that contains a photograph of William Bracy, a/k/a Rel, the

defendant, that was posted on and recovered from Bracy's

account on the social media website Facebook.

"B.  Government Exhibit 34, which is a 'Wanted For

Murder' poster prepared by the New York City Police Department

containing a still snapshot from video surveillance footage

taken on April 16, 2012 of Bracy and others involved in the

murder of Moises Lora, a/k/a Noah, walking away from the scene

of the murder.

"C.  Government Exhibit 32, which is a redacted color

version of Government Exhibit 34.

"It is further stipulated and agreed that Government

Exhibits 31, 32, 34 and this stipulation may be received into

evidence as government exhibits.  The government offers

Government Exhibits 31, 32, 34 and 36.

THE COURT:  31, 32, 34 and 36 are received.

(Government's Exhibits 31, 32, 34 and 36 received in

evidence)

MS. CASTELLANO:  Your Honor, at this time the

government calls Davaughn Brooks.

H7jnbrah

1    DAVAUGHN BROOKS,

2         called as a witness by the Government,

3         having been duly sworn, testified as follows:

4    h7jnbrah                    Brooks – direct

5    BY MS. CASTELLANO:

6              MS. CASTELLANO:  May I proceed, your Honor.

7              THE COURT:  Yes.

8    Q.  Good morning, Mr. Brooks.

9    A.  Good morning.

10   Q.  Do you have any nicknames, Mr. Brooks?

11   A.  Yes.  Dayday or Dolla.

12             THE COURT:  Dayday or Dollar?

13             THE WITNESS:  Yes.

14             THE COURT:  There's two separate nicknames?

15             THE WITNESS:  Yes.

16   Q.  Mr. Brooks, how old are you?

17   A.  25.

18   Q.  Where were you born?

19   A.  Bronx, South Bronx, Lincoln hospital.

20   Q.  And where did you grow up?

21   A.  Mott Haven projects.

22   Q.  Is that a city housing development?

23   A.  Yes.

24   Q.  Where are the Mott Haven housing projects located?

25   A.  Also in the South Bronx.

H7jnbrah

1    Q.  Mr. Brooks, where do you currently live?

2    A.  GEO facility.

3    Q.  Where did you live before you lived at the GEO facility?

4    A.  MDC Brooklyn.

5    Q.  When were you arrested?

6    A.  June 26, 2015.

7    Q.  Are you here testifying pursuant to a cooperation agreement

8    with the government?

9    A.  Yes.

10   Q.  Generally speaking, what crimes did you plead guilty to?

11   A.  Brandishing of a gun, aiding and abetting a murder, aiding

12   and abetting a gun while in furtherance of a murder, (b)(1)(A)

13   narcotics and RICO racketeering.

14   Q.  Did you commit those crimes alone or with others?

15   A.  With others.

16   Q.  Mr. Brooks, were you ever a member of a gang?

17   A.  Yes.

18   Q.  What gang?

19   A.  YGs, the Young Gunnaz.

20   Q.  Do you see any members of that gang in the courtroom today?

21   A.  Yes.

22   Q.  Who do you see?

23   A.  Rel.

24   Q.  Can you identify Rel by pointing him out and by an article

25   of clothing that he is wearing?

H7jnbrah

1    A.  A gray shirt.

2    Q.  A gray shirt?

3    A.  Yes.

4          THE COURT:  In the back?  Which table?  The second

5    table?

6          THE WITNESS:  The second row.

7          THE COURT:  Indicating the defendant, Mr. Bracy.

8    BY MS. CASTELLANO:

9    Q.  Mr. Brooks did you ever commit a crime with Rel?

10   A.  Yes.

11   Q.  What crime?

12   A.  We jumped an inmate at MDC Brooklyn.

13   Q.  When was that, approximately?

14   A.  January 2016.

15   Q.  And you said that was at the MDC Brooklyn?

16   A.  Yes.

17   Q.  Did Rel ever tell you about any crimes that he committed?

18   A.  Yes.

19   Q.  What types of crimes did he tell you about?

20   A.  Murder, robberies, shootings.

21   Q.  Let's talk about the murder that Rel told you about.  Did

22   Rel tell you who the victim of that murder was?

23   A.  Yes.

24   Q.  Who was that?

25   A.  Moises Lora.

H7jnbrah

1   Q.   Moises Lora?

2   A.   Yes.

3   Q.   Did he have any street names?

4   A.   No.

5   Q.   We'll refer to Moses Lora as Noah if that's OK.

6          Did Rel tell you whether he committed the murder of

7   Noah alone or with others?

8   A.   With others.

9   Q.   Did Rel tell you what his role was in the murder of Noah?

10  A.   Yes.

11  Q.   What did he tell you his role was?

12  A.   Stomping and kicking.

13  Q.   OK.  We are going to get back to Rel in a moment.  Let's

14  talk about you, Mr. Brooks, and your involvement in YGz.

15         Earlier you mentioned that you grew up in Mott Haven.

16         Did you live in the Mott Haven projects?

17  A.   No.

18  Q.   Where did you live?

19  A.   The Forest projects.

20  Q.   Why do you consider yourself as growing up in the Mott

21  Haven projects?

22  A.   That's where I'm from.  That's where I grew up.

23  Q.   Did anybody in your family live there?

24  A.   Yes, my father.

25  Q.   Mr. Brooks, how far did you go in school?

H7jnbrah

1    A.  Tenth grade.

2    Q.  How old were you when you became a member of the YGz?

3    A.  14.

4    Q.  As a member of the YGz since you were 14 years old, have

5    you become familiar with the history and the structure of the

6    YGz?

7    A.  Yes.

8    Q.  Was there a leader of the YGz?

9    A.  Yes.

10   Q.  Who was that?

11   A.  Juther Perez.

12   Q.  Mr. Brooks, how did you become a member of the YGz?

13   A.  I was blessed in by Juther Perez.

14   Q.  What does it mean to be blessed in?

15   A.  He just -- he put me down with him.

16   Q.  Did you have to do anything specific to get into the YGz?

17   A.  No.

18   Q.  I will direct your attention now to Government Exhibit 2.

19        MS. CASTELLANO:  Mr. Pavlis can you publish Government

20   Exhibit 2, please.

21   Q.  Do you recognize the person in Government Exhibit 2?

22   A.  Yes.

23   Q.  Who is that?

24   A.  Juther Perez.

25   Q.  Is the YGz comprised of one group, or are there different

H7jnbrah

1   sets within the YGz?

2   A.  Different sets.

3   Q.  Can you name some of those sets?

4   A.  MHG, Most Hated Gunnaz; MHG, Morris Avenue Gunnaz; 2Fly;

5   1090; RBT.

6   Q.  Are those all of the sets of the YGz, or just a few that

7   you mentioned?

8   A.  A few.

9   Q.  Are the different sets within the YGz typically associated

10  with different neighborhoods?

11  A.  Yes.

12          THE COURT:  Can people be a member of more than one

13  set?

14          THE WITNESS:  No.

15          THE COURT:  No.  So you have a set, and that's a

16  subset of the gang as a whole?

17          THE WITNESS:  Yes.

18  BY MS. CASTELLANO:

19  Q.  What set of the YGz were you a member of?

20  A.  MHG.

21  Q.  And what did MHG stand for?

22  A.  Most Hated Gunnaz.

23  Q.  Does it stand for anything else?

24  A.  Mott Haven Gunnaz.

25  Q.  What neighborhood is MHG associated with?

H7jnbrah

1    A.  Mott Haven.

2    Q.  Is there a leader of MHG?

3    A.  Yes.

4    Q.  Who is that?

5    A.  Juther Perez and Ramel Matthews.

6    Q.  So there were two leaders of MHG.

7    A.  Yes.

8    Q.  Directing your attention to Government Exhibit 3, now on

9    the screen, do you recognize the person in Government Exhibit

10   3?

11   A.  Yes.

12   Q.  Who is that?

13   A.  Ramel Matthews.

14   Q.  You mentioned that another set of the YGz is MAG.  What

15   does MAG stand for?

16   A.  Morris Avenue Gunnaz.

17   Q.  Was there a leader of the MAG set?

18   A.  Yes.

19   Q.  Who is that?

20   A.  Terrance Williams.

21   Q.  Directing your attention now to Government Exhibit 4 on the

22   screen, do you recognize the person in Government Exhibit 4?

23   A.  Yes.

24   Q.  Who is that?

25   A.  Terrance Williams.

H7jnbrah

1   Q.  What neighborhood is the MAG set associated with?

2   A.  Morris.

3   Q.  Is that in the Bronx?

4   A.  Yes.

5   Q.  Was there a subset of the MAG set?

6   A.  Yes.

7   Q.  What was the name of that subset?

8   A.  Six Third.

9           THE COURT:  Say that again?

10          THE WITNESS:  Six Third.

11          THE COURT:  Six Third?

12          THE WITNESS:  Yes.

13  Q.  What neighborhood is the Six Third set associated with?

14  A.  163rd and Morris.

15  Q.  Is that also in the Bronx?

16  A.  Yes.

17  Q.  Do you know who was in charge of the Six Third set?

18  A.  Yes.

19  Q.  Who was that?

20  A.  Rel.

21  Q.  At the time you joined the YGz, was there a set of the YGz

22  located in the vicinity of Courtlandt Avenue in the Bronx?

23  A.  Yes.

24  Q.  What set was that?

25  A.  YGFC.

H7jnbrah

```
1   Q.  YGFC?

2   A.  Yes.

3   Q.  What does YGFC stand for?

4   A.  Young Gunnaz From Courtlandt.

5   Q.  And who was the leader of Young Gunnaz From Courtlandt?

6   A.  Nathaniel Fludd.

7           THE COURT:  Dean Fludd?

8           THE WITNESS:  Nathaniel Fludd.

9   Q.  Did Nathaniel Fludd have a nickname?

10  A.  JunTao.

11  Q.  I am going to direct your attention to Government Exhibit 5

12  and ask Mr. Pavlis to publish that on the screen.

13          Do you recognize the person in Government Exhibit 5?

14  A.  Yes.

15  Q.  Who is that?

16  A.  JunTao.

17  Q.  Is the YGFC, Young Gunnaz from Courtlandt, set sometimes

18  referred to as Courtlandt?

19  A.  Yes.

20  Q.  Is that set still part of the YGz?

21  A.  No.

22  Q.  We are going to discuss Courtlandt again in a moment.

23          I am now going to direct your attention to Government

24  Exhibits 6 through 18.  I will ask Mr. Pavlis to publish those

25  when I get to them.  For each photo I am going to ask you if
```

H7jnbrah

1    you know the individual's government name, if you know the

2    individual's street name, and if you know the individual to be

3    associated with a gang.

4              MS. CASTELLANO:  Mr. Pavlis, can you please publish

5    Government Exhibit 6.

6    Q.  Mr. Brooks, do you know the person in Government Exhibit 6?

7    A.  Yes.

8    Q.  Who is that?

9    A.  Tykeem Berry.

10   Q.  Do you know his street name?

11   A.  Keemy.

12   Q.  And is Tykeem Berry associated with a gang?

13   A.  Yes.

14   Q.  What gang is that?

15   A.  MHG YG.

16   Q.  MHG.  OK.

17             MS. CASTELLANO:  Mr. Pavlis, could you please publish

18   Government Exhibit 7.

19   Q.  Mr. Brooks, do you know the person in Government Exhibit 7?

20   A.  Yes.

21   Q.  Who is that?

22   A.  Davaughn Matthews.

23   Q.  Does he have a street name?

24   A.  Juice.

25   Q.  Do you know Davaughn Matthews to be associated with a gang?

H7jnbrah

1    A.   Yes.

2    Q.   Which gang?

3    A.   MHG YG.

4         MS. CASTELLANO:  Mr. Pavlis, can you publish

5    Government Exhibit 8, please.

6    Q.   Mr. Brooks, do you know the person in the photo in

7    Government Exhibit 8?

8    A.   Yes.

9    Q.   Who is that?

10   A.   Tykiem Ewing.

11   Q.   Does he have a street name?

12   A.   Moolah.

13   Q.   And what gang is he associated with, if any?

14   A.   RBT YG.

15        MS. CASTELLANO:  Mr. Pavlis, Government Exhibit 9,

16   please.

17   Q.   Mr. Brooks, do you know the person in the photograph in

18   Government Exhibit 9?

19   A.   Yes.

20   Q.   Who is that?

21   A.   Tyson.

22   Q.   Do you know his government name?

23   A.   Anthony Scott.

24   Q.   And is Tyson associated with any gang?

25   A.   Yes.

H7jnbrah

1   Q.  What gang is that?

2   A.  MHG YG.

3          MS. CASTELLANO:  Mr. Pavlis, Government Exhibit 10,

4   please.

5   Q.  Mr. Brooks, do you know the person depicted in Government

6   Exhibit 10?

7   A.  Yes.

8   Q.  Who is that?

9   A.  Donovan Reynolds.

10  Q.  Does he have a street name?

11  A.  Donnie Gz.

12  Q.  Is Donnie Gz associated with any gang?

13  A.  MAG YG.

14  Q.  MAG?

15  A.  Yes.

16         MS. CASTELLANO:  Government Exhibit 11, please.

17  Q.  Mr. Brooks, do you know the person depicted in government

18  Exhibit 11?

19  A.  Yes.

20  Q.  Who is that?

21  A.  Kareem Lanier.

22  Q.  Does he have a street name?

23  A.  Reem.

24  Q.  Is he associated with a gang?

25  A.  Yes.

H7jnbrah

1   Q.  What gang?

2   A.  MAG YG.

3   Q.  Directing your attention to Government 12, do you know the

4   person in the photo in Government Exhibit 12?

5   A.  Yes.

6   Q.  Who is that?

7   A.  Michael Brown.

8   Q.  Does he have a street name?

9   A.  Mighty.

10  Q.  Is he associated with a gang?

11  A.  RBT YG.

12  Q.  Directing you to Government Exhibit 13.  Do you know the

13  person in the photo in Government Exhibit 13?

14  A.  Yes.

15  Q.  Who is that?

16  A.  Charlie Colon.

17  Q.  Does he have a street name?

18  A.  Charlie Rock.

19  Q.  And is he associated with any gang?

20  A.  Yes.  1090 YG.

21  Q.  Directing you to Government Exhibit 14.  Do you know the

22  person in the photo in Government Exhibit 14?

23  A.  Yes.

24  Q.  Who is that?

25  A.  Paul Gilbert.

H7jnbrah

1    Q.   Street name?

2    A.   Too Fly, Too Fly Tate.

3    Q.   Is he associated with any gang?

4    A.   Yes.

5    Q.   Which one?

6    A.   2Fly YG.

7    Q.   Directing you to Government Exhibit 15.

8            Do you know the person in the photo in Government

9    Exhibit 15?

10   A.   Yes.

11   Q.   Who is that?

12   A.   Wendell Belle.

13   Q.   Does he have a street name that you know?

14   A.   Delly Dell.

15   Q.   And is Delly Dell associated with any gang?

16   A.   Yes.

17   Q.   Which gang?

18   A.   RBT YG.

19   Q.   Directing you to Government Exhibit 16, do you know the

20   person in Government Exhibit 16?

21   A.   Yes.

22   Q.   Who is that?

23   A.   Ant Flocka.

24   Q.   Do you know his government name?

25   A.   No.

H7jnbrah

1    Q.  What gang, if any, is Ant Flocka associated with?

2    A.  Six Third.

3    Q.  Directing your attention to Government Exhibit 17, do you

4    know the person in the photograph in Government Exhibit 17?

5    A.  Yes.

6    Q.  Who is that.

7    A.  Rel.

8    Q.  Do you know his government name?

9    A.  No.

10   Q.  Is it the same Rel that you pointed out in the courtroom

11   earlier?

12   A.  No.

13   Q.  We'll call this Rel, Rel 2 if that's OK.

14   A.  All right.

15   Q.  Now directing your attention to Government Exhibit 18.  Do

16   you know the person in Government Exhibit 18?

17   A.  Yes.

18   Q.  Who is that?

19   A.  Mel.

20   Q.  Do you know his government name?

21   A.  No.

22            THE COURT:  Mel as in M-e-l?

23            THE WITNESS:  Yes.

24            THE COURT:  OK.

25   BY MS. CASTELLANO:

H7jnbrah

1  Q.  Do you know Mel to be associated with any gang?

2  A.  Yes.

3  Q.  Which gang?

4  A.  Two Stacks.

5          THE COURT:  Two steps?

6          THE WITNESS:  Stacks.

7          THE COURT:  Stacks.  OK.

8  BY MS. CASTELLANO:

9  Q.  Mr. Brooks, did you commit crimes as a member of the YGz?

10  A.  Yes.

11  Q.  What types of crimes did you commit?

12  A.  Aiding and beating of a murder, brandishing of guns,

13  robberies, drug sales.

14  Q.  OK.  You mentioned aiding and abetting a murder.

15          When was that murder approximately?

16  A.  2009.

17  Q.  Who was the victim of that murder?

18  A.  Darrel Ledgister.

19  Q.  What was your role in the murder of Darrel Ledgister?

20  A.  Lookout.

21  Q.  Let's break that down, Mr. Brooks.

22          How did you get involved in the murder?

23  A.  I went to a friend's house, seen three kids there with

24  chains on.  I was planning to rob them.  The kids started to

25  leave the building with the friend that I went for.  We all

H7jnbrah

1   left.  We called for guns at first --

2   Q.  Who were you with?

3   A.  Me, Tykeem Berry, Anthony Scott, Ramel Matthews.

4              MS. CASTELLANO:  Mr. Pavlis, can you publish

5   Government Exhibit 3, which has been identified as Ramel

6   Matthews; 6, which has been identified as Tykeem Berry; and, 9,

7   which has been identified as Anthony Scott, please.

8   BY MS. CASTELLANO:

9   Q.  You were with these three individuals, Mr. Brooks?

10  A.  Yes.

11  Q.  Did you discuss the robbery?

12  A.  Yes.

13  Q.  What did you discuss?

14  A.  It was supposed to be a simple robbery.

15  Q.  Was the plan to use guns?

16  A.  Yes.

17             THE COURT:  You were robbing people who were at

18  somebody's house?

19             THE WITNESS:  Yes.

20             THE COURT:  Did you know these people?

21             THE WITNESS:  No.

22             THE COURT:  They were just visitors?

23             THE WITNESS:  Yes.

24             THE COURT:  OK.

25  BY MS. CASTELLANO:

H7jnbrah

1   Q.  Why did you plan to rob them?

2   A.  They had big chains on.

3           THE COURT:  Like gold chains?

4           THE WITNESS:  Yes.

5   Q.  At some point did you leave the house that you were at?

6   A.  Yes.

7   Q.  Where did you go?

8   A.  Downstairs across the street to the corner store.

9   Q.  What happened next?

10  A.  Haswani Tyson got a gun, Anthony Scott got a gun, and Ramel

11  Matthews went across the street as the overseer to look at --

12  make sure we did everything right.

13  Q.  You mentioned Haswani Tyson.  Who is that?

14  A.  He was also someone who was with us.

15  Q.  Was he a member of the YGz?

16  A.  Yes.

17  Q.  So Haswani Tyson had a gun and Anthony Scott had a gun?

18  A.  Yes.

19  Q.  Did you have a gun?

20  A.  No.

21  Q.  You said Ramel Matthews was there as well?

22  A.  Yes.

23  Q.  What happened next?

24  A.  We went downstairs, we left the house, we followed the kids

25  out.  We was thinking of the right time to rob them.  Crystal,

H7jnbrah

1   the friend that we was visiting, she walked into the corner

2   store, so we figured there was perfect timing.

3   Q.  At that point where were the individuals that you were

4   planning to rob?

5   A.  They hopped in the car.  I guess they felt the vibe, and

6   they was ready to drive off.

7           MR. KIRTON:  Objection.

8           THE COURT:  Overruled.

9   Q.  After Crystal went into the corner store, what did you do?

10  A.  Tyson -- Haswani first walked in front of the car, pulled

11  the gun out to make sure they didn't drive off.  Tyson ran to

12  the side of the car window put the gun in the window and told

13  them to give the chains up.

14  Q.  Where were you at this time?

15  A.  Standing in front of the corner store watching.

16  Q.  What happened next?

17  A.  Crystal came out of the store, she started screaming.  So

18  when she started screaming, she distracted Tyson.  When he

19  turned around to look at her, the kid grabbed the gun.

20  Q.  Which kid?

21  A.  Darrel Ledgister.  They was tussling for the gun for a

22  little while, and Tyson decided to shoot.  He felt that was the

23  only way that he was going to get away with the gun.

24          MR. KIRTON:  Objection.

25          THE COURT:  Did he tell you that at some point?

H7jnbrah

         THE WITNESS:  Yes.

         THE COURT:  OK.  Overruled.

BY MS. CASTELLANO:

Q.  What happened next?

A.  We ran off.

Q.  And when you say Tyson, are you referring to Haswani Tyson

or Anthony Scott?

A.  Anthony Scott.

Q.  Are you willing to discuss that murder in further detail if

defense counsel or the judge has any questions about it?

A.  Yes.

Q.  Mr. Brooks, did the YGz have rivals?

A.  Yes.

Q.  Who were the YGz rivals?

A.  Highbridge, 18 Park, and Courtlandt.

Q.  Did the YGz have other rivals as well?

A.  Yes.

Q.  OK.  You mentioned Courtlandt.  Let's talk about

Courtlandt.

         When you say Courtlandt, what does that refer to?

A.  GFC or OGZ.

Q.  So GFC, what does that stand for?

A.  God's Favored Children or Gunnaz From Courtlandt.

Q.  When you said OGZ --

A.  Yes.

H7jnbrah

1    Q.   What does that refer to?

2    A.   Original Gunnaz From Courtlandt.

3    Q.   And earlier you mentioned YGFC, is that correct?

4    A.   Yes.

5    Q.   Is that also associated with Courtlandt?

6    A.   Yes.

7    Q.   And are YGFC, GFC, and the OGZ, are those all references to

8    a gang?

9    A.   Yes.

10   Q.   Do you at some times refer to those different gang names as

11   Courtlandt?

12   A.   Yes.

13           THE COURT:  So they are all the same?

14           THE WITNESS:  Yes.

15           THE COURT:  YGFC, GFC, and OG are all the same group?

16           THE WITNESS:  Yes.

17           THE COURT:  OK.

18   BY MS. CASTELLANO:

19   Q.   Does Courtlandt also refer to a neighborhood?

20   A.   Yes.

21   Q.   And does that neighborhood consist of different housing

22   projects?

23   A.   Yes.

24   Q.   Can you name some of those housing projects?

25   A.   Jacksons or Melrose.

H7jnbrah

1   Q.  OK.  At this point, I am going to direct your attention to

2   what's been marked for identification as Government Exhibit 30.

3   I am going to ask Mr. Pavlis to publish Government Exhibit 30

4   on the screen and also ask him to set up a larger blowup of

5   Government Exhibit 30.?

6           MS. CASTELLANO:  Can you turn it a bit so that counsel

7   table can see as well.

8           MR. KIRTON:  I will stand over here, your Honor.

9           THE COURT:  That's fine.

10           MR. KIRTON:  If that's OK.

11           MS. CASTELLANO:  Mr. Brooks has to be able to see as

12   well.  Sorry.  That should work.

13   BY MS. CASTELLANO:

14   Q.  Mr. Brooks, can you see that?

15   A.  Yes.

16           THE COURT:  Can everybody see the map?

17           MR. KIRTON:  Yes.

18           THE COURT:  OK.

19           MS. CASTELLANO:  Your Honor, may I approach?

20           THE COURT:  Yes.

21   BY MS. CASTELLANO:

22   Q.  Mr. Brooks, I'm going to hand you a laser pointer.  If you

23   push this red button up here, it should work.

24           Mr. Brooks, taking a look at what's been marked for

25   identification as Government Exhibit 30, do you recognize it?

H7jnbrah

1    A.   Yes.

2    Q.   What is it?

3    A.   A map of the South Bronx.

4    Q.   And are you familiar with the locations depicted in

5    Government Exhibit 30?

6    A.   Yes.

7    Q.   So, earlier you testified that you were a member of Mott

8    Haven Gunnaz or Most Hated Gunnaz and that that set of the YGz

9    was associated with the Mott Haven projects, is that correct?

10   A.   Yes.

11   Q.   Can you show us on Government Exhibit 30 using the pointer

12   that I just handed to you the location of the Mott Haven

13   projects, and can you describe for the record the streets and

14   the avenues that you're referring to.

15   A.   143rd and Willis between Third Avenue and Willis Avenue.

16   Q.   Between Third Ave. and Willis Avenue and 143rd Street?   Is

17   that what you said?

18   A.   Yes.

19   Q.   That's the lower left-hand side of the map?

20   A.   Yes.

21   Q.   You also mentioned that there was a set of the YGz called

22   MAG, or Morris Avenue Gunnaz, is that correct?

23   A.   Yes.

24   Q.   And that that set of the YGz was associated with Morris

25   Avenue?

H7jnbrah

1   A.  Yes.

2   Q.  Can you point to that neighborhood on Government Exhibit

3   30, please.  Can you describe using the streets and the avenues

4   where you are pointing to.

5   A.  151 and Morris.

6   Q.  151 -- 151st Street and Morris Avenue?

7   A.  Yes.

8   Q.  Is that the middle slightly to the left on the map?

9   A.  Yes.

10  Q.  You also mentioned that there was a subset of the YGz

11  referred to -- sorry.  Excuse me.  A subset of the Morris

12  Avenue Gunnaz referred to as the Six Third YGz?

13  A.  Yes.

14  Q.  What neighborhood was the Six Third YGz associated with?

15  A.  163rd and Morris.

16  Q.  Do you see that neighborhood on the map?

17          So the top center of the map?

18  A.  Yes.

19  Q.  Finally, Mr. Brooks, you just mentioned -- I just asked you

20  about Courtlandt and the OG, GFC and YGFC sets associated with

21  Courtlandt.

22  A.  Yes.

23  Q.  Do you see Courtlandt Avenue on the map?  I see you're

24  pointing.  Can you describe, using the street names and the

25  avenues, where you're pointing to on the map?

H7jnbrah

1   A.  Courtlandt Avenue, between Park and Melrose.

2   Q.  Between what streets?

3   A.  Park Avenue and Melrose avenue.

4            THE COURT:  No, the streets going the other direction.

5            THE WITNESS:  156th Street.

6            THE COURT:  OK.

7   Q.  Is it just on 156th street, or does it span other streets

8   as well?

9   A.  It spans other streets as well.

10   Q.  Do you know what streets it spans?

11   A.  From 151 to 162.

12   Q.  Sorry, Mr. Brooks, can you say that again.

13   A.  From 151st Street to 162nd.

14            MS. CASTELLANO:  Thank you.

15            THE COURT:  All along Courtlandt?

16            THE WITNESS:  Yes.

17            THE COURT:  OK.

18   BY MS. CASTELLANO:

19   Q.  You testified earlier that when you first joined the YGz,

20   Courtlandt was a set of the YGz, is that correct?

21   A.  Yes.

22   Q.  And you also testified that Courtlandt was a rival of the

23   YGz, is that correct?

24   A.  Yes.

25   Q.  Do you know when that change took place?

H7jnbrah

| | |
|---|---|
| 1 | A.   Yes. |
| 2 | Q.   Approximately when? |
| 3 | A.   Around 2011. |
| 4 | Q.   Did you know members of Courtlandt? |
| 5 | A.   Yes. |
| 6 | Q.   How did you know them? |
| 7 | A.   We used to be affiliated. |
| 8 | Q.   OK.  I am going to again direct your attention to |
| 9 | Government Exhibits -- let's start with Government Exhibit 19. |
| 10 | Do you know the person in the photograph in Government |
| 11 | Exhibit 19? |
| 12 | A.   Yes. |
| 13 | Q.   Who is that? |
| 14 | A.   Devon Parsons. |
| 15 | Q.   Did he have a street name? |
| 16 | A.   Dev. |
| 17 | Q.   Is he associated with any gang? |
| 18 | A.   YGFC. |
| 19 | Q.   Directing your attention to Government Exhibit 20, do you |
| 20 | know the person in Government Exhibit 20? |
| 21 | A.   Jamal. |
| 22 | Q.   Do you know his last name? |
| 23 | A.   No. |
| 24 | Q.   Do you know any street names that he goes by? |
| 25 | A.   Jamal. |

H7jnbrah

1    Q.   Do you know Jamal to be associated with any gang?

2    A.   YGFC.

3    Q.   Directing your attention to Government Exhibit 21, do you

4    know the person depicted in Government Exhibit 21?

5    A.   Moises Lora.

6    Q.   Do you know if he has any street names?

7    A.   No.

8    Q.   Do you know if he was associated with any gang?

9    A.   YGFC.

10   Q.   Finally, directing your attention to Government Exhibit 22,

11   do you know the person in the photo in Government Exhibit 22?

12   A.   Polo.

13   Q.   Do you know if that's his street name or his government

14   name?

15   A.   Street name.

16   Q.   Do you know his government name?

17   A.   No.

18   Q.   Do you know polo to be associated with any gang?

19   A.   YGFC.

20          THE COURT:   Do you know how Noah and Polo got their

21   nicknames of Noah and polo?

22          THE WITNESS:   No.

23   BY MS. CASTELLANO:

24   Q.   OK.   When you say YGFC, are you referring to Courtlandt?

25   A.   Yes.

H7jnbrah

1    Q.  You mentioned before that Courtlandt had been a set of the

2    YGz, but then around 2011 it changed to be a rival, is that

3    correct?

4    A.  Yes.

5    Q.  What caused that, if you know?

6    A.  Devon Parsons shot Terrance Williams in the stomach.

7           MR. KIRTON:  Your Honor, I just didn't hear that.  I'm

8    sorry.

9           THE WITNESS:  Devon Parsons shot Terrance Williams in

10   the stomach.

11          MR. KIRTON:  Thank you.

12   Q.  And after that shooting, did you participate in any

13   shootings against Courtlandt?

14   A.  Yes.

15   Q.  Did any of those shootings that you participated in involve

16   Noah?

17   A.  Yes.

18   Q.  OK.  Let's talk about that shooting that you participated

19   in that involved Noah.

20          When was that shooting?

21   A.  January 21, 2011.

22   Q.  Mr. Brooks, how do you remember the exact date of that

23   shooting?

24   A.  My birthday.

25   Q.  OK.  So on January 21, 2011, where were you before that

H7jnbrah

1   shooting?

2   A.   Jackson Avenue.

3   Q.   And where specifically were you on Jackson Avenue?

4   A.   In the chicken spot.

5   Q.   Who were you with?

6   A.   Davaughn Matthews, Kells, Dot.

7   Q.   What is Davaughn Matthews' street name?

8   A.   Juice.

9   Q.   Was he a member of the YGz?

10   A.   Yes.

11   Q.   You also mentioned Kells and Dot?

12   A.   Yes.

13   Q.   Are they also members of the YGz?

14   A.   Yes.

15   Q.   When you were at the chicken spot on Jackson Avenue on

16   January 21, 2011, did you have a gun?

17   A.   No.

18   Q.   Did anybody else you were with have a gun?

19   A.   Juice.

20   Q.   Why were you at the chicken spot on Jackson Avenue?

21   A.   We was looking for rival gang members.

22   Q.   Were you looking for any specific rivals?

23   A.   People from Jackson.

24   Q.   What were you doing at the chicken spot?

25   A.   Recording a video.

H7jnbrah

1    Q.  What type of video?

2    A.  A video on a phone stating that we was on Jackson.

3          THE COURT:  You were taunting them?

4          THE WITNESS:  Yes.

5    Q.  What happened while you were recording the video?

6    A.  We seen members who we thought was from Jackson, we walked

7  out the store, and it ended up being members from Courtlandt.

8    Q.  How did you know that they were members from Courtlandt?

9    A.  I noticed Jamal and Noah.

10   Q.  And what happened after you noticed Jamal and Noah?

11   A.  They was walking towards us.  They kept walking towards us.

12  I told Juice to shoot.  He pulled the gun out and started

13  shooting.  Noah fell.  We thought we hit him, so we ran off.

14   Q.  Was anybody hurt in that shooting?

15   A.  Yes.

16   Q.  Who was hurt?

17   A.  Noah.

18   Q.  Was he shot?

19   A.  No.

20   Q.  What happened to him?

21   A.  He broke his leg.

22   Q.  Was anybody else shot that day?

23   A.  No.

24          THE COURT:  Was he running?  How did he break his leg?

25          THE WITNESS:  Running.

H7jnbrah

1           THE COURT:  OK.

2   BY MS. CASTELLANO:

3   Q.  Mr. Brooks, did you participate in other acts of violence

4   against Courtlandt?

5   A.  Yes.

6   Q.  And are you willing to discuss those other acts of violence

7   that you participated in with defense counsel or the judge if

8   either has questions?

9   A.  Yes.

10  Q.  OK.  Let's focus on Rel again.  How did you meet Rel?

11  A.  From Delly Dell.

12  Q.  And when was that approximately?

13  A.  2010.

14  Q.  How did you meet Delly Dell?

15  A.  In Mott Haven.  He came home from juvenile.  He came to

16  Mott Haven.  That's how we met.

17  Q.  So Delly Dell came home from juvenile, and you met him in

18  Mott Haven, is that correct?

19  A.  Yes.

20  Q.  And when was that approximately?

21  A.  2010.

22  Q.  Did you know Delly Dell before he went to juvenile?

23  A.  No.

24  Q.  After you met Delly Dell in 2010, how did you get

25  introduced to Rel?

H7jnbrah

1    A.   Delly introduced us.

2    Q.   Where were you before he introduced you?

3    A.   At 162 and Courtlandt.

4    Q.   And why did Delly, if you know, introduce you to Rel?

5    A.   He said it was other YG members of the block.

6    Q.   And after he told you that, what did you and Delly Dell do,

7    if anything?

8    A.   We went to 163rd.

9    Q.   To 163rd?

10   A.   Yes.

11   Q.   Is that the area that you pointed out on the map before?

12   A.   Yes.

13              THE COURT:  How old are you at this time?

14              THE WITNESS:  Around --

15              THE COURT:  Seven years ago.

16              How old are you now?

17              THE WITNESS:  17.

18              THE COURT:  You were 17 at the time.  OK.

19              Were they about the same age?

20              THE WITNESS:  Yes.

21              THE COURT:  OK.

22   BY MS. CASTELLANO:

23   Q.   So you went with Delly to 163rd?

24   A.   Yes.

25   Q.   And who did he introduce you to there?

H7jnbrah

1    A.  To Rel.

2    Q.  Did he introduce you to anybody else?

3    A.  Ant Flocka and the other Rel.

4    Q.  Did you have a conversation with Rel that first day that

5    you met him?

6    A.  Yes.

7    Q.  What did you discuss?

8    A.  Was they the ones that Courtlandt shot at.

9    Q.  OK.  Can you explain that in more detail?

10   A.  I was in my house one day with a female friend, I heard

11   gunshots.  I looked out the window.  I seen members from

12   Courtlandt running past my window.  I was wondering what they

13   was doing around my section.  So, when I met them, that day

14   came back to mind.  I asked them were they the ones that was

15   getting shot at by Courtlandt.  They said yes.

16   Q.  Before Delly introduced you to Rel, did you know that there

17   were YGz in 16 -- living, hanging out at 163rd?

18   A.  No.

19   Q.  You learned it that day?

20   A.  Yes.

21   Q.  And that day that you first met Rel, you asked him about

22   the shooting --

23   A.  Yes.

24   Q.  -- that you had seen earlier?

25   A.  Yes.

H7jnbrah

1    Q.  What, if anything, did he say in response?

2    A.  He said, yes, they was the ones being shot at.

3    Q.  When you say they was the ones being shot at, who is the

4    they?

5    A.  Him and other members from Six Third.

6    Q.  Do you know if Rel ever shot at Courtlandt?

7    A.  Yes.

8    Q.  How do know that?

9    A.  From conversations.

10   Q.  Conversations with whom?

11   A.  With Rel.

12   Q.  Where did these conversations take place?

13   A.  In MDC.

14   Q.  And when did those conversations take place, approximately?

15   A.  In unit 43 and in the box.

16   Q.  We are going to get to your time in the MDC in just a

17   moment.  Are you willing to discuss in more detail the

18   conversations you had with Rel in MDC concerning the other

19   shootings, Rel's other shootings at Courtlandt if defense

20   counsel or the judge has questions?

21   A.  Yes.

22   Q.  So after Delly introduced you to Rel in 2010, how often did

23   you see Rel?

24   A.  About once or twice a week.

25   Q.  Where did you see him generally?

H7jnbrah

1    A.   Mainly in Mott Haven, or I would go to 163rd and buy weed

2    off him or he would come to 162 and buy weed off me.

3    Q.   Was he typically with others?

4    A.   Yes.

5    Q.   Who was he with?

6    A.   Ant Flocka, Mel, Rel.

7    Q.   OK.  You testified earlier that Rel told you that he

8    participated in the murder of Noah, correct?

9    A.   Yes.

10   Q.   Let's go through that in detail.

11        Do you recall what you were doing the day of the Noah

12   murder?

13   A.   I was in my house with a female friend.

14   Q.   Why do you recall that day, Mr. Brooks?

15   A.   Because Delly came to my window calling me from the window.

16   Q.   OK.  So you said you were in your house with a female

17   friend, is that correct?

18   A.   Yes.

19   Q.   And that Delly called you from the window?

20   A.   Yes.

21   Q.   What did Delly -- what did you hear coming from the window?

22   A.   I heard him screaming Dolla.

23   Q.   And did you go to your window then?

24   A.   Yes.

25   Q.   Who did you see outside?

H7jnbrah

```
 1   A.  Delly, Rel, Mel, the other Rel, and Ant Flocka.
 2              MS. CASTELLANO:  Mr. Pavlis, can you publish
 3   Government Exhibits 15, previously identified as Delly; 16,
 4   previously identified as Ant Flocka; 17, previously identified
 5   as the other Rel; and 18, previously identified as Mel.
 6   Q.  Where were these individuals standing when you went to your
 7   window?  Where did you see them?
 8   A.  On the corner.
 9              THE COURT:  What floor is your apartment on?
10              THE WITNESS:  Fifth.
11              THE COURT:  OK.
12   Q.  And did anybody talk to you from the corner?
13   A.  Delly.
14   Q.  What did Delly say?
15   A.  He said we was going to Courtlandt to put in work.
16   Q.  What did you understand "put in work" to mean?
17   A.  To mean cause violence, look for someone we was beefing
18   with and cause violence.
19   Q.  What was Delly's demeanor when he said that?
20   A.  He looked OK.
21   Q.  I'm sorry?
22   A.  He looked OK.
23   Q.  He looked OK?
24              THE COURT:  Did he look angry, did he look --
25              THE WITNESS:  A little.
```

H7jnbrah

1    Q.  Was he carrying anything?

2    A.  A half empty bottle of Hennessy.

3    Q.  Did he look drunk to you?

4    A.  Not really.

5    Q.  What did you do?

6    A.  I went to the window, I listened to what he said.  My

7    female friend stopped me from going, so I never went back to

8    the window.  I guess he got the picture and walked off.

9    Q.  You said your apartment is on the fifth floor -- was on the

10   fifth floor, is that correct?

11   A.  Yes.

12   Q.  Where was it located?

13   A.  On 162rd and Courtlandt.

14   Q.  Mr. Brooks, did you later learn that that group that you

15   saw outside of your window participated in killing Noah?

16   A.  Yes.

17   Q.  When did you first learn that?

18   A.  The very next day.

19   Q.  Who told you that?

20   A.  Tykeem Berry.

21   Q.  What did Tykeem Berry tell you?

22   A.  He said Delly and them came to his house and told him they

23   think they killed Noah.

24   Q.  Did he say who besides Delly came to his house?

25   A.  Mel, Rel, Rel 2, and Ant Flocka.

H7jnbrah

1   Q.  Did he tell you when they came to his house?

2   A.  Right after the murder.

3   Q.  Did he tell you what they said?

4   A.  He said Delly was bragging about killing him.

5   Q.  Did there come a time when you discussed the Noah murder

6   with Rel?

7   A.  Yes.

8   Q.  When was that?

9   A.  In MDC Brooklyn.

10  Q.  Let's talk about the time you spent in the MDC, Mr. Brooks.

11          When did you arrive in the MDC?

12  A.  Around June 30, 2015.

13  Q.  And why were you in the MDC?

14  A.  For brandishing of a gun.

15  Q.  Were you later charged in a RICO indictment?

16  A.  Yes.

17  Q.  While you were at the MDC, were you a member of the YGz?

18  A.  Yes.

19  Q.  And in the MDC did you live in a unit?

20  A.  Yes.

21  Q.  What unit was that?

22  A.  43.

23  Q.  Can you describe what unit 43 looked like generally.

24  A.  It was about 60 cells, 30 top and bottom, computers, a TV

25  area, a rec deck.

H7jnbrah

1   Q.  What is a rec deck?

2   A.  It's where we go out for air, rec, exercise.

3   Q.  And within unit 43 did you live within a cell?

4   A.  Yes.

5   Q.  And how many inmates are in a cell?

6   A.  Two.

7   Q.  When you first got to unit 43 in July or June of 2015, were

8   there any members of the YGz in unit 43?

9   A.  No.

10  Q.  Were there any members of Courtlandt in unit 43 at the

11  time?

12  A.  No.

13  Q.  At some point did a member of Courtlandt move to your unit?

14  A.  Yes.

15  Q.  Who was that?

16  A.  Nathaniel Fludd, JunTao.

17  Q.  You testified earlier that JunTao was the leader of

18  Courtlandt?

19  A.  Yes.

20  Q.  So what did you do when JunTao moved to unit 43?

21  A.  I approached him so we could speak.

22  Q.  What did you speak about?

23  A.  Our differences from the streets.

24  Q.  When you say your differences from the streets, what are

25  you referring to?

H7jnbrah

1  A.  The beef that we had.

2  Q.  And what was the outcome of that conversation?

3  A.  He said he didn't care about it.  He said he loved YG still

4  in his heart.

5  Q.  And after that did you and JunTao live together in the MDC?

6  A.  Yes.

7  Q.  Did there come a time when other YGz came to your unit?

8  A.  Yes.

9  Q.  Who was that?

10  A.  Delly and Rel.

11  Q.  And when did Delly and Rel come to your unit,

12  approximately?

13  A.  Around January of 2016.

14  Q.  Was that before or after you had been indicted in the RICO

15  case?

16  A.  After.

17  Q.  Were Delly and Rel also indicted in that case?

18  A.  Yes.

19  Q.  So do Delly and Rel arrive at unit 43 at the same time?

20  A.  Yes.

21  Q.  So when Delly and Rel arrive at the MDC, do you discuss

22  JunTao with them?

23  A.  Yes.

24  Q.  And why do you discuss JunTao with them?

25  A.  Because I knew they was the ones who killed Noah.

H7jnbrah

1    Q.  What did you discuss?

2    A.  How did they feel about living with him.

3            MR. KIRTON:  I'm sorry.

4            THE COURT:  I'm sorry.  I'm confused.  Back up.

5            MS. CASTELLANO:  Yes, your Honor.

6            THE COURT:  Why did you discuss JunTao with Delly and

7    Rel?

8            MS. CASTELLANO:  Yes.

9            THE COURT:  And you did that because you knew they had

10   killed Noah, so you wanted to know how they felt about being

11   locked up with JunTao?

12           THE WITNESS:  Yes.

13           THE COURT:  Had you asked JunTao about how he felt

14   about being locked up with them?

15           THE WITNESS:  Yes.

16           THE COURT:  OK.

17   BY MS. CASTELLANO:

18   Q.  And what did Delly and Rel say about being locked up with

19   JunTao?

20   A.  They said they didn't trust him.

21   Q.  Why didn't they trust him?

22           MR. KIRTON:  Objection.

23   A.  Because they killed Noah.

24           THE COURT:  Overruled.

25   Q.  Mr. Brooks, did there come a time when you participated in

H7jnbrah

1    an assault of JunTao?

2    A.   Yes.

3    Q.   When was that approximately?

4    A.   Late January.

5    Q.   Of what year?

6    A.   2016.

7    Q.   Did you assault him alone or with others?

8    A.   With others.

9    Q.   Who did you assault him with?

10   A.   With Delly and Rel.

11   Q.   And where did that assault take place?

12   A.   In unit 43.

13   Q.   Why did you assault JunTao?

14   A.   We felt he was playing both sides.

15   Q.   When you say playing both sides, what do you mean?

16   A.   We felt he was just cool with us for the moment because he

17   was outnumbered.

18   Q.   Why was he outnumbered?

19   A.   Because we was on the racketeering conspiracy and there was

20   a lot of us in the building.

21   Q.   And you, Delly, and Rel were members of the YGz?

22   A.   Yes.

23   Q.   And at the time was JunTao a member of Courtlandt?

24   A.   Yes.

25   Q.   And Courtlandt and the YGz were rivals, correct?

H7jnbrah

1          THE COURT:  Were there no other Courtlandts in that

2   unit?

3          THE WITNESS:  No.

4          THE COURT:  OK.

5   BY MS. CASTELLANO:

6   Q.  What did you do during the assault of JunTao?

7   A.  Punched him, hit him with food trays and chairs.

8   Q.  And you said you committed that assault with Delly and Rel,

9   is that correct?

10  A.  Yes.

11  Q.  What did Rel do during that attack?

12  A.  The same thing.

13  Q.  How about Delly?

14  A.  The same thing.

15  Q.  How did that assault end?

16  A.  JunTao grabbed a mop stick, chased us around the unit.  COs

17  came, sprayed us.  We ran out of our cells and went to the box.

18  Q.  You said you went to the box.  What is the box?

19  A.  The SHU, segregated housing unit.

20  Q.  And was that part of your punishment for participating in

21  the assault?

22  A.  Yes.

23  Q.  Were you punished in other ways?

24  A.  Yes.

25  Q.  What other ways were you punished for the assault?

H7jnbrah

1   A.  We was given 90 days box time, 90 days loss of property,

2   and about six months loss of everything else.

3   Q.  You said we were given that punishment.  Who else besides

4   you was given that punishment?

5   A.  Everyone involved:  Me, Rel, Delly and JunTao.

6            THE COURT:  JunTao got punished for being attacked?

7            THE WITNESS:  Yes.

8   Q.  You all got 90 days in the box?

9   A.  Yes.

10  Q.  What is the box?

11  A.  It consists of about 60 cells, eight rec decks.

12           THE COURT:  Is each cell an individual cell?

13           THE WITNESS:  Yes.

14  Q.  When you are in the box, do you have a cellmate in the box

15  with you?

16  A.  Yes.

17  Q.  One or more than one?

18  A.  One.

19  Q.  And when you refer to the box, are you referring to the

20  cell or the larger unit?

21  A.  The larger unit.

22  Q.  And that unit is called the segregated housing unit?

23  A.  Yes.

24  Q.  And when you are in your cell in the box, how many hours of

25  the day are you in the cell?

H7jnbrah

1   A.  23 and one, 23 hours in the cell and one hour of rec.

2   Q.  When you are in the cell for 23 hours, who are you with?

3   A.  Rel.

4   Q.  Rel was your cellmate in the box?

5   A.  Yes.

6   Q.  Then you said one hour of rec, is that right?

7   A.  Yes.

8   Q.  When you go to rec, who are you with?

9   A.  Rel.

10  Q.  So you are with your cellmate when you are at rec?

11  A.  Yes.

12  Q.  Are you with anybody else when you are at rec?

13  A.  Yes, others, but not in the same pen.

14  Q.  Not in the same pen.  OK.  Rec segregated by pens?

15  A.  Yes.

16  Q.  You said that Rel was your cellmate in the box, is that

17  correct?

18  A.  Yes.

19  Q.  For how long approximately was Rel your cellmate in the

20  box?

21  A.  About 40 to 45 days.

22  Q.  40 to 45 days?

23  A.  Yes.

24  Q.  Can you describe the cell that you shared with Rel for 40

25  to 45 days.

H7jnbrah

1   A.   A bunk bed, toilet, sink, table, a shower.

2   Q.   And were there any exceptions to the time that you spent

3   alone with Rel in the cell or at rec?  Were there times when

4   you were not with Rel?

5   A.   There can be times, but, no, we was always together.

6   Q.   Did you or Rel have legal visits during the time that you

7   were in the cell?

8   A.   Yes.

9   Q.   And during those legal visits, are you separated from Rel?

10  A.   Yes.

11  Q.   So while you were in the cell in the box with Rel for those

12  40 to 45 days, what did you do generally?

13  A.   We spoke, read books, listened to music, and I would work

14  out from time to time.

15  Q.   What did you and Rel speak about?

16  A.   Different acts of violence we committed in the streets.

17  Q.   Why did you talk about acts of violence that you committed

18  in the streets?

19  A.   We was just reminiscing on the past.  We also spoke of

20  females.

21          THE COURT:  I assume you talked about everything you

22  could think of to talk about.

23          THE WITNESS:  Yes.

24          THE COURT:  OK.

25  BY MS. CASTELLANO:

H7jnbrah

1   Q.  While you were cellmates with Rel in the box, did you tell

2   Rel about any serious crimes you committed?

3   A.  Yes.

4   Q.  Which ones?

5   A.  Aiding and abetting of a murder.

6   Q.  Are you referring to the Darrel Ledgister murder that you

7   spoke about earlier?

8   A.  Yes.

9   Q.  And what did he say when you told him about that murder?

10  A.  To not tell anybody else because the murder wasn't on the

11  case.  That means they probably forgot.

12  Q.  At the time that you spoke about the Ledgister murder with

13  Rel in the box, had you been charged with the Ledgister murder?

14  A.  No.

15  Q.  Had others been charged with the Ledgister murder?

16  A.  Yes.

17          THE COURT:  Others had been charged.  So it was in

18  your indictment, but you weren't charged with it?

19          THE WITNESS:  Yes.

20          THE COURT:  So he was advising you to keep your mouth

21  shut so you didn't get added?

22          THE WITNESS:  Yes.

23          THE COURT:  OK.

24  BY MS. CASTELLANO:

25  Q.  Did you talk about the Noah murder while you were in the

H7jnbrah

1   box with Rel?

2   A.  Yes.

3   Q.  And did you discuss that once or more than once?

4   A.  More than once.

5   Q.  So did Rel tell you about what he was doing on the day of

6   the Noah murder before the murder?

7   A.  Yes.

8   Q.  What did he tell you he was doing that day before the

9   murder?

10  A.  Drinking and smoking.

11  Q.  Did he tell you who he was drinking and smoking with, if

12  anyone?

13  A.  Yes, Rel, Mel, Ant Flocka and others.

14  Q.  When you say Rel, are you referring to the other Rel that

15  we talked about before?

16  A.  Yes.

17  Q.  So Rel, the other Rel, Mel, Ant Flocka.  Anybody else?

18  A.  And Delly.

19  Q.  And Delly.

20          MS. CASTELLANO:  Mr. Pavlis, can you please publish

21  Government Exhibits 15, 16, 17 and 18.  15 previously

22  identified as Delly; 16 previously identified as Ant Flocka; 17

23  previously identified as the other Rel; and 18 previously

24  identified as Mel.

25  BY MS. CASTELLANO:

H7jnbrah

1   Q.   So Rel told you that he was with Delly, Ant Flocka, the

2   other Rel, and Mel drinking and smoking, is that correct?

3   A.   Yes.

4   Q.   Did he tell you where they were drinking and smoking?

5   A.   Six Third.

6   Q.   Is that the vicinity of 163rd Street and Morris?

7   A.   Yes.

8   Q.   Did he tell you about any conversations that those

9   individuals had while they were drinking and smoking before the

10  Noah murder?

11  A.   Yes.

12  Q.   What did he tell you?

13  A.   They was conversating about who put the most work in.

14  Q.   What did you understand put the most work in to refer to?

15  A.   Who caused the most violence.

16  Q.   Did he tell you how that conversation proceeded?

17          THE COURT:  Before you get to that, is this

18  specifically relative to the rivalry with the Courtlandt gang?

19          THE WITNESS:  No.

20          THE COURT:  Or just generally who did the most violent

21  activities.

22          THE WITNESS:  In general.

23          THE COURT:  OK.

24  BY MS. CASTELLANO:

25  Q.   Did he tell you any details about that conversation?

H7jnbrah

1    A.  Yes.

2    Q.  What did he tell you?

3    A.  It started off as a light conversation, and then, as they

4    started to get more intoxicated, it got a little more hostile.

5    Q.  Did he tell you what happened after they continued that

6    conversation and it got a little more hostile?

7    A.  Delly jumped up and said, Let's see who puts some work in

8    right now.

9    Q.  What happened next?

10   A.  They went to Courtlandt.

11   Q.  And did Rel describe to you what happened after Delly

12   said -- or after they proceeded to Courtlandt?

13   A.  Yes.

14   Q.  What did he tell you?

15   A.  They walked to Courtlandt.  They seen Noah and Polo sitting

16   on the bench.

17   Q.  When they saw Noah and Polo on the bench, were they facing

18   Noah and Polo or were they behind Noah and Polo?

19   A.  They was behind them.

20   Q.  What happened after they saw Noah and Polo on the bench?

21   A.  They was creeping up on them.  They hopped the gate,

22   started walking through the grass.  Noah and Polo was speaking.

23   Noah got up.  As he was talking, he got up and jumped off the

24   bench.  When he went to turn around, he seen them.

25   Q.  He saw who?

H7jnbrah

1   A.  He seen Delly and Rel.

2   Q.  OK.

3   A.  He told Polo.  They started to run.  As they started to

4   run, Noah broke his leg.  Polo kept running.  They caught Noah,

5   and they jumped him.

6   Q.  Who caught Noah?

7   A.  Delly, Rel, Mel, Ant Flocka, and the other Rel.

8   Q.  You said they jumped him?

9   A.  Yes.

10  Q.  Did Rel tell you what he did to Noah?

11  A.  Kicked him.

12  Q.  Did Rel tell you what he did to Polo, if anything?

13  A.  Not exactly.

14  Q.  Did he describe what happened to Polo?

15  A.  He said Polo came back and they also jumped him.

16  Q.  So first Polo ran away?

17  A.  Yes.

18  Q.  And then at some point he came back?

19  A.  Yes.

20  Q.  And that's when they jumped Polo?

21  A.  Yes.

22  Q.  Did Rel tell you what happened after they jumped Polo and

23  Noah?

24  A.  They walked down 151 and Morris and they proceeded to

25  Tykeem's house.

H7jnbrah

1    Q.  Did he tell you what happened at Tykeem's house?

2    A.  Delly got there and immediately started talking about the

3    murder.

4    Q.  Who was at Tykeem's house?

5    A.  Delly, Rel, the other Rel, Mel, and Ant Flocka.

6    Q.  Did Rel describe to you what Delly was saying at Tykeem's

7    house?

8    A.  He said they were saying that they thought they killed him,

9    and Delly was saying, No, I killed him.  I was the one stomping

10   on his head.  Y'all was just kicking him.

11   Q.  And what, if anything, did Rel say about what he thought

12   about Delly talking about the murder at Tykeem's house?

13   A.  He said he thought it was a bad idea.  He thought that

14   Tykeem would be the one to tell on him.

15   Q.  While you were in the box with Rel, did you ever discuss

16   discovery provided by the government with Rel?

17   A.  Yes.

18   Q.  Just taking a step back, Mr. Brooks, what is discovery?

19   A.  It's legal work you get from your lawyer provided by the

20   government.

21   Q.  Mr. Brooks, I am going to direct your attention to

22   Government Exhibit 34 and ask Mr. Pavlis to publish Government

23   Exhibit 34.

24        Mr. Brooks, taking a look at Government Exhibit 34, do

25   you recognize that document?

H7jnbrah

1    A.  Yes.

2    Q.  How do you recognize it?

3    A.  Rel showed me it in the box after the legal visit.

4    Q.  Did you and Rel have a conversation about this document

5    when you in the box?

6    A.  Yes.

7    Q.  Can you describe that conversation?

8    A.  He asked me which one I thought was him.  I picked the

9    wrong one.  He said, If you couldn't figure me out, how can

10   they figure me out.

11   Q.  Did he point out who -- let's take a step back.  Did Rel

12   tell you what this document is?

13   A.  Yes.

14   Q.  What is it?

15   A.  It was a picture from a security camera of them walking

16   down 151 and Morris.

17   Q.  Do you know what day it was from?

18   A.  The day of the death, the murder of Noah.

19   Q.  Do you know if it was before or after the murder of Noah?

20   A.  After.

21   Q.  And you testified that Rel asked you to see if you could

22   pick him out in the photo in Government Exhibit 34?

23   A.  Yes.

24   Q.  You testified you picked out the wrong person?

25   A.  Yes.

H7jnbrah

1    Q.  What did Rel say in response to that?

2    A.  If I couldn't pick him out, how could the government.

3    Q.  And how did that conversation continue?

4    A.  He pulled out another picture that he took on Facebook,

5    another discovery that he got from his lawyer.

6    Q.  What did he tell you about that picture?

7    A.  He said, This is how they know who I am in the wanted

8    picture.

9    Q.  Let me direct your attention to Government Exhibit 31.

10            Mr. Brooks, do you recognize Government Exhibit 31?

11   A.  Yes.

12   Q.  What is that?

13   A.  A Facebook picture.

14            THE COURT:  That is the picture that Rel told you came

15   off of his Facebook page?

16   A.  Yes.

17            THE COURT:  That was what was provided to him in

18   discovery?

19            THE WITNESS:  Yes.

20            MS. CASTELLANO:  Mr. Pavlis, can you publish 31 and 34

21   side by side, please.

22   BY MS. CASTELLANO:

23   Q.  Mr. Brooks, directing your attention to Government Exhibit

24   34, again on the screen, did Rel tell you where he was in the

25   photo in Government Exhibit 34?

H7jnbrah

1   A.  Yes.

2   Q.  How did he describe himself in that photo?

3   A.  White cargo pants.

4   Q.  Did he point himself out?

5   A.  Yes.

6   Q.  Where is he in the picture?

7   A.  In the bottom middle corner.

8          THE COURT:  With the white pants?

9          THE WITNESS:  Yes.

10          THE COURT:  OK.

11  BY MS. CASTELLANO:

12  Q.  Did you have any discussions with Rel about the others

13  depicted in that photograph in Government Exhibit 34?

14  A.  Yes.

15  Q.  What did Rel tell you about the others in the photo?

16  A.  He said the 40th precinct put possibly AI and possibly

17  McNabb.  They was thinking that McNabb was Donovan Reynolds.

18  His Facebook was Donovan McNabb at the time, but it was really

19  Ant Flocka.

20  Q.  Let's focus on that for a moment.  On the right side of

21  Government Exhibit 34 towards the top it's written "McNabb"

22  with question marks.

23          Do you see that?

24  A.  Yes.

25  Q.  Did Rel tell you who wrote that?

H7jnbrah

1   A.   The police at the precinct.

2   Q.   Did he tell you who they believed, who he believed that the

3   police thought was the person identified as McNabb?

4   A.   Donnie Gz.

5        THE COURT:   That's what Rel told you he thinks the

6   police thought?

7        THE WITNESS:   Yes.

8        THE COURT:   OK.

9   BY MS. CASTELLANO:

10  Q.   Did he tell you who that person identified by the police as

11  McNabb actually was?

12  A.   Yes.

13  Q.   Who did he tell you it was?

14  A.   Ant Flocka.

15  Q.   And now directing your attention to the left side of

16  Government Exhibit 34.   It says "AI possibly" with question

17  marks.

18       Do you see that?

19  A.   Yes.

20  Q.   What did Rel say about the "AI possibly" written on Exhibit

21  34?

22  A.   He said the police thought it was AI.

23  Q.   And did he say whether or not it was AI?

24  A.   Yes, he said it was Mel.

25       THE COURT:   Is AI somebody else?   That is a nickname

H7jnbrah

1     as well?

2              THE WITNESS:  Yes.

3              THE COURT:  OK.

4     BY MS. CASTELLANO:

5     Q.  Other than Mel and Ant Flocka, did Rel point out anybody

6     else in this photo?

7     A.  Yes, Delly.

8              THE COURT:  Which one is Delly?

9              THE WITNESS:  In the back.

10             THE COURT:  Again with sort of light colored pants?

11             THE WITNESS:  Yes.

12    BY MS. CASTELLANO:

13    Q.  On the left side of the photo?

14    A.  Yes.

15             THE COURT:  How far approximately was this from the

16    location where Noah was killed?

17             THE WITNESS:  A couple blocks down.

18    Q.  Mr. Brooks, do you know if Rel was familiar with the

19    discovery provided by the government in this case?

20             MR. KIRTON:  Objection.

21             THE COURT:  Overruled.

22    A.  Yes.

23    Q.  How do you know that?

24             MR. KIRTON:  As to his discovery, your Honor, there

25    are multiple defendants.  He couldn't possibly know about all

H7jnbrah

```
1    of the discovery of all of the defendants.

2              THE COURT:  I'm sorry.  I didn't --

3              MR. KIRTON:  I think the question was --

4              THE COURT:  Is he familiar with the discovery provided

5    by the government in this case.  That's the question.

6              MR. KIRTON:  And I object to that question.

7              THE COURT:  OK.  Overruled.

8    BY MS. CASTELLANO:

9    Q.  Mr. Brooks, how do you know that Rel was familiar with the

10   discovery provided by the government in this case?

11   A.  He went over it with his lawyer on legal visits.

12   Q.  Did he tell You that?

13   A.  Yes.

14   Q.  Did you discuss the discovery provided by the government

15   with Rel?

16   A.  Yes.

17              MR. KIRTON:  Objection.  Which discovery?

18              THE COURT:  That is what cross-examination is for.

19   You're welcome to explore it if it's important.

20              Overruled.

21              Remember, I am the trier of fact on this.  We don't

22   have a jury here.

23   Q.  Did you discuss the discovery related to the murder of

24   Noah?

25   A.  Yes.
```

H7jnbrah

1   Q.   Other than what we have already discussed concerning

2   Government Exhibits 31 and 34, what did you discuss with Rel

3   about the discovery related to the murder of Noah?

4           MR. KIRTON:   Objection as to relevance of this.   It is

5   a Fatico hearing as to what --

6           THE COURT:   This is all about the murder of Noah.

7           MR. KIRTON:   -- my client told this witness.

8           THE COURT:   It's precisely relevant.   We are having

9   the *Fatico* hearing because of a dispute about the Noah murder,

10  so I can't imagine why this is not relevant.

11          Overruled.   Go ahead.

12  A.   Can you repeat the question.

13  Q.   Yes, Mr. Brooks.   Other than what we've already discussed

14  about Government Exhibits 31 and 34, what did you discuss with

15  Rel about the discovery related to the murder of Noah?

16  A.   Oh, he said it was supposed to be charged as a manslaughter

17  because the news reports, everything, everything resulted to

18  manslaughter.   The newspaper article said Bronx beat down.

19          MR. KIRTON:   Your Honor, again I move to strike.   That

20  is not relevant to this proceeding.

21          THE COURT:   Overruled.

22          MR. KIRTON:   It is a legal opinion.

23          THE COURT:   It's fine.   Overruled.

24          So Rel told you that he thought if this murder was

25  ever charged it would have been charged as a manslaughter?

H7jnbrah

1            THE WITNESS:  Yes.

2            THE COURT:  Because that's how the news reported it?

3            THE WITNESS:  Yes.

4            THE COURT:  Do you understand the difference between

5    murder and manslaughter?

6            THE WITNESS:  Not really.

7            THE COURT:  Did he ever explain the difference.

8            I hope you were taking legal advice from your lawyer

9    and not from him.  But be that as it may.

10           Because no weapons were used?

11           THE WITNESS:  Yes.

12           THE COURT:  OK.

13           MR. KIRTON:  Your Honor, when my client is going over

14   the photo and says this is this person and not that person,

15   that is relevant.  Certainly, it is a factual observation.  But

16   his legal analysis of the case, what it should or should not

17   be, is not relevant in my view to this case.

18           THE COURT:  OK.  Overruled.

19   BY MS. CASTELLANO:

20   Q.  While you were in the box with Rel, Mr. Brooks, did you see

21   Rel review discovery?

22           THE COURT:  Did you have your legal papers with you in

23   the cell?

24           THE WITNESS:  Yes.

25           THE COURT:  Did he have his legal papers with him in

H7jnbrah

1    the cell?

2            THE WITNESS:  Yes.

3    BY MS. CASTELLANO:

4    Q.  While you were in the box, did you and Rel have any

5    discussions about who was cooperating in your case?

6    A.  Yes.

7    Q.  Who did you speak about?

8    A.  Tykeem Berry.

9    Q.  And --

10           THE COURT:  Is that the guy who they went to his house

11   right after the murder?

12           Was that the same person?

13           THE WITNESS:  Yes.

14           THE COURT:  So he was right?

15           THE WITNESS:  Yes.

16   BY MS. CASTELLANO:

17   Q.  Why did you speak about Tykeem Berry?

18   A.  Because we felt he was the one who started the whole case.

19   Q.  At the time that you and Rel were in the box together, did

20   you know if anybody who was involved in the murder of Noah was

21   cooperating?

22   A.  No.

23           THE COURT:  You didn't know, or did you know for sure

24   that they weren't?

25           THE WITNESS:  We didn't know at all.

H7jnbrah

1          THE COURT:  OK.

2     BY MS. CASTELLANO:

3     Q.  At that time when you were in the box with Rel, was Ant

4     Flocka arrested in this case?

5     A.  No.

6     Q.  What, if anything, did Rel say about Ant Flocka being

7     arrested?

8     A.  I hope he doesn't get caught because, he's going to tell.

9     He knew everything that went down the day of the robbery -- the

10    murder, because he was there.

11    Q.  Do you know if Rel was in contact with Ant Flocka while you

12    were in the box with Rel?

13    A.  Yes.

14    Q.  How do you know that?

15    A.  Through mail.

16    Q.  Excuse me?

17    A.  Through mail.

18    Q.  Through mail?

19    A.  Yes.

20    Q.  What do you mean?

21    A.  We received mail while we was in the box.  That was our

22    main source of communication to the outside world.

23          THE COURT:  So the punishment does not include being

24    cut off from mail?

25          THE WITNESS:  No.

H7jnbrah

1              THE COURT:  OK.

2    BY MS. CASTELLANO:

3    Q.  So through the mail how did you know that Rel was in

4    contact with Ant Flocka?

5    A.  He used to read the letters.

6    Q.  Rel used to read the letters?

7    A.  Yes.

8    Q.  And who were those letters from?

9    A.  Ant Flocka.

10   Q.  Did he tell you anything about those letters?

11   A.  He said he was just -- he was outside in the streets doing

12   the right thing.  He had a baby.  He was working.

13   Q.  That's what Rel told you about Ant Flocka?

14   A.  Yes.

15   Q.  Just going back for a second, Mr. Brooks, you testified

16   earlier that you didn't know if anybody involved in the Noah

17   murder was cooperating.

18              At the time you were in the box, did you believe that

19   anybody involved in the Noah murder was cooperating?

20   A.  No.

21              MR. KIRTON:  Objection.

22              THE COURT:  Overruled.

23   Q.  Mr. Brooks, did you ever discuss the Noah murder with

24   Delly?

25   A.  Yes.

H7jnbrah

1   Q.  When did you discuss the Noah murder with Delly?

2   A.  In unit 43.

3   Q.  What did Delly say about the Noah murder?

4          MR. KIRTON:  Objection.

5          THE COURT:  Overruled.

6   A.  He said that he was the one who actually killed him.

7   Q.  Did he say anything else?

8   A.  That he was just jumping up and down on his head, stomping

9   on his head with both feet while Rel and others just kicked

10   him.

11   Q.  Where were you -- excuse me.  You said where you were.

12          Was anybody else present for this conversation with

13   Delly?

14   A.  Rel.

15   Q.  Did Rel say anything in response to Delly's comments about

16   the Noah murder?

17   A.  Delly started laughing.  Rel started laughing.  He said,

18   See, that's the reason we in now, because you always opening

19   your mouth.

20          THE COURT:  I'm sorry.  Tell me that again.  Who said

21   that?

22          THE WITNESS:  Delly started laughing.  Then Rel

23   laughed and said, That's the reason we here now, because you

24   always open your mouth.

25          THE COURT:  Was that a reference to his belief that

H7jnbrah

1     Tykeem Berry was cooperating?

2              THE WITNESS:  Yes.

3     BY MS. CASTELLANO:

4     Q.  Mr. Brooks, was the Noah murder the only crime that Rel

5     told you about when were you in the box?

6     A.  No.

7     Q.  He told you about other crimes?

8     A.  Yes.

9     Q.  Are you willing to discuss those other crimes if defense

10    counsel or the judge has any questions?

11    A.  Yes.

12    Q.  Mr. Brooks, earlier I asked you if you recognized any

13    members of the Young Gunnaz in the courtroom and you identified

14    Rel?

15    A.  Yes.

16    Q.  Do you see any other members of the Young Gunnaz in the

17    courtroom today?

18              MR. KIRTON:  Objection.

19              THE COURT:  Overruled.

20    A.  No.

21    Q.  Can you see everybody in the back Mr. Brooks or do you need

22    to stand up?

23    A.  No.

24    Q.  Thank you, Mr. Brooks.

25              Mr. Brooks, earlier you testified that you were

H7jnbrah

1    arrested in June 2015, is that correct?

2    A.   Yes.

3    Q.   At some point after June 2015 did you decide to cooperate

4    with the government?

5    A.   Yes.

6    Q.   When did you decide to cooperate with the government?

7    A.   October 2016.

8    Q.   October 2016?

9    A.   Yes.

10   Q.   So over a year after you were arrested?

11   A.   Yes.

12   Q.   At the time that you decided to cooperate with the

13   government in October 2016, had you been charged in the

14   Ledgister murder?

15   A.   No.

16   Q.   As part of your cooperation agreement, did you plead guilty

17   to the Ledgister murder?

18   A.   Yes.

19   Q.   Mr. Brooks, have you been sentenced yet?

20   A.   No.

21   Q.   What is the maximum sentence that you face?

22   A.   Life.

23   Q.   What is the mandatory minimum sentence that you face?

24   A.   45 years.

25   Q.   When you pled guilty, do you recall signing a cooperation

H7jnbrah

1    agreement with the government?

2    A.  Yes.

3    Q.  I am going to show you what's been marked for

4    identification as Government Exhibit 35 and ask Mr. Pavlis to

5    publish that on the screens.

6          Mr. Brooks, taking a look at Government Exhibit 35, do

7    you recognize this document?

8    A.  Yes.

9    Q.  What is it?

10   A.  A cooperation agreement.

11   Q.  Mr. Pavlis, can you turn to the second-to-last page of

12   Government Exhibit 35 this page, please.  It is page 7.

13         Mr. Brooks, is your signature on this cooperation

14   agreement?

15   A.  Yes.

16   Q.  Is the signature of a representative of the Government on

17   this cooperation agreement?

18   A.  Yes.

19         MS. CASTELLANO:  Your Honor, the government offers

20   Government Exhibit 35.

21         THE COURT:  Any objection.

22         MR. KIRTON:  No objection.

23         THE COURT:  All right.  35 is received.

24         (Government's Exhibit 35 received in evidence)

25         MS. CASTELLANO:  Mr. Pavlis, can you turn to the last

H7jnbrah

1   page of Government Exhibit 35, please.

2   Q.  Mr. Brooks, taking a look at the last page of Government

3   Exhibit 35 --

4              THE COURT:  Can you reorient it.

5              Thank you.

6              MS. CASTELLANO:  Thank you, Mr. Pavlis.

7              THE COURT:  It is not up on his screen.

8              MS. CASTELLANO:  Oh.

9   Q.  Mr. Brooks, can you see the last page of Government Exhibit

10  35 now?

11  A.  No -- yes.

12             THE COURT:  There it is.

13             MS. CASTELLANO:  OK.

14  BY MS. CASTELLANO:

15  Q.  What is the last page of Government Exhibit 35?

16  A.  Different acts of violence I committed.

17  Q.  Are these acts of violence that you pled guilty to as part

18  of your cooperation agreement?

19  A.  Yes.

20  Q.  And are these in addition to the crimes that you listed

21  earlier at the beginning of your testimony?

22  A.  Yes.

23  Q.  Are you willing to discuss any of the crimes that you pled

24  guilty to as part of your cooperation agreement with the

25  government with the defense counsel or the judge if either has

H7jnbrah

1    questions?

2    A.   Yes.

3    Q.   Mr. Brooks, what is your understanding of what you have

4    agreed to do for government in this cooperation agreement?

5    A.   Tell them about all acts of violence I committed by myself

6    and with others and stay truthful.

7    Q.   Did you agree to testify in court?

8    A.   Yes.

9    Q.   Did you agree to meet with the government and answer

10   questions?

11   A.   Yes.

12   Q.   Did you also agree not to commit any additional crimes?

13   A.   Yes.

14   Q.   Is your testimony today part of your cooperation agreement

15   with the government?

16   A.   Yes.

17   Q.   So, Mr. Brooks, if you tell the truth, meet with the

18   government, testify, not commit any additional crimes, what is

19   your understanding of what the government will do for you?

20   A.   Grant me a 5K1 letter.

21   Q.   What is your understanding of the information contained in

22   a 5K1 letter?

23   A.   It tells about everything I've done for the government.

24   Q.   And who is a 5K1 letter sent to?

25   A.   My lawyer and the judge.

H7jnbrah

Q.   And what, if anything, does a 5K1 letter allow the judge to
do?

A.   Go under my mandatory minimum.

Q.   Mr. Brooks, have you been promised a reduced sentence?

A.   No.

Q.   What is your understanding of who will decide your
sentence?

A.   The judge.

Q.   Will the government recommend any sentence for you?

A.   No.

Q.   Have any promises been made to you by anyone about what
your sentence will be?

A.   No.

Q.   Do you hope to get a lower sentence because you cooperated
with the government?

A.   Yes.

Q.   If the government writes a 5K letter for you, what is the
least amount of jail time that you can be sentenced to?

A.   Time served.

Q.   Even if you get a 5K letter from the government, what is
the maximum sentence that you can receive?

A.   Life.

Q.   Mr. Brooks, does the outcome of this hearing today, whether
the government wins or loses, does that have any effect on
whether you will receive a 5K letter?

H7jnbrah

1    A.  No.

2    Q.  And does the outcome of the hearing today, whether the

3    government wins or loses, have any effect on the sentence you

4    will receive?

5    A.  No.

6                MS. CASTELLANO:  Your Honor, may I have just a quick

7    moment.

8                THE COURT:  Sure.

9    BY MS. CASTELLANO:

10   Q.  Mr. Brooks, finally, have you told us everything that you

11   know about the YGz today, or have you just answered the

12   questions that I've asked.

13   A.  I answered the questions you asked.

14               MS. CASTELLANO:  Your Honor, the only thing that I

15   don't think I did is offer Government Exhibit 30, which is the

16   map, into evidence.

17               THE COURT:  OK.  Any objection to 30?

18               MR. KIRTON:  No objection.

19               THE COURT:  30 is received.

20               (Government's Exhibit 30 received in evidence)

21               MS. CASTELLANO:  Thank you, your Honor.

22               No further questions.

23               THE COURT:  Why don't we take a brief break before we

24   start cross.  About how long do you think your cross is going

25   to be?  Who's crossing?

H7jnbrah

1          MR. KIRTON:  Less than an hour.

2          THE COURT:  OK.  Let's take about a five-minute break.

3          (Recess)

4          THE COURT:  OK.  Who is crossing?

5          Mr. Kirton?

6          MR. KIRTON:  I am, your Honor, but I think we have a

7     stipulation first.

8          MR. ENZER:  Your Honor, before the defense cross, we

9     want to make clear that the parties have agreed to make part of

10    the record the notes, the documents memorializing statements to

11    law enforcement by the individuals we have described as

12    witnesses 1, 2, 3, 4, and 5.  These are in the 3500 binder.

13          3502 is the 3500 for witness 1.

14          3503 is the 3500 for witness 2.

15          3504 is the 3500 for witness 3.

16          3505 is the 3500 for witness 4.

17          3506 is the 3500 for witness 5.

18          These are civilians, or in one instance, Polo, these

19    are statements these individuals made to police.  The

20    government is not calling them.  I don't think the defense is

21    calling them to save time.  But, just so the Court can consider

22    what these people told the police, we are agreeing to make that

23    part of the record.

24          THE COURT:  That's 3502 through 3505?

25          MS. CASTELLANO:  06.

H7jnbrah                          Brooks - cross

1              MR. ENZER:  06.

2              THE COURT:  06.

3              MR. ENZER:  Also, 3509 is a letter that the government

4    previously submitted to the Court.  It has a summary of

5    statements by a proffering defendant.

6              THE COURT:  Yes.

7              MR. ENZER:  The government is agreeing to make that

8    statement part of the record as well.

9              MR. KIRTON:  May I inquire, your Honor.

10             Your Honor, I handed up to the Court the witness as

11   well as the government a binder with defense exhibits.

12             THE COURT:  OK.

13             MR. KIRTON:  They are listed as 1 through 6.

14             THE COURT:  OK.

15             MR. KIRTON:  They are actually listed as to what they

16   actually are also.

17             THE COURT:  Got it.

18             MR. KIRTON:  May I inquire, your Honor?

19             THE COURT:  You may.

20   CROSS EXAMINATION

21   BY MR. KIRTON:

22   Q.  Good morning.

23   A.  Good morning.

24   Q.  Sir, can you just turn to that binder that you have.

25             If you could turn to 3, where it says plea agreement.

1    If you need to refresh your recollection, feel free to do so.

2              So, Mr. Brooks, you pled guilty in this case, is that

3    correct?

4    A.   Yes.

5    Q.   You pled guilty to three counts pursuant to the plea

6    agreement, is that right?

7    A.   Five counts.

8    Q.   Five counts.  Sorry.  Five counts.

9              Count One is a racketeering conspiracy, is that

10   correct?

11   A.   Yes.

12   Q.   And the maximum of that count is life in prison, is that

13   right?

14   A.   Yes.

15   Q.   And Count Two is participating in -- murder in aid of

16   racketeering as to Darrel Ledgister, is that right?

17   A.   Yes.

18   Q.   And the maximum sentence is life imprisonment, is that

19   correct?

20   A.   Yes.

21   Q.   Count Three is the drug conspiracy, is that correct?

22   A.   Yes.

23   Q.   And the maximum penalty for that charge is life in prison,

24   is that right?

25   A.   Yes.

1   Q.  And there is a mandatory minimum of ten years, is that

2   correct?

3   A.  Yes.

4   Q.  Just one moment.

5         Count Four is the firearms charge, carrying a firearm

6   in relation to a crime of violence, is that correct?

7   A.  Yes.

8   Q.  And that charge carries a ten-year mandatory minimum, is

9   that correct?

10  A.  Yes.

11  Q.  And a maximum of life in prison, is that right?

12  A.  Yes.

13  Q.  And that sentence, that particular count is to run

14  consecutive to any other term of imprisonment, is that right?

15  A.  Yes.

16  Q.  Added on top of whatever you get in another count, is that

17  right?

18  A.  Yes.

19  Q.  And, lastly, Count Five is also a firearms count in

20  relation to a crime of violence.  That has a 25-year

21  consecutive sentence, is that right?

22  A.  Yes.

23  Q.  So you are actually facing a mandatory minimum of 45 years,

24  is that right?

25  A.  Yes.

H7jnbrah                        Brooks - cross

1   Q.  And a maximum of life?

2   A.  Yes.

3   Q.  Now, you don't want to go to jail for 45 years, is that

4   right?

5   A.  No.

6   Q.  In fact, you want to have something called a 5K letter, is

7   that right?

8   A.  Yes.

9   Q.  What is a 5K letter?

10  A.  It is a letter provided by the government that shows that

11  they can go under my mandatory minimum.

12  Q.  You have been in jail in this case since 2015, is that

13  correct?

14  A.  Yes.

15  Q.  So, whenever you get sentenced, whenever that is, you would

16  like to get, if possible, time served, is that right?

17  A.  Yes.

18  Q.  You can get as little as time served, is that right?

19  A.  Yes.

20  Q.  Not 45 years?

21  A.  Yes.

22  Q.  Now, also --

23          MR. KIRTON:  If you could bring up Government Exhibit

24  35, the last page.

25  Q.  There were also some other things that you did in your

1    past.  Do you have that in front of you?  Is that under Exhibit

2    A?

3    A.  Yes.

4    Q.  These are crimes that are not federal crimes, is that

5    right?

6    A.  No.

7    Q.  You are not being charged with any of these offenses, is

8    that right?

9    A.  Yes.  They are under the racketeering law.

10   Q.  So these are things that you told the government about, is

11   that correct?

12   A.  Yes.

13   Q.  During the course of your cooperation?

14   A.  Yes.

15   Q.  Now, as you look at 1 through 11, if you look at No. 11

16   where it says street robberies, including robberies of

17   pedestrians of phones, jewelry, coats, and other property,

18   isn't it true that none of those offenses were committed with

19   Mr. Bracy?  Is that right?

20   A.  Yes.

21   Q.  You yourself, you actually did rob people, and you were a

22   chain snatcher, is that correct?

23   A.  Yes.

24   Q.  In fact, you've done that numerous times, is that right?

25   A.  Yes.

H7jnbrah                           Brooks - cross

1  Q.  What exactly is a chain snatcher?  What did you actually

2  do?

3  A.  Snatched chains off people's necks and run.

4  Q.  What did you do with the chain?  You didn't wear it, you

5  sold it; is that right?

6  A.  Yes.

7  Q.  So you actually knew where to sell -- bring stolen items to

8  be brought in and to get money for it, is that right?

9  A.  Yes.

10  Q.  You call those people fences, is that right?

11  A.  I don't know.

12  Q.  What did you call them?

13  A.  Pawnshops.

14  Q.  Pawnshops.  OK.  So you took somebody else's property and

15  you pawned it for money, is that right?

16  A.  Yes.

17  Q.  And used that money on whatever you wanted to use it on?

18  A.  Yes.

19  Q.  In fact, did you ever work?

20  A.  No.

21  Q.  You never had a real job?

22  A.  One time.

23  Q.  One time?

24  A.  Yes.

25  Q.  Did you pay taxes?

H7jnbrah                        Brooks - cross

1    A.  Yes.

2    Q.  You filed taxes?

3    A.  Yes.

4    Q.  You filed a tax return?

5    A.  Yes.

6    Q.  How many years?

7    A.  I can't remember.

8    Q.  You are 25 years old now?

9    A.  Yes.

10   Q.  And you had one job?

11   A.  Yes.

12   Q.  One regular job, is that right?

13   A.  Yes.

14   Q.  You said you filed taxes once, but you don't recall what

15   year that was?

16   A.  Yes.

17   Q.  And, again, when you brought these items in to be sold, did

18   you bring them to Mr. Bracy to give you money for them?

19   A.  No.

20   Q.  You knew where to go, is that right?

21   A.  Yes.

22   Q.  You can put that down.  You talked about your relationship

23   with Mr. Bracy.  Had you ever met his mother?

24   A.  Yes.

25   Q.  You have been to his home?

H7jnbrah                         Brooks - cross

1   A.  No.

2   Q.  You met his son?

3   A.  No.

4   Q.  Did you ever take any photos with him and post them on

5   social media?

6   A.  No.

7   Q.  In fact, let's take a look at that exhibit again.  Turn to

8   page 1, section 1.

9            THE COURT:  Page 1 of the plea agreement?

10            MR. KIRTON:  No.  The photo.  The defense exhibits.

11            THE COURT:  Exhibit 1?

12            MR. KIRTON:  Exhibit 1.

13   BY MR. KIRTON:

14   Q.  Do you recognize that Exhibit 1?

15   A.  Yes.

16   Q.  What do you recognize that to be?

17   A.  A picture of Noah.

18   Q.  OK.  And what is he doing?

19   A.  Throwing up a YGK.

20   Q.  Is that a gang sign?

21            THE COURT:  Throwing up a YG?

22            THE WITNESS:  A gang sign.  He's shooting a YG sign.

23            THE COURT:  OK.

24   Q.  So the shooting means what?  It means that --

25   A.  Kill.

H7jnbrah                    Brooks - cross

1   Q.  Kill YG?

2   A.  Yeah.

3   Q.  So you recognize that to be Noah, is that correct?

4   A.  Yes.

5   Q.  Does that fairly and accurately depict how he appeared when

6   you knew him?

7   A.  Yes.

8           MR. KIRTON:  At this time I offer I defense, I guess A

9   in evidence.

10          THE COURT:  Any objection?

11          MS. CASTELLANO:  No, your Honor.

12          THE COURT:  Defense A is received.

13          (Defendant's Exhibit A received in evidence)

14  BY MR. KIRTON:

15  Q.  Also take a look at the next tab, which is tab 2.

16          Mr. Brooks, do you recognize that?

17  A.  Yes.

18  Q.  What do you recognize that to be?

19  A.  Another picture of Noah.

20  Q.  And are there other people in the photo?

21  A.  Yes.

22  Q.  Who are those other people in the photo?

23  A.  It is a friend.  I can't make their face out.

24  Q.  What is he doing with his hands?

25  A.  Throwing up a YGK again.

H7jnbrah                    Brooks – cross

1    Q.  Kill YG?

2    A.  Yes.

3    Q.  Does that fairly and accurately depict how Noah appeared

4    when you knew him?

5    A.  Yes.

6           MR. KIRTON:  At this time I offer Defense Exhibit B,

7    which is section 2 for identification, into evidence.

8           THE COURT:  Any objection?

9           MS. CASTELLANO:  No objection.

10          THE COURT:  It is received.

11          (Defendant's Exhibit B received in evidence)

12          THE COURT:  Do you know what Noah has around his neck?

13          THE WITNESS:  A rest in peace photo.

14          THE COURT:  OK.

15   BY MR. KIRTON:

16   Q.  So these photos show Noah with another person and Noah with

17   members of YGz, but you never took photos like these with

18   Mr. Bracy, is that correct?

19   A.  No.

20          THE COURT:  Are any of these people YGz?

21          THE WITNESS:  No.

22   BY MR. KIRTON:

23   Q.  Now, you claim that you have had weekly conversations,

24   meetings with Mr. Bracy for about five years, is that right?

25   A.  Yes.

H7jnbrah                          Brooks - cross

1   Q.  From 2010 until 2015, is that right?

2   A.  Yes.

3   Q.  And you have never taken any photos with him, is that

4   correct?

5   A.  As I recall, yes.

6   Q.  And those robberies that you were committing, you never

7   committed any of those robberies with Mr. Bracy, is that right?

8   A.  No, not at all.

9   Q.  So let's talk about the Darrel Ledgister murder.  That took

10  place on June 27, 2009, is that right?

11  A.  Yes.

12  Q.  Now, according to your testimony, you were the lookout --

13  A.  Yes.

14  Q.  -- for that?

15          Now, you testified that the person Mr. Ledgister and

16  the other people had large gold chains on, is that right?

17  A.  Yes.

18  Q.  The kinds of chains that you --

19  A.  Snatched.

20  Q.  -- had been taking and snatching, is that right?

21  A.  Yes.

22  Q.  You have done that maybe hundreds of times between the time

23  you were maybe 16 and this date, June 27, 2009, is that right?

24  A.  Yes.

25  Q.  But it is your testimony that you didn't have a gun that

H7jnbrah                         Brooks - cross

1   day --

2   A.  Yes.

3   Q.  -- is that right?

4           It is your testimony that you, the person who was

5   probably -- would you consider yourself to be an expert in

6   chain snatching?

7   A.  Yes.

8   Q.  You were on that occasion not engaged in snatching a chain.

9   You were just a lookout.  Is that right?

10  A.  Yes.

11  Q.  That is truthful testimony, is that right?

12  A.  Correct.

13  Q.  And it is your testimony you never touched the guy, you

14  never touched Mr. Ledgister, is that right?

15  A.  Yes.

16  Q.  Never shot at him?

17  A.  No.

18  Q.  Never punched at him?

19  A.  No.

20  Q.  Never tried to restrain him in any way?

21  A.  No.

22  Q.  Isn't it true that -- is it Swani?

23  A.  Swani.

24  Q.  Swani was standing in front of the car with a gun or

25  blocking the car as they were trying to pull off?

H7jnbrah                          Brooks - cross

1   A.   Yes.

2   Q.   And Tyson --

3            Is that his name?   Tykeem or Tyson?

4   A.   Tyson.

5   Q.   -- was shooting, shot them, is that correct?

6   A.   Yes.

7   Q.   You testified that he put his gun through the window and

8   demanded the chain of Mr. Ledgister, is that correct?

9   A.   Yes.

10  Q.   And there was a struggle with the firearm?

11  A.   Yes.

12  Q.   Isn't it true, sir, that you have had meetings with the

13  government, is that right?

14  A.   Yes.

15  Q.   And you've talked to the government about different things

16  that you've done, different things that you've observed, is

17  that correct?

18  A.   Yes.

19  Q.   Isn't it true, sir, that you told them that Tyson was

20  shooting through the window, shooting window by window at the

21  car, in other words he shot through the front window, shot

22  through the back window several times, is that right?

23  A.   Yes.

24  Q.   There was no mention of him struggling with the gun in

25  those interviews, is that right?

H7jnbrah                        Brooks - cross

1   A.  I don't recall.

2   Q.  OK.  Just one moment.

3           MR. KIRTON:  I am going to have you look at 3501-2.

4   This is part of the government's 3500 material.  It's actually

5   starting at page No. 6.

6           THE COURT:  3501-6.

7           MR. KIRTON:  No.  3501-2.

8           THE COURT:  Dash 2.

9           MR. KIRTON:  Which is the interview on 10/27/2016.

10          THE COURT:  What page?

11          MR. KIRTON:  Page 6.  It is the last paragraph.

12          Can I approach the witness, your Honor.

13          THE COURT:  It says "DB Notice 3" at the top of the

14  page?

15          MR. KIRTON:  Yes.

16          THE COURT:  OK.

17          MR. KIRTON:  If the witness could -- may I approach

18  the witness?

19          THE COURT:  You're welcome to, if he can read

20  Mr. Enzer's chicken scratch.

21          MR. ENZER:  This is not my chicken scratch.

22          THE COURT:  OK.

23          MR. ENZER:  It's Detective Jared Tepperman's chicken

24  scratch, who is sitting there.

25          THE COURT:  It is a detective's chicken scratch.

H7jnbrah                     Brooks - cross

1   Apparently they are not issuing typewriters anymore.

2   BY MR. KIRTON:

3   Q.  Take a look at the last paragraph and read the last

4   paragraph to yourself.  The question is whether or not you

5   recall saying to the government at this meeting that Tyson was

6   shooting through window by window and there was no mention of

7   Ledgister grabbing the gun.  Just take a look at that

8   paragraph.

9   A.  Yes.

10  Q.  All right.  So does that refresh your recollection,

11  Mr. Brooks?

12  A.  Yes.

13  Q.  So, again, isn't it true that during that particular

14  meeting you never mentioned that Mr. Ledgister tried to grab

15  the gun?

16  A.  I mentioned it, but he's human.  They make mistakes.  He

17  probably didn't write it down.

18  Q.  I am just saying it's not written down there, is that

19  right?

20  A.  No.

21  Q.  Prior to June 27, 2009, how many chain snatching robberies

22  had you done prior to that?

23  A.  Over a hundred.

24  Q.  Over a hundred.

25            Now, one of the things that you are not supposed to do

1     pursuant to this cooperation agreement is you are not supposed

2     to lie, is that right?

3     A.  Correct.

4     Q.  In other words, you are not supposed to even minimize what

5     you did, is that right?

6     A.  Correct.

7     Q.  So, if you shot a guy and you said you were standing by

8     while a guy was shot, that would be a lie, is that right?

9     A.  Definitely.

10    Q.  So if the group you know did something, and you claim that

11    you were not physically participating in that act, but you

12    were, that would also be a lie, is that right?

13    A.  Yes.

14    Q.  So, given the fact that you are an expert chain snatcher

15    and Mr. Ledgister was reported to be the victim of a chain

16    snatching, is it your testimony that you did nothing --

17    A.  Yes.

18    Q.  -- physical to Mr. Ledgister?  Is that right?

19    A.  Yes.

20    Q.  You were just a lookout that day, is that right?

21    A.  Yes.

22    Q.  That's truthful testimony?

23    A.  Correct.

24    Q.  You are not minimizing anything?

25    A.  Not at all.

H7jnbrah                          Brooks - cross

1   Q.   Now, prior to this date, June 27, 2009, had you ever had a

2   gun?

3   A.   Yes.

4   Q.   How many times had you had a gun?

5   A.   A couple times.  I can't recall.

6   Q.   Have you ever had a knife?

7   A.   Yes.

8   Q.   So you have had a gun and you had a knife before this date,

9   is that right?

10  A.   Yes.

11  Q.   Yet you never touched the guy, and you were the lookout, is

12  that right?

13  A.   Yes.

14  Q.   And your nickname.  One of your nicknames is Dolla.  Is

15  that D-o-l-l-a?

16  A.   Yes.

17  Q.   Dolla like dollar bill?  Like money?

18  A.   Yes.

19  Q.   In other words, you're known for making money, is that

20  right?

21  A.   Yes.

22  Q.   At least amongst the groups of guys that you hang out with

23  in Mott Haven and other areas, is that right?

24  A.   Yes.

25  Q.   And you are called Dolla in part because of the robberies

1    and the chain snatchings that you commit, is that right?

2    A.  No.

3    Q.  No?

4    A.  No.

5    Q.  Is it other crimes that you commit that makes you have this

6    nickname as Dolla?

7    A.  No, it was just a nickname that I made.

8    Q.  Does Dolla mean -- does it mean getting paid?

9    A.  No.  It's just a nickname.

10   Q.  Just a name.  It has nothing to do with money or getting

11   paid?

12   A.  No.

13   Q.  Or the ability to make money?

14   A.  Just a nickname.

15   Q.  Just a name.

16          So you said you are not sure if you paid taxes.

17          Do you pay rent?

18   A.  No.

19   Q.  Do you pay child support through the courts?

20   A.  No.

21   Q.  Do you have any children?

22   A.  Yes.

23   Q.  Do you pay child support --

24   A.  No.

25   Q.  -- to the mom?

H7jnbrah                        Brooks - cross

1    A.  No.

2    Q.  Do you have any skills, like plumbing, carpentry, HVAC?

3    A.  No.

4    Q.  So the skill that you have is robbing people of their

5    chains?

6    A.  Yes.

7    Q.  One of them anyway?

8    A.  Yes.

9    Q.  The other is selling drugs?

10   A.  Yes.

11   Q.  But the name Dolla has nothing to do with the ability to

12   make money?

13   A.  No.

14   Q.  OK.  So let's talk about the assault and murder of Noah.

15            It is your testimony that Mr. Bracy and others wanted

16   you to go with them to put in work, is that right?

17   A.  That Delly.

18   Q.  He was there?

19   A.  Yes.

20   Q.  Bracy was there.  Delly was -- they wanted you to put in

21   work with them?

22   A.  Yes.

23   Q.  This man that you never did any robberies with before

24   wanted you to do work with him that particular day, is that

25   right?

1    A.  Correct.

2    Q.  That is a true statement?

3    A.  Correct.

4    Q.  He's been to your place?

5    A.  Yes.

6    Q.  -- Mr. Bracy, in your apartment?

7    A.  Correct.

8    Q.  He's been to your apartment?

9    A.  Correct.

10   Q.  And he came that day so that you can go with him to do

11   work?

12   A.  Correct.

13   Q.  And you declined?

14   A.  Yes.

15   Q.  You are a member of the gang, is that right?

16   A.  Yes.

17   Q.  I mean, were you physically incapacitated?  Was something

18   wrong with your body that you weren't able to go?

19   A.  No.

20   Q.  You were busy?  You were doing other things?

21   A.  Yes.

22   Q.  It's OK for gang members to just say, OK, I'm not going to

23   do it this time?

24   A.  Correct.

25   Q.  So, if the people agree to put in work and they ask you to

H7jnbrah                    Brooks - cross

1    go with them, you could just say, no, I don't feel like it?

2    A.  Correct.

3    Q.  And that's fine?

4    A.  Correct.

5    Q.  So, as they were going, they knocked on your -- I'm sorry.

6    Did somebody come to your apartment and ring your doorbell and

7    knock on your door?  How did they communicate with you?

8    A.  Screamed my name from downstairs to the window.

9    Q.  And they knew you were home?

10   A.  They didn't know I was home, but I was home.

11   Q.  And you stuck your head out and you they said what to you?

12        Who said what to you when you stuck your head out the

13   winnow?

14        Did you stick your head out the window?

15   A.  Yes.

16   Q.  Did you hear what they were saying?

17   A.  Yes.

18   Q.  What were they saying to you?

19   A.  Delly said come with us to Courtlandt to put in work.

20   Q.  I'm sorry.  He's saying this in public?

21   A.  Yes.

22   Q.  I am going to do an activity for the gang and he's saying

23   this out in public not only for you, but other people could

24   hear it possibly, is that right?

25   A.  Correct.

H7jnbrah                          Brooks - cross

Q.  Because you are not on the first floor?

A.  Correct.

Q.  I am not going to ask you what floor you were on.  It is

not really important.

        THE COURT:  He's already testified he was on the fifth

floor.

Q.  OK.  So he said that to you, and you said what?

A.  I didn't say nothing.  I pushed back from the window.  I

looked at my female friend.  She said not to go.  I never went

back to the window.

Q.  And that's it?

A.  Yes.

Q.  So it's your testimony that you were not present at the

time that Noah was assaulted and murdered, is that right?

A.  Correct.

Q.  It is also your testimony that Mr. Bracy confessed to you

about this incident in detail, is that right?

A.  Correct.

Q.  Of course, you didn't tape any of these conversations that

took place at the SHU --

A.  No.

Q.  -- right?

        You didn't write down exactly what was said right

after he said it to you on a notepad or anything like that?

A.  No.

H7jnbrah                    Brooks - cross

1   Q.  You never sent an e-mail to anyone at all the same day just

2   to memorialize this conversation?

3   A.  No.

4   Q.  So we have to rely on what you are saying today?

5   A.  Yes.

6   Q.  That's the only record that we have, is your testimony and

7   your conversations with the government previously, is that

8   right?

9   A.  Yes.

10  Q.  This is also not something that came up in every meeting

11  that you had with the government, is that right?

12  A.  Yes.

13  Q.  It kind of came up later on, is that right?

14  A.  Yes.

15  Q.  For example, you were shown a number of photos by the

16  government in these meetings, is that right?

17  A.  Yes.

18  Q.  You talked about the people in the photos, whether or not

19  you recognized them or not, is that right?

20  A.  Yes.

21  Q.  And you talked about whether or not those people were

22  shooters or involved in murders and things like that, is that

23  right?

24  A.  Yes.

25  Q.  Sometimes it was a shooter no, murder yes, is that right?

H7jnbrah                       Brooks - cross

1   A.  Yes.

2   Q.  Drugs yes, drugs no?

3   A.  Yes.

4   Q.  It wasn't until later on, two months into these meetings

5   that you told the government this story about this confession

6   from Mr. Bracy to you, is that right?

7   A.  I spoke about it the first meeting.

8   Q.  You spoke about it the first meeting that he said that I

9   kicked Lora?

10  A.  No.

11  Q.  OK.  So, Mr. Brooks, it is your testimony that you were

12  going through at some point discovery with Mr. Bracy?

13  A.  Yes.

14  Q.  And he was telling you all these things about his case and

15  about other people's cases and things like that, is that right?

16  A.  His case.

17  Q.  He talked about other people also, like this is this person

18  in this photo, this is --

19  A.  Yes.

20  Q.  Yeah, right.

21       So all this came out during your conversations with

22  Mr. Bracy, is that right?

23  A.  Yes.

24  Q.  You told him about all the things that you were involved

25  with, is that right?

1   A.  Yes.

2   Q.  All of them?

3   A.  Not everything.

4   Q.  So you held something back?

5   A.  Of course.

6   Q.  You held some stuff back, right?

7   A.  Yes.

8   Q.  Why is that?

9   A.  It wasn't that much to tell.  He didn't tell me everything

10  he'd done.

11  Q.  Did you know him well enough to tell him everything?

12  A.  Yeah.

13  Q.  But you didn't tell him everything?

14  A.  No.

15  Q.  But he told you this really, really major important thing.

16  He told it to you.  Is that right?

17  A.  Yes.

18  Q.  Now, you talked about an assault that took place at the MDC

19  in January of 2016, is that right?

20  A.  Yes.

21  Q.  Now, you were at the unit at the MDC on June 30, about June

22  30, 2016, is that right?

23  A.  Yes.

24  Q.  It is your testimony that Mr. Bracy came into that unit

25  about January of 2016, is that right?

H7jnbrah                          Brooks - cross

1    A.  Yes.

2    Q.  And the assault took place?

3            THE COURT:  I'm sorry.  I think you misspoke.

4            He got into the unit in 2015.

5            MR. KIRTON:  I'm sorry.

6            THE COURT:  June 2015.

7    BY MR. KIRTON:

8    Q.  You got into that unit June 2015, is that right?

9    A.  Yes.

10   Q.  And Mr. Bracy came into the unit in January of 2016, is

11   that right?

12   A.  Correct.

13   Q.  And the assault took place later on that month, is that

14   right?

15   A.  Correct.

16   Q.  And you started to cooperate in October of 2016, is that

17   right?

18   A.  Correct.

19   Q.  You also talked about a shooting that took place on June

20   21, 2011, is that right, involving Noah?

21   A.  January 21, 2011.

22   Q.  January 21, 2011?

23   A.  Yes.

24   Q.  That was a shooting at the chicken spot, is that correct?

25   A.  Yes.

H7jnbrah                    Brooks - cross

1   Q.  And you told Juice to shoot at Noah, is that right?

2   A.  Yes.

3   Q.  But he was not hit, is that correct?

4   A.  Correct.

5   Q.  Why did you tell him to shoot at Noah?

6   A.  Because they was rival gang members, and they kept coming

7   towards us.

8   Q.  Did you have the gun that day?

9   A.  No.

10  Q.  Juice had the gun that day?

11  A.  Yes.

12  Q.  How did he get the gun?

13  A.  He had it from when we left the block.

14  Q.  You knew that?

15  A.  Yes.

16  Q.  And during the robbery of Mr. Ledgister, you said that

17  there was a plan to rob him and other people got the guns, is

18  that right?

19  A.  Yes.

20  Q.  Didn't Ramel Matthews, isn't he the one who organized

21  getting the guns that day?

22  A.  Yes.

23  Q.  He also wanted part of the proceeds if you guys were

24  successful?  That's why he stood far off?

25  A.  Yes.

H7jnbrah                    Brooks – redirect

1   Q.  But, again, you never engaged in any robberies with or

2   shootings with Mr. Bracy, is that right?

3   A.  Yes.

4            MR. KIRTON:  Just one moment, your Honor.

5            No further questions, your Honor.

6            THE COURT:  OK.

7            MR. DuBOULAY:  Judge, we may have one moment, please.

8            THE COURT:  Sure.

9            MR. KIRTON:  No further questions.

10           THE COURT:  OK.

11           Ms. Castellano?

12           MS. CASTELLANO:  Yes, your Honor.  Just briefly.

13  REDIRECT EXAMINATION

14  BY MS. CASTELLANO:

15  Q.  Mr. Brooks, do you recall just moments ago when defense

16  counsel asked you about your participation in the murder of

17  Darrel Ledgister?

18  A.  Yes.

19  Q.  And do you remember questions about whether you mentioned

20  to the government the struggle that ensued between Tyson and

21  the victim?

22  A.  Yes.

23  Q.  Do you remember defense counsel directing you to notes of a

24  meeting that you had with the government?

25  A.  Yes.

H7jnbrah                    Brooks – redirect

1    Q.  And he asked you to read a certain portion of those notes?

2    A.  Yes.

3    Q.  And in the portion that he asked you to read, you testified

4    that there was no written documentation of that struggle, is

5    that correct?

6    A.  Yes.

7    Q.  I am going to direct your attention to that same set of

8    notes, so that's 3501-2, and I'm going to direct your attention

9    to page 8 of that set of notes.

10            MS. CASTELLANO:  Your Honor, may I approach and show

11   the witness?

12            THE COURT:  Yes.

13   Q.  I will ask you to read the bottom of page 8.

14            Your Honor, at the top of the page it says --

15            THE COURT:  I got it.

16            MS. CASTELLANO:  OK.

17   Q.  Just to yourself those paragraphs towards the bottom of

18   page 8, starting with the third paragraph from the bottom?

19   A.  Yes.

20   Q.  Does that refresh your recollection of whether or not you

21   discussed the struggle over the gun between Tyson and the

22   victim --

23   A.  Yes.

24   Q.  -- during that proffer session?

25   A.  Yes.

1   Q.  Did you discuss that with the government?

2   A.  Yes.

3            MS. CASTELLANO:  Thank you, your Honor.

4            Actually, you can hold that up there.

5   BY MS. CASTELLANO:

6   Q.  Mr. Brooks, do you recall defense counsel just asking you

7   whether you memorialized any of the conversations that you had

8   with Rel while you were in the box?

9   A.  Memorized?

10  Q.  Wrote down conversations that you had of what Rel told you

11  when you were in the box together?

12  A.  Yes.

13  Q.  Did you do that?

14  A.  No.

15  Q.  Did you write any e-mails?

16  A.  No.

17  Q.  But you talked about it with the government, right?

18  A.  Yes.

19  Q.  And you testified truthfully to it earlier?

20  A.  Yes.

21  Q.  Is it possible that your memory about what Rel told you in

22  the box is wrong?

23  A.  Yes.

24  Q.  How many times did you discuss the Noah murder with Rel in

25  the box?

H7jnbrah                    Brooks - redirect

1    A.  Several occasions.

2    Q.  About how many?

3    A.  Five, ten times.

4    Q.  Is it possible that your memory about what Rel told you

5    about the Noah murder is wrong?

6    A.  Not really.

7    Q.  Why not?

8    A.  We spoke about it too many times.

9    Q.  You remember --

10         THE COURT:  Did he consistently tell you that he had

11   kicked Noah?

12         THE WITNESS:  Yes.

13         THE COURT:  Did he ever tell you that his only

14   involvement was punching Polo?

15         THE WITNESS:  No.

16   BY MS. CASTELLANO:

17   Q.  You testified that you began cooperating with the

18   government in October of 2016, correct?

19   A.  Yes.

20   Q.  And at your first meeting with the government did you tell

21   the government about the Noah murder?

22   A.  Yes.

23   Q.  And you met with the government a number of times, correct?

24   A.  Yes.

25   Q.  And did the government's questions about the Noah murder

1  get more specific over time?

2  A.  Yes.

3  Q.  Did the government ask you questions about different

4  defendants' roles in the Noah murder over time?

5  A.  Yes.

6  Q.  I am going to direct your attention now –- I should ask.

7  Do you remember exactly what you said to the government at

8  every meeting that you had with the government?

9  A.  No.

10  Q.  Would reviewing the notes from those meetings refresh your

11  recollection?

12  A.  Yes.

13  Q.  I am now going to direct your attention to what's marked

14  3501-4 and to page 10 of 3501-4.

15          MS. CASTELLANO:  Your Honor, may I approach to just

16  help Mr. Brooks with that?

17          THE COURT:  Yes.

18          MS. CASTELLANO:  Thank you.

19          THE COURT:  The tenth page did you say?

20          MS. CASTELLANO:  Yes.

21  BY MR. KIRTON:

22  Q.  First I will just direct your attention to –- I apologize,

23  3501-4 the first page.  Does this refresh your recollection of

24  a date in December that you met with the government, looking at

25  the top right of that page?

H7jnbrah                     Brooks - redirect

1           THE COURT:  The question is does it refresh your

2      recollection.

3           Do you have any idea what dates you met with the

4      government?

5           THE WITNESS:  No.

6      BY MS. CASTELLANO:

7      Q.  Looking at that first page, does that refresh year

8      recollection of a date that you met with the government?

9           THE COURT:  He just said he doesn't know what date he

10     met with you.

11          MS. CASTELLANO:  OK.

12          THE COURT:  These are December notes.

13          MS. CASTELLANO:  OK.  We are going to look at page 10.

14     BY MS. CASTELLANO:

15     Q.  I am going to direct your attention to the bottom of page

16     10.  If you could read that.

17          THE COURT:  This is the page that starts at the top

18     "when in box"?

19          MS. CASTELLANO:  Yes.

20     BY MS. CASTELLANO:

21     Q.  If you could start from the middle of that page and read

22     down.

23     A.  Read it out loud?

24     Q.  Read it to yourself and look up when you're done reading

25     it.  Have you read that, Mr. Brooks?

1    A.  Yes.

2    Q.  Does this refresh your recollection of what you discussed,

3    Rel's role of kicking Noah with the government during this

4    meeting?

5    A.  Yes.

6    Q.  Did you discuss Rel's role of kicking Noah during that

7    meeting?

8    A.  Yes.

9              MS. CASTELLANO:  One moment, your Honor.

10             THE COURT:  Sure.

11             MS. CASTELLANO:  No further questions, your Honor.

12             THE COURT:  OK.

13             Any recross?

14             MR. KIRTON:  Briefly.

15   RECROSS EXAMINATION

16   BY MR. KIRTON:

17   Q.  3501-4, if you look at the first page, you have page 1 of

18   that document, 3501-4?

19   A.  I don't.

20             THE COURT:  Here.

21   Q.  The date on top of that is -- was the date on that

22   12/12/2016?

23   A.  Yes.

24   Q.  This meeting that took place, were you aware that there was

25   a trial date set for Mr. Bracy in January?

1    A.  Yes.

2    Q.  For January 2017?

3    A.  Yes.

4    Q.  So this meeting took place within a month of Mr. Bracy's

5    trial date, is that right?

6    A.  Yes.

7    Q.  All of the details regarding him stepping on and kicking

8    Noah were in this particular debriefing, is that right?  What

9    you just read on page 10 about the kicking and --

10   A.  Yes.

11   Q.  -- things like that.

12          But this was not in the earlier debriefings in

13   October, is that right?

14   A.  Yes.

15   Q.  That type of detail, is that right?

16   A.  Yes.

17   Q.  Now, again, you really wanted to get -- you really want to

18   get a 5K letter, is that right?

19   A.  Yes.

20   Q.  So this type of detail was not in the first sets of

21   debriefings, but they are in this debriefing, is that right?

22   A.  Yes.

23   Q.  Now, you are having conversations with them about Mr. Bracy

24   specifically, is that right?

25   A.  Yes.

H7jnbrah                        Brooks - recross

1   Q.  You're preparing to testify against Mr. Bracy at his trial,

2   is that right?

3   A.  Yes.

4   Q.  And you want to get a 5K letter at this point, is that

5   right?

6   A.  Yes.

7   Q.  Now, you were also asked about mistakes, that there were

8   some -- you could be mistaken about some of the conversations

9   and some of the details of the conversations with Mr. Bracy in

10  the SHU, is that right?  I think that's the question that you

11  were asked, is that right?

12  A.  Yes.

13  Q.  So what things were you mistaken about as you sit here now?

14  Were you mistaken about anything?

15  A.  No.

16  Q.  So the mistakes that you were referring to were what?  Were

17  there mistakes made or not?

18  A.  No.

19  Q.  So you were just asked before could you have made mistakes

20  about the conversations.  You said yeah.

21  A.  About any conversations we made in the SHU, yes.

22  Q.  Now you're saying, no, there was no mistakes about those

23  conversations?

24  A.  No mistakes about the conversations about Noah.

25  Q.  About conversations?  The question was about conversations?

H7jnbrah                          Brooks - recross

```
 1   A.   Yes.
 2   Q.   The time that you spent with him in the SHU, are you saying
 3   now that everything that was said to you you remembered it all
 4   correctly and properly?
 5   A.   Yes.
 6   Q.   Is that your testimony now?
 7   A.   Yes.
 8            THE COURT:  Relative to Noah, is that your testimony?
 9            THE WITNESS:  Relative to Noah.
10            THE COURT:  About Noah.
11            THE WITNESS:  Yes.
12            THE COURT:  You are not saying you remember every
13   conversation you had with Mr. Bracy when you were in the SHU
14   together?
15            THE WITNESS:  Correct.
16   BY MR. KIRTON:
17   Q.   So which ones are you incorrect about?
18   A.   None.
19   Q.   Are you mistaken about anything that he said to you in the
20   SHU?
21   A.   Not relative to Noah.
22            THE COURT:  That he testified to today.
23   Q.   That is not my question.  You are answering a question I am
24   not asking.
25   A.   Anything that he testified to today.
```

1   Q.  I said anything.

2   A.  No.

3   Q.  Are you mistaken about anything that he told you while in

4   the SHU?

5   A.  That he testified to today, no.

6   Q.  That is not my question.

7           THE COURT:  I don't know how anybody can answer that

8   question, Mr. Kirton, with all due respect.

9           MR. KIRTON:  The question was asked by the government,

10  your Honor.

11          THE COURT:  I don't know why she asked it either.

12  BY MR. KIRTON:

13  Q.  Were you telling the truth about everything you said about

14  what Mr. Bracy told you in every debriefing with the

15  government?

16  A.  Correct.

17  Q.  And there were no mistakes at all in terms of anything that

18  you told them that Mr. Bracy told you was absolutely correct

19  with no mistakes?

20  A.  Correct.

21  Q.  So the question that you answered from Mr. Castellano was

22  that -- what?  You lied about that?  You were mistaken about

23  that?

24  A.  No.

25  Q.  So what did you mean by it?

1   A.  Anything relating to Noah I made no mistakes about.

2   Q.  But everything else, something else you may have made a

3   mistake about?

4   A.  I could have made a mistake about anything else we spoke

5   of.  Anything else we spoke of could have been an honest

6   mistake.

7   Q.  Like what?

8   A.  Like anything.  Like the shooting he had done, like

9   anything.  Like the shooting when he broke his leg.

10  Q.  It could have been something else?

11  A.  You want me to go into detail?

12  Q.  You said you made a mistake.  I am asking you, did you make

13  a mistake about anything else?

14  A.  No.

15          MR. KIRTON:  All right.  No further questions.

16          THE COURT:  OK.  Thank you, Mr. Brooks.  You can step

17  down.

18          Mr. Brantley, do you want to let him out our back

19  door?

20          THE DEPUTY CLERK:  Yes, Judge.

21          MR. ENZER:  Your Honor, while Mr. Brooks is being

22  taken out of the courtroom, we have one final stipulation to

23  read into the record.

24          THE COURT:  OK.

25          (Witness excused)

H7jnbrah                    Brooks – recross

1              MR. ENZER:  This is Government Exhibit 38.  I'll skip

2      the intro.

3              1.  William Bracy a/k/a Rel, the defendant, has been

4      incarcerated at the Metropolitan Detention Center, Brooklyn the

5      MDC, since on or about January 28, 2016.

6              2.  From on or about January 29, 2016, to on or about

7      February 19, 2016, William Bracy, a/k/a Rel, the defendant,

8      Wendell Belle, a/k/a Delly, Nathaniel Fludd, a/k/a JunTao, and

9      Davaughn Brooks, a/k/a Dollar were incarcerated in the same

10     unit, unit 43 at the MDC.

11             3.  From on or about February 25, 2016, to on or about

12     April 7, 2016, William Bracy a/k/a Rel, the defendant, and

13     Davaughn Brooks, a/k/a Dolla, were incarcerated in the same

14     cell in the special housing unit in the MDC.

15             4.  On or about October 17, 2016, Davaughn brooks,

16     a/k/a Dolla, was transferred from the MDC to the Geo Group

17     Incorporated's Queens detention facility.

18             5.  It is further stipulated and agreed that this

19     stipulation may be received into evidence as a Government

20     Exhibit.

21             The government offers Government Exhibit 38.

22             THE COURT:  38 is received.

23             (Government's Exhibit 38 received in evidence)

24             MR. ENZER:  The government rests.

25             THE COURT:  Mr. Kirton or Mr. DuBoulay, are you

H7jnbrah                          Brooks - recross

1   intending to present any evidence?

2          MR. KIRTON:  No, your Honor.

3          The stipulation, I just want to direct the Court's

4   attention to the stipulation numbered 5.  Actually the

5   stipulation involving witness No. 5.  It's the complaint

6   follow-up of an interview done by -- it's located in the

7   defense 5.

8          THE COURT:  Which number is it?

9          MR. KIRTON:  It's No. 5.  It is a one-page document.

10  It's already in evidence.

11         THE COURT:  This is the 911 caller?

12         MR. KIRTON:  Yes.  That particular person was an

13  eyewitness to the Moises Lora murder.  He basically called the

14  police department at 2230 hours and -- I'm sorry.  He called

15  the police department.

16         He said that, he explained he was returning from the

17  store walking under the scaffold when he saw a group of six or

18  seven tall teenaged dark skinned male blacks attacking two male

19  Hispanics.

20         He knew the victim from the neighborhood.  He observed

21  two of the perpetrators o attacking the kid on the ground,

22  stomping him, and the others were attacking the other male

23  Hispanic, who was screaming for help and asking for anybody to

24  call 911, which Mr. Smith did.

25         Then the group ran out towards the football field on

H7jnbrah                    Brooks - recross

1    Melrose Avenue.

2              There is also another document which is part of the

3    911 notes.

4              Just one moment, your Honor.

5              It is located at No. 6 of the defense exhibits.

6              THE COURT:  Right.

7              MR. KIRTON:  At this time I move to offer this.  It is

8    a 911 document.  I move to offer this document into evidence.

9              THE COURT:  What is this?

10             MR. KIRTON:  It is they are notes taken by the -- just

11   one second.

12             THE COURT:  Is it the 911 operator's handwritten

13   notes?

14             MR. ENZER:  No.  A document called a SPRINT report,

15   which summarizes 911 calls --

16             THE COURT:  Yes.

17             MR. ENZER:  -- was created.

18             This is a detective's handwritten notes summarizing

19   what he reviewed from the SPRINT report, and I think the part

20   that the defense cares about is under the 911 call notation for

21   this particular witness, Charles Smith, the detective wrote,

22   Six kids, four on one, ran, two on one.

23             MR. KIRTON:  That's consistent with the complaint

24   report that four of the perpetrators were on one, on the

25   victim, and the two were on the other one.  It's also

1    consistent with our client's allocution.  This witness --

2            THE COURT:  It is not entirely consistent with your

3    client's allocution.

4            MR. KIRTON:  Well, this witness testified that all of

5    the persons who were involved in the assault and murder of

6    Mr. Lora were at some point kicking Mr. Lora.  And maybe at a

7    later point while looking back he was punched and/or assaulted

8    by some other people.

9            I think this testimony, this information by this

10   contemporaneous uninvolved witness corroborates our client's

11   allocution, which is that obviously he went -- his allocution.

12           THE COURT:  You have moved on to arguing it.

13           Do you have any evidence?  I am going to allow you to

14   argue, but let's close the record.

15           MR. KIRTON:  Other than those two documents, I have no

16   other evidence.

17           The defense rests.

18           THE COURT:  You want me to receive defense, I guess

19   Defense C would be Mr. Smith's call that is reflected in the

20   complaint follow-up report and then Defense --

21           MR. KIRTON:  D.

22           THE COURT:  -- d is the notes from the SPRINT report.

23           MR. KIRTON:  That's correct.

24           THE COURT:  Those are received.

25           (Defendant's Exhibits C and D received in evidence)

H7jnbrah

1              THE COURT:  Anything further?

2              Any other evidence?

3              MR. KIRTON:  Not from the defense.

4              THE COURT:  OK.

5              Mr. Enzer, do you want to be heard.

6              MR. ENZER:  Certainly, your Honor.

7              We think if you believe Mr. Brooks, it is clear the

8    government has established at least by a preponderance of the

9    evidence that William Bracy was one of the assailants who

10   actually physically struck Moises Lora, Noah, during the

11   attack, that he wasn't merely somebody attacking Polo with no

12   hands on Noah, as he falsely claimed in his plea allocution to

13   the Court.

14             Let me first talk about why the testimony is enough if

15   you believe Brooks, and then I will talk about why you should

16   believe Brooks.

17             In terms of if you believe him, he clearly stated in

18   his testimony on direct Bracy told him I kicked Noah in

19   substance.

20             This is not something that Bracy would lie about.

21   First of all, he complained about Wendell Belle, Delly,

22   bragging about the Noah homicide.  He complained that it was

23   Delly bragging that got them caught up in this case.  He is

24   somebody sophisticated enough to know you don't talk about your

25   role in a homicide when you are in a federal RICO case facing a

H7jnbrah

1   murder because you don't know who could end up cooperating.  He

2   understood that.

3            And this wasn't his first rodeo in the criminal

4   justice system, as we are going to talk about when we go into

5   sentencing.  Mr. Bracy is somebody who had been committing

6   serious crimes since he was young juvenile, since 14.  This

7   murder is something he did still as a juvenile, but really kind

8   of in the middle of his blossoming criminal career.

9            THE COURT:  He was just barely a juvenile at this

10  point.

11           MR. ENZER:  It makes sense that he would tell Brooks.

12  They had a relationship on the street.

13           No, they didn't take photos together on social media.

14  No, they didn't commit crimes together in the street, but they

15  knew each other.

16           THE COURT:  They dealt drugs with each other.

17           MR. ENZER:  Correct.

18           THE COURT:  That still is a crime, Mr. Enzer.

19           MR. ENZER:  It is a crime.  As a violence prosecutor,

20  we focus more on the violence.  But it is correct; it is a

21  crime.  They would buy weed from one another from time to time.

22           So they knew that they were members of the gang.  Then

23  they got locked up together, and they commit a serious crime

24  together, they commit an assault in jail.

25           Now they're together basically 24 hours a day.  They

H7jnbrah

are in a tiny cell.  They have to be together 23 hours.  If

they want to have rec, they are in the same rec pen together

for that other hour.  The only exception to that is legal

visits, which are not happening all the time.  Maybe it happens

sometimes.  So they are together all the time.  They have

nothing else to talk about but reminisce about the various

crimes they've committed.

Brooks told you he opened up about his himself.  He

told Rel about a murder he had committed, a murder he had not

been charged with, so it makes sense that Rel in turn would

open up and talk about what he did, that he kicked Noah during

the stomping.  This is somebody he could trust.  Brooks put

himself on the line, so, all right, he could open up and put

himself on the line as well.

It is important also, his reaction.  When Brooks tells

Bracy about this murder that he's involved in, but wasn't

charged in, Bracy's response is, You shouldn't tell people

that.  He understands people could cooperate.  You don't brag

or talk about this stuff.

So for him to then tell Brooks, as Brooks testified,

about the Noah murder and about himself kicking, he wouldn't

make this up.  He would only say it if it was true.  And it is

true.  He did hit Noah during the attack.

It also makes sense in terms of his motive.  You heard

Brooks testify.  Bracy was the leader of his subset of the YGz,

H7jnbrah

the Six Third.  He's not a nobody.  He's not a hanger on.  This
is the guy who runs that block.

         And he had a personal motive.  He had been shot by
Courtlandt.  That shooting occurred on November 22, 2010,
before the attack on Noah.  He had personal stake in this.
He's not just going to go over there and stand by or kind of
punch, throw a few punches at Polo while all his friends put in
the real work.  He's going to be involved in the real work.
Him and Delly Dell are the two main protagonists in this
attack.

         What Brooks said is also corroborated not just by
Bracy's statement, but by what Belle said.  Brooks said, him,
Rel and Belle were together, and Belle was bragging, I'm the
one who really killed Noah.  He was the one stomping on his
head.  You guys were just kicking him.

         So Belle's statement as well establishes that Bracy
was one of the people who -- I mean he physically kicked Noah.
He didn't just attack Polo.  And Bracy's reaction to that
wasn't I didn't touch him or I was only touching Polo.  His
reaction was you shouldn't talk about this.  This is what got
us caught up.

         That's not the reaction you have if the statement is
false.  If the statement is false, you correct it.  You deny
it.  You don't say, Oh, this is going to get us in trouble.  It
gets him in trouble because it's true.

H7jnbrah

1           It's also important to pay attention to the timing of

2      the statements that Bracy makes to Brooks.  There's a reason we

3      just read that boring stip.  The timing of when Bracy is in the

4      SHU with Brooks is February to April of 2016, that's long

5      before any trial date, or it's long before we knew that Bracy

6      would be going to trial.

7           THE COURT:  We didn't have any trial date set yet,

8      right?

9           MR. ENZER:  That's correct.  It wasn't until later

10     that year that a trial was set.

11          THE COURT:  I thought I set the first trial sometime

12     that summer.  That's when I set it.  I set it for January.

13          MR. ENZER:  For January, two groups.  He doesn't know

14     which group he's going to be in yet.  He doesn't know who's

15     going to go to trial, if he's going to plead.  He has no reason

16     at this time to come up with a story about his role.  This is

17     at a time when his only incentive when he's talking to his

18     cellmate in the SHU is to tell the truth.

19          I think it's approximately eight to nine months before

20     he actually ends up –– before the trial date that he was set to

21     have, and it's eight or nine months before he actually ends up

22     pleading guilty on January 4, 2017.  This is not something

23     Brooks would forget.  It is important.  This is a big event.

24     And they talked about it multiple times.  Brooks said roughly

25     five or ten.  It's clearly something they discussed in detail

H7jnbrah

multiple times.

          Now, obviously, we are here because Bracy said
something different in his plea.  That plea was self-serving.
It's obvious why he has an incentive to minimize his role.  It
was the defense who spent a lot of time on cross about
minimization.  That is really the issue we had here.

          He said what he thought he had to say to get out of
trial.  He knows if he goes to trial he's getting convicted and
he's going to get life.  So he wants to minimize the damage
that has been done by his actions and by the evidence that has
mounted up against him.

          So, he's got to admit something about this, but he's
not going to admit that he touched Noah because that will jack
up his sentence.  He has no mandatory minimum.  He knows that
he can argue for something less than life.  He's hoping to get
the least he can get, and so he minimized in his plea
allocution.

          And he is smart enough to do that.  He's
sophisticated.  You heard he reviewed the discovery.  He was
familiar with it.  He talked about it at length with his
cellmate in the SHU.  He knew how cooperation works.  You don't
want to tell somebody what you've done, and they paid attention
to who is and who is not cooperating.

          Ant Flocka, that's Anthony Reddick, one of the members
involved in this murder, at the time when these conversations

H7jnbrah

are happening in the SHU, he's in the street.

What does that tell Bracy, and how do we know that?

Brooks said Bracy had correspondence back and forth with Ant Flocka while he was out.  He was keeping tabs on him. He wants to know if is this guy a rat.

Is he cooperating?  If he's in the street and he's got a job and he hasn't been charged yet, then he's not talking. The government can't prove I kicked because they don't have anybody who was there.

He knows Belle isn't cooperating.  He's still at the MDC.  Cooperators go to GEO.  He's not cooperating.  He knows that we haven't charged any of the other participants in the murder.

So obviously he doesn't know with a hundred percent certainty, but he as a betting man knows -- has good information that chances are, while the government may have enough to convict me because they have people who witnessed statements about the murder, they don't have somebody who can really say, I hit Noah.  I will take my chances.  I'll lie to the judge at the plea and hope that I get a lower sentence.

THE COURT:  This murder was in the original indictment, correct?

MR. ENZER:  It was.

MR. KIRTON:  Yes.

MR. ENZER:  The original indictment, December 2015,

H7jnbrah

charged Bracy and it charged Belle.  It did not charge Reddick.

When these conversations are happening in the SHU,
Reddick has not been charged yet.  It was not until late in
2016, after Brooks started cooperating, that we superseded the
indictment to charge Reddick.  I'm going to come to that in a
minute.

Part of the record here we have agreed is the
statement described in the government's disclosure letter about
the proffering defendant.

THE COURT:  Yes.

MR. ENZER:  For purposes of the record that is -- 3509
is our letter which summarizes it.

In a nutshell Bracy tells this proffering defendant, a
statement that is basically, it's substantially consistent,
substantially the same as his allocution.

THE COURT:  Correct.

MR. ENZER:  What is important is the timing of it.

As we note in our footnote, this proffering defendant
and Bracy, they first got housed together on January 2, 2017.
And the proffering defendant, his recollection is that this
conversation between him and Bracy occurs between that date and
the plea.  The plea is January 4, 2017.

So this is the time period, Bracy pleads guilty --
just so the Court has the full picture on the timing, as your
Honor may recall, and I have it with me, Friday, December 30,

H7jnbrah

1   the government sends an e-mail to chambers informing the Court

2   that Bracy is considering pleading guilty and has asked for a

3   written plea agreement.

4           So he's clearly begun the process of considering a

5   real plea offer that Friday before he even ends up getting

6   housed with the proffering defendant.  In that e-mail we note,

7   based on what defense counsel had told us, defense counsel was

8   planning to meet with Bracy to discuss the plea on Tuesday,

9   which is January 3, the day before he pleads.  He ends up

10  actually pleading guilty Wednesday, January 4.

11          So this statement, which is between January 2 and the

12  actual plea on the 4th of January, is smack in the middle of

13  the period when he has decided or has seriously considered

14  pleading, ultimately decides to plead under a plea agreement.

15  So he has every reason -- it makes perfect sense that the lie

16  he tells the Court on the 4th is pretty much what he tells this

17  proffering guy in that time window.

18          THE COURT:  Maybe he was trying it out.

19          MR. ENZER:  Perhaps trying it out.  Maybe he was

20  reporting what he had discussed his allocution would be.  We

21  don't know.  But the timing of this casts serious doubt on

22  these statements, just as it does on what he says in his plea

23  allocution.  The only other thing that we, to talk about is the

24  civilians. We have made part of the record the particular

25  civilian statement that defense counsel referred to, but also

H7jnbrah

1    the others that I mentioned.  I will file them after this

2    proceeding with Court.  It is 3502 through 06.

3              THE COURT:  Right.

4              MR. ENZER:  If the defense counsel doesn't mind, we

5    can also make the 911 materials part of the record, too.  It is

6    up to them.

7              MR. KIRTON:  That is fine.

8              THE COURT:  They are in evidence.

9              MR. ENZER:  3507 as well.  That's the SPRINT report of

10   the 911 calls and the summary document that the defense

11   referred to.

12             These are not that helpful.  There is a reason we

13   didn't call these civilians.  Aside from the fact that we don't

14   want to bother them for a *Fatico* and endanger them and expose

15   them to the risks of testifying in a violent gang case when we

16   have somebody who's pleaded guilty, and this is a *Fatico* not a

17   trial, the civilians by and large, what they have to say is not

18   that helpful.

19             I mean I could summarize for the Court what each of

20   these people says in a nutshell, but the gist of it, the gist

21   of all of them is there are multiple attackers.  They're males

22   in the teenage or early 20s age, they appear to be black or

23   Hispanic, one of them is tall.  They attack -- I think everyone

24   is consistent that this group attacks Noah, and they are all

25   consistent that there is a second person attacked.  Some of

H7jnbrah

1    them know that's Polo, one of them is Polo.

2         So what we can glean from this is there are multiple

3    attackers, Noah and Polo both get attacked, and Noah gets

4    killed.  But in terms of who runs when, who are the people

5    hitting Polo, when does Polo run away, the civilians are not

6    that helpful on it.  Your Honor can scrutinize this all you

7    want.  It is not helpful.

8         THE COURT:  I read it.  It's pretty common on this

9    kind of event.  Everybody sees it through their own lens.

10        MR. ENZER:  Right.

11        For the civilians, Polo, who might know, what he says

12   in the statement that is in the record is he gets hit, his

13   hoody is pulled over his head, and he's on the ground.  So he

14   says he doesn't see what happens after that.  He is useless in

15   terms of who is hitting who.

16        The other civilians, these are people who -- they are

17   not expecting this.  They are not planning to see it.  They are

18   not recording it.  They don't know who the various people are

19   hitting who.  It happens suddenly and quickly, and they are not

20   reflecting on it.

21        The people who are most likely to really remember it

22   are the participants.  Bracy is a participant.  This was an

23   important event for him.  He did it to put in work.  He's

24   there.  He knows what he did.

25        So when he's recounting it, you can count on and bank

1    on that he's accurate in what he says to his cellmate, and also

2    it is highly likely that Brooks is not the only person Bracy

3    has discussed this with.  It is highly likely that Bracy

4    discussed this with other members of the gang, including other

5    people who were there and involved, which probably helped him

6    reinforce who did what.

7              He's going to have a great recollection of this.  The

8    civilians are not going to be that helpful.

9              So, for those reasons, your Honor, we submit if you

10   believe Brooks, which you should, then your Honor should find

11   that Bracy was one of the kickers.

12             Now let me talk about why you should believe Brooks.

13             First, we didn't get into all of it on cross or

14   direct, but Brooks has told the government about every crime he

15   did, everything.

16             In his first proffer with the government, he told the

17   government about a murder he was involved in that we had no

18   idea he had any participation in.  He was asked questions on

19   cross:  Are you minimizing?  Did you lay hands on Ledgister?

20             Well, I mean we could call the other cooperators,

21   because we have charged this murder in the case in the original

22   indictment.  We charged Ramel Matthews and Haswani Tyson, who

23   is a fugitive and Anthony Scott.

24             Anthony Scott pleaded guilty to being the shooter, so

25   we know he's the shooter.  We know it wasn't Brooks who put his

H7jnbrah

1    hand in.  Otherwise, I don't know why Anthony Scott would plead

2    to doing it.

3          We know he's not making that it up about the gun grab,

4    because that's what Anthony Scott said in his allocution and at

5    sentencing.

6          The other cooperators who helped us charge this

7    murder, none of them put Brooks in it.  We had no idea.  The

8    government had no clue that Brooks was involved in this murder

9    when he came in to proffer.  We were shocked when he told us

10   that he was in the murder.

11         He told us because he understood his obligation is to

12   tell the truth.  He wasn't messing around.  He understands

13   there are other people who are cooperating.  There are other

14   witnesses.  The government is going to investigate this.  It is

15   not worth his life to lie about something.  He's going to tell

16   the truth meticulously about himself and about others.  And he

17   did that.

18         That goes a long way towards his credit.  Because he's

19   been truthful about himself, he should be credited about what

20   he's saying about Bracy.

21         The second reason you should believe him, he cannot be

22   that far off in terms of what he's saying because we know Bracy

23   has pled to this murder.

24         Brooks said he was involved, Bracy pled.

25         Brooks says Anthony Reddick was involved, Reddick

H7jnbrah

1    pled.

2          Brooks said Belle was involved, Belle pled.

3          All of them pled after Brooks began cooperating, so he

4    can't be that far off in terms of what he's saying.

5          And he doesn't need to lie about this issue to get a

6    5K1 letter or to get cooperation credit.  He has given enormous

7    and substantial assistance.

8          Even if you took the entire Lora murder out of the

9    case, he gave assistance in terms of the Ledgister murder that

10   he was a participant in.  When he came in, others, including

11   Ramel Matthews had not plead, were not cooperating.  We might

12   have had a trial against Ramel.

13         Ramel was the lead defendant in this case.  Brooks

14   came in before Ramel did,  and Brooks gave us very solid

15   information about Ramel's involvement.  That alone would be a

16   worthy 5K1 letter.

17         He gave us information, without getting into the

18   particulars, his general information that the attackers

19   involved in the Noah homicide were Belle, Bracy, Reddick and

20   others.  That's valuable information without getting into who

21   kicked who.

22         That would be valuable to us.  It would be worthy of a

23   5K1 letter.

24         He helped us identify others involved in this who

25   haven't been charged yet, which we didn't know.

H7jnbrah

1        In particular, he was the third witness, the third

2    cooperator who put Reddick in the murder.  It was because

3    Brooks came in and gave us that information that we then

4    charged Anthony Reddick in a superseder.  We've documented that

5    in the briefing filed by Reddick in connection with his motion

6    to dismiss the indictment.

7        He gave us information about Davaughn Matthews, a

8    defendant who pled to the chicken spot shooting that Brooks

9    talked about.  He says honestly, I told Matthews to shoot, but

10   Matthews shot.  Matthews pled to that.  That alone is

11   substantial assistance.

12       There are things we didn't go through today, but that

13   if your Honor studies the 3500 you will see Brooks talked about

14   shootings by Kareem Lanier and Terrance Williams, two very high

15   ranking YG members, one of whom has been sentenced by the

16   Court, one of whom will be sentenced later.

17       So I could go on and on and on, but the point is this

18   go has a lot of valuable information.  There is no reason for

19   him to stick his neck out on the line and risk a 45-year

20   mandatory minimum to make something up about Bracy kicking

21   Noah.  He would have gotten his 5K1 if he just said Bracy was

22   there, even if he was the one hitting Polo.

23       Brooks, his testimony is detailed and corroborated.

24   This is another reason why you should believe him.

25       How is he corroborated?

H7jnbrah

1          First, he told you him and Davaughn Matthews shot at

2     Noah.  Noah broke his leg.  Then he told you that when -- based

3     on the statements he was given by Bracy, Noah broke his leg

4     again a year later when Noah is attacked in the murder.

5          If you study the autopsy report, which we have

6     provided the Court, the autopsy report itself and the x-ray

7     included -- show -- they describe there clearly was a leg

8     injury that Noah had, it had been surgically repaired, and it

9     rebroke during the attack.

10          How would Brooks know that?  The discovery in this

11     case, to say it's voluminous is the understatement of the

12     century.  We've been in countless status conferences in this

13     case before the defendants pled guilty where defense lawyers

14     were complaining that they needed more time because of the

15     volume.

16          do you really think Brooks studied everything and read

17     everything and memorized everything, including about murders he

18     wasn't involved in?

19          No.  The reason he knows that is because Bracy told

20     him that, and the only way he would know that is if Bracy told

21     him.  It shows he must be telling the truth.

22          Another thing, Brooks says that Bracy, Belle, Reddick

23     that they were drinking right before the murder.

24          We have included in our sentencing submission Facebook

25     messages that corroborate that.  This is another example of how

H7jnbrah

1    Brooks is corroborated.

2           Brooks knew that they didn't have weapons, that they

3    didn't have guns, that they didn't have wrenches or hammers,

4    that it was hands and feet.  That's corroborated by the crime

5    scene photographs we've submitted and by the pleas that your

6    Honor has heard, in particular, the guilty plea of Anthony

7    Reddick, who describes pretty much what Brooks talked about,

8    and Brooks has not been housed with Reddick.

9           There's no way that he could have talked to Reddick

10   and gotten that.  He got it because Bracy told him.

11          You also heard Brooks describe how Bracy and the

12   others involved in this attack on Noah, how they creeped

13   through the grass before the attack.  That is an interesting

14   detail, and it's corroborated by one of the civilian statements

15   which is in the record.

16          In particular, witness No. 2, which is 3503.

17          THE COURT:  Yes.

18          MR. ENZER:  In his statement in the notes, and these

19   are my chicken scratch notes, December 22, 2016 --

20          THE COURT:  I'm sorry.  Which one is this?  3500 what?

21          MR. ENZER:  3503.

22          THE COURT:  01-03?

23          MR. ENZER:  3503-02.  It's 3503, which is witness 2,

24   dash 02.  So it's the notes of the second meeting with this

25   witness.  The date of the notes is December 22, 2016.

H7jnbrah

1              THE COURT:  Got it.

2              MR. ENZER:  If you go to page 4, which is at the top

3     of the page, it says five to six guys.

4              THE COURT:  Yes.

5              MR. ENZER:  If you go right below that, it says they

6     were moving swiftly, like a military team.  The witness

7     described how the group that attacked Noah moved like a

8     military team through the grass and then went and hit Noah.

9              This is somebody who has never spoken to Brooks.  The

10     reason Brooks got it right as somebody who wasn't there is

11     because Bracy told him.  And Brooks knew, he talked about how

12     he learned from the statements made by Belle and Bracy, Belle

13     is the guy hitting the head, the others are kicking the rest of

14     Noah.

15              Well, that's corroborated by the autopsy report.  Noah

16     has injuries.  The kill injuries, the injuries that really

17     cause his death are the injuries to his head.  But he also has

18     abrasions, contusions, a broken leg, indicating that others

19     were hitting him below the neck.

20              I think the evidence shows Bracy was one of the people

21     doing that.  The only way Brooks would know that is because

22     Bracy told him, and it's corroborated by the autopsy report.

23              A few more points.

24              You can tell Brooks is not a guy who embellishes.  He

25     answers as -- he keeps his answers as short as possible.  He

H7jnbrah

gives the most straightforward answer possible.  When he was

asked, Could you have made a mistake about your conversations?

he said yes.

        If he was trying to lie, there would have been a lot

easier ways to do it.  He could have said -- he lived on 162

Street, which is not that far from where the murder happens.

He could say, I was walking by and saw it.  It would have been

a lot easier.  We probably wouldn't have a *Fatico* right now if

he said that.  But he told the truth.  He didn't learn the

details of it really until he was in the SHU.  He didn't

embellish.  He was telling the truth.

        You can tell by his demeanor.  He did not evade.  He

wasn't arguing.  Whether it was your Honor the government or

the defense, he had the same demeanor when he was answering

questions, calm, cool and collected.

        He knows the outcome of this hearing doesn't matter

for his letter, and he knows he's just got to tell the truth in

his words to stay truthful.  That's his obligation, and that's

what he did.

        The last thing I'll say is most of the cross was

devoted to things that Brooks had done that were bad, but the

reason we know about that, a lot of it is because he told us.

        So if you are going to credit him for the things he's

done that are bad, you should also credit him for what he's

telling us today about Bracy's statements.

H7jnbrah

1          For those reasons, your Honor, we respectfully submit

2     that we have at least shown by a preponderance of the evidence

3     that Bracy was one of the kickers in the attack on Noah.

4          THE COURT:  Thank you, Mr. Enzer.  Mr. Kirton.

5          MR. KIRTON:  Your Honor, I just have three points I

6     wanted to raise for the Court's consideration.

7          First I just wanted to give some background

8     information in terms of my client's allocution to this Court.

9          My client pled guilty on January 4, 2017.  We had a

10    number of discussions with my client about whether or not he

11    should go to trial, whether or not he should take a plea, and

12    he decided, without thinking about Mr. Brooks or anything

13    Mr. Brooks may or may not have said or anything that any other

14    cooperator may or may not have to say, to decide to plead

15    guilty.

16         My client had no knowledge or premonitions that

17    somehow somebody was going to say this or that.  He pled guilty

18    because it was in his best interest to do so.  It wasn't

19    anything about any particular cooperator.

20         Now, we had some discussions with the government about

21    what the allocution would look like.  We had some discussions

22    about this on the phone.

23         In fact, the day he took the plea actually the roles

24    were reversed, I was a little bit early, Mr. DuBoulay was a

25    little bit late, but he wrote out the allocution.  I made some

H7jnbrah

1   edits, and I showed it to the government before my client pled

2   guilty in this case.

3           My client pled guilty.  His allocution was on the

4   record.  The Court asked whether or not anybody had anything to

5   say.  There was no statement by the government about this

6   particular allocution being a problem.  This is despite the

7   fact that they have had these discussions with this particular

8   witness in December of 2016.

9           There were no objections to the probation report.

10          THE COURT:  I am not sure what your point is on that.

11          MR. KIRTON:  The point is the government has an

12   enormous amount invested in this particular cooperator.  That's

13   why this whole proceeding in my view even arose.

14          THE COURT:  No.  Wait a minute.  Let's make the record

15   clear.  We had this hearing because I said it's clear between

16   the submissions there is a factual issue about whether

17   Mr. Bracy in fact laid hands, or in this case foot, on Noah.

18          I said, Does the defense want a *Fatico* hearing on

19   that, and the defense said yes.  That's why we are having the

20   *Fatico* hearing --

21          MR. KIRTON:  Your Honor, but there's more to it.

22          THE COURT:  -- and that it is material to my decision.

23          MR. KIRTON:  When Mr. Bracy pled guilty his allocution

24   was sufficient.

25          THE COURT:  It was sufficient.  It was legally

H7jnbrah

1    sufficient.

2            MR. KIRTON:  It was legally sufficient.

3            THE COURT:  That doesn't mean it's truthful.

4            MR. KIRTON:  The day of the government's submission,

5    several months after -- again, the government had three

6    opportunities to raise this factual inaccuracy:  The day he

7    took the plea, during the objections to the probation report,

8    and some other time.  They could have notified us at any point

9    that they had a problem with the facts underlying our client's

10   allocution.

11           They didn't do that.  They said in their letter that

12   our client lied, and we would like to have a *Fatico* hearing

13   unless he changes his story.  That's basically what their

14   letter said, which was included in their sentencing submission.

15   That is some background information.

16           THE COURT:  I don't have it in front of me.  They may

17   well have said that they're prepared to prove it up at a *Fatico*

18   hearing.

19           MR. KIRTON:  That's what they said.  They're prepared

20   to go forward with a *Fatico* hearing unless --

21           THE COURT:  If the defense disputes it.

22           MR. KIRTON:  Right.

23           THE COURT:  We are having a *Fatico* hearing because

24   there is a factual dispute.

25           MR. KIRTON:  I am going to get into that.  I have two

H7jnbrah

1      points in support of our position.

2                  THE COURT:  OK.

3                  MR. KIRTON:  I wanted to just give one last point in

4      terms of background.

5                  Again, you know, I have no personal problems with any

6      of these prosecutors.  I have worked with them before.  I have

7      never had any problems.

8                  It is our view, your Honor, that our client's plea was

9      is legally sufficient.  This issue I think to a large extent

10     was generated by their enormous investment in Mr. Brooks, which

11     was certainly outlined in Mr. Enzer's remarks:  He's so

12     valuable.  He's very truthful and so forth and so on.

13                 Unfortunately our client is being crushed in part --

14     he made a legally sufficient plea, but because of one element

15     we have this *Fatico* hearing, and now the Court is aware of all

16     this information that is not only relevant for the *Fatico*

17     hearing, but may be relevant under 18 U.S.C. 3553(a).

18                 THE COURT:  I'm sorry --

19                 MR. KIRTON:  That is an unfortunate situation.

20                 THE COURT:  -- I still am not quite sure that I

21     understand you.

22                 Are you suggesting that because of the *Fatico* hearing

23     I now know more about Mr. Bracy than I would have known if we

24     didn't have a *Fatico* hearing, or are you suggesting I know more

25     about Mr. Brooks because he testified than I would know

H7jnbrah

1    otherwise?

2            MR. KIRTON:  I think to a certain extent the Court now

3    has additional information that may not have been part of the

4    parties' submissions.

5            Now some things may have come up in the oral arguments

6    which Mr. DuBoulay would make, but to a certain extent the

7    Court does have more information.

8            THE COURT:  That's true.

9            MR. KIRTON:  The other problem is this.  This is the

10   other problem.

11           We sent out a number of e-mails over the past week

12   about this *Fatico* hearing.  We were aware of the four witness

13   statements in which those witnesses did not corroborate what we

14   knew what this witness's testimony was going to be.  We

15   accepted that.

16           But there was another statement.  There was another

17   witness, and we never got notice of that.  I think the Court

18   received a letter the other day that the government

19   acknowledged that there was the statement of witness No. 5 that

20   they didn't turn over to us.

21           Now they did.  In my view, your Honor, I mean

22   certainly that issue was ultimately resolved because they

23   turned it over, but we happened to have that document.

24           Mr. DuBoulay subpoenaed those records quite sometime

25   ago, and we happened to have the statement of witness 5, whom

H7jnbrah

1    we had the Court sign a subpoena to try to compel to testify at

2    this hearing.

3            In my view, those are two elements, two aspects of

4    this case that are troubling to the defense.

5            Number one, this issue could have been raised and/or

6    possibly resolved much earlier than this *Fatico* hearing.

7            And, secondly, we are troubled by the fact that there

8    was some additional information, some additional evidence that

9    was inconsistent with the testimony of Mr. Brooks.

10           It is our view, your Honor, that the government has

11   put an enormous amount of effort and resources in making sure

12   that Mr. Brooks is taken seriously at Mr. Bracy's expense.

13           THE COURT:  OK.

14           MR. KIRTON:  In terms of the factual argument.

15           THE COURT:  Yes.  Let's talk about facts.

16           MR. KIRTON:  OK.

17           In our view, your Honor, the objective evidence in

18   this case supports our client's allocution.  If the government

19   could pull up Exhibit No. 32, which is already in evidence, the

20   wanted photo.

21           THE COURT:  Yes.

22           MR. KIRTON:  If you look at the photo, the person in

23   the foreground is wearing a gray sweatshirt and white pants.

24   There's no blood on the pants.

25           THE COURT:  Well, you can't tell.

H7jnbrah

1             MR. KIRTON:  We are talking about --

2             THE COURT:  You can't tell.

3             MR. KIRTON:  -- objective evidence.

4             The government submitted this letter dated July 18 and

5       Exhibit C is -- it is enclosed as Exhibit C of crime scene

6       photographs of the seen of the Lora murder taken by a crime

7       scene detective of the New York City Police Department shortly

8       after the murder.  The Court has these photos.

9             THE COURT:  Yes.

10            MR. KIRTON:  Unfortunately, obviously I know what

11      happened here.  I am not making light of what happened.  It is

12      a terrible, terrible situation, a horrible situation.

13            What I am trying to say, what I am trying to point out

14      to the Court is that you have a person who is purported to be

15      kicking this victim.  This victim unfortunately bled to a large

16      extent on the sidewalk.  There is a large pool of blood.  And

17      this person -- this was taken moments after the incident -- has

18      no blood on these white pants.

19            THE COURT:  But you can't see below his knee.

20            Mr. Kirton, I'm happy to listen to your argument, but

21      with all due respect that doesn't corroborate anything.

22            MR. KIRTON:  Also, with exhibit No. 31, the Facebook

23      picture of Bracy, again it's the same person wearing the same

24      outfit.  That's how the connection was made between Mr. Bracy

25      and the person in the first photo.

H7jnbrah

1          THE COURT:  Right.

2          MR. KIRTON:  Your Honor, a photo is a photo.  If a

3     cooperating witness said something that was belied by objective

4     evidence, that should mean something.  And this is, in my view,

5     objective evidence, these two photos, the first one taken right

6     after the incident, that Mr. Bracy was not involved in the

7     physical assault of Mr. Lora.

8          Secondly, you have witness No. 5.  Witness No. 5 saw

9     the whole thing and said there were four people on one victim,

10    two on another.

11         None of the other witnesses 1 through 4 had or said

12    anything or made any statement that was consistent with the

13    testimony of Mr. Brooks.  So we have five civilian eyewitnesses

14    and one photograph, none of which corroborate that sworn

15    testimony of Mr. Brooks.  That is important.

16         That is the second point.

17         The third point, and my final point, is that by itself

18    should call into question the credibility of Mr. Brooks.  That

19    nowhere, nowhere is his testimony corroborated.  It's not

20    corroborated by any civilian witnesses, who have no stake in

21    this case at all, nor is it corroborated by this photograph,

22    which was taken right after it, which led to the arrest of

23    Mr. Bracy.

24         Mr. Brooks had an opportunity on October 11, 2016,

25    October 27, 2016, to talk about some of these details that of

H7jnbrah

1    course he was never wrong about.  He never mentioned anything

2    about Mr. Bracy kicking and stomping Mr. Lora.  It's only in

3    the later meeting that this incident, this information comes

4    out.

5              Mr. Brooks is basically a career chain snatcher.  This

6    is what he does.  Yet, when it comes to the murder of

7    Mr. Ledgister, who had not only a large chain himself, but he

8    was with two others who had large chains, they were being cased

9    by this witness and others for this robbery.  This is not a

10   spur of the moment sort of thing.

11             THE COURT:  That's what he told us, right.

12             MR. KIRTON:  This is what he does.  Yet, in our view,

13   he minimized his participation: I never got the gun.  I never

14   shot the gun.  I was just a lookout.

15             I find that to be a preposterous statement, given his

16   experience in chain snatching and in selling chains that he

17   snatched and his prior record of snatching chains.  It seems to

18   me, I would argue to the Court, that this witness has from time

19   to time minimized and added things to his testimony.

20             Lastly, he happened to say, I never did anything with

21   Mr. Bracy, right, other than the situation at MDC.

22             THE COURT:  And dealing drugs with each other.

23             MR. KIRTON:  I will get into that in a minute.

24             But the day of the Lora assault/murder inexplicably

25   the head of the Six Three subsection of the YGz, along with

H7jnbrah

1    others, asked him to come along.  And he, who was not a leader,

2    who was not a subset leader, who has no rank anywhere, who's

3    not physically incapacitated, all of a sudden has the option to

4    say I don't feel like going.

5            In fact, what he says was he said nothing.  He stuck

6    his head out, they announced their plans to commit crimes

7    publicly, which, OK, that is what he says, and then he sticks

8    his head back in and he just lets them go.  That's

9    preposterous.

10           THE COURT:  Why would he make that up?

11           MR. KIRTON:  It's preposterous.

12           THE COURT:  That is an odd detail that neither

13   inculpates him nor inculpates Bracy particularly.  Everybody

14   agrees that he didn't participate in this murder.  So that is

15   an odd detail for him to make up.

16           MR. KIRTON:  I submit to the Court it gives him, I

17   guess, to a certain extent more credibility.  It gives him some

18   insight that there were in fact these folks who did agree at

19   some point to put in work and later on he found out Mr. Lora

20   was murdered.

21           THE COURT:  There's no dispute over that.  That is

22   what your client testified to.  That is what your client

23   allocuted to.  He didn't implicate the other people, but

24   there's no dispute about that.

25           MR. KIRTON:  In his mind it may add some credibility

H7jnbrah

1      to his overall testimony.

2              THE COURT:  If he wanted to do that, he could have

3      said they rang my bell.  I came down.  They said, We are going

4      to go do some work.  He said, Hey, I have a woman upstairs.  I

5      don't want to.

6              There's a lot of ways he could embellish his story

7      from that perspective.  This just seems like an odd detail that

8      doesn't seem like something anyone would make up.

9              MR. KIRTON:  Again, it seems made up.  If you compare

10     the objective evidence in this case with the testimony of

11     somebody who's basically made a deal with the government --

12             THE COURT:  He has.

13             MR. KIRTON:  Look, at some point objective evidence

14     has to have some weight.  At some point everything a cooperator

15     says cannot be true if everything else says otherwise.  There's

16     no evidence to support this particular cooperator's testimony.

17             On this issue, I mean, you know he has talked about

18     making mistakes and not making mistakes, but he's sure about

19     this.  And I am sure and we are sure that there's nothing else

20     to support his testimony other than his assurance that this

21     happened in the way that he said it happened.

22             Just one last point.

23             In terms of other evidence, although it's -- after the

24     assault/murder of Moises Lora, they all want to Tykeem's house.

25     Based on some of the discovery that exists in this case,

H7jnbrah

1    Mr. Belle was very bloody.  He had to change his clothes.  The

2    same source of discovery indicates that he did not have to

3    change his clothes and did not change his clothes.  Again,

4    another source of information that does not corroborate this

5    particular witness's testimony.  I understand that the

6    government has an enormous amount invested in this witness.

7              THE COURT:  You have made that argument.

8              MR. KIRTON:  It is what it is.  But in our view there

9    is no proof, objective proof to support this witness's

10   testimony.

11             THE COURT:  OK.

12             I am going to tell you the result of the *Fatico*

13   hearing.  Then we are going to break because it's 1:30.  So we

14   will come back after lunch for sentencing.

15             I found Mr. Brooks to be an incredibly credible

16   witness.

17             I find by a preponderance of the evidence that in fact

18   Mr. Bracy did in fact kick Mr. Lora during the course of the

19   assault.

20             I think Mr. Brooks' testimony was corroborated by the

21   fact that Noah had a broken leg, that the perpetrators were

22   drinking before the attack.  It's consistent with what Reddick

23   allocuted to.  It's consistent a little bit with some of the

24   civilian witnesses.

25             The civilian witnesses I find to be generally

H7jnbrah

1   unreliable in relaying this sort of thing.  They tend to get a

2   lot of adrenaline going and exactly what they are seeing, it is

3   not all that critical, but the core of what they report is

4   correct, which is someone is being attacked, and there are

5   multiple people doing it.  That was all consistent.

6         I find the fact that these guys were locked up

7   together for 45 days with just the two of them to talk to makes

8   perfect sense why they were talking about this crime as well as

9   other crimes that they had committed.

10        The bottom line is I find Mr. Brooks to be credible.

11  I find by a preponderance of the evidence that Mr. Bracy in

12  fact kicked, at least kicked Mr. Lora during the course of the

13  assault.

14        So I want to give you that information so you can

15  accommodate that for whatever you are going to tell me at the

16  time of sentence for all of you.

17        Why don't we come back at 2:30 for sentence.

18        (Luncheon recess)

19

20

21

22

23

24

25

H7jnbrah

1

2

3                    A F T E R N O O N    S E S S I O N

4                         (2:30 p.m.)

5          THE COURT:  Are we ready to proceed?

6          MR. ENZER:  The government is ready.

7          Before we get to the sentencing, your Honor, there are

8    two things we wanted to correct, or at least make a record on.

9          THE COURT:  OK.

10          MR. ENZER:  These are two comments that Mr. Kirton

11    made when he was arguing about whether or not our witness was

12    credible in connection with the *Fatico*.  We just want to make

13    sure that the record is complete on it.

14          THE COURT:  OK.

15          MR. ENZER:  The first remark that he made is -- he

16    didn't say the words, but he seemed to be insinuating that the

17    government acted in bad faith by not raising earlier that we

18    did not believe or find credible Mr. Bracy's plea allocution in

19    regards to Bracy's role in the Lora murder.  I just want to

20    make sure that the record is complete on this.

21          I have spoken with Ms. Castellano and Mr. Adams.  All

22    of us were at the plea.  We have different recollections of

23    whether or not we were shown the written document that contains

24    the plea allocution.

25          I don't remember seeing it.  Mr. Adams doesn't.

H7jnbrah

 1   Ms. Castellano thinks she may have seen it.  We assume that we

 2   did, the government, so to speak, was shown this written plea

 3   allocution.  But the written portion of it did not alert us to

 4   the real problem.

 5          It really wasn't until Mr. Bracy was responding to

 6   live questions from your Honor that it really became clear that

 7   he was minimizing.  I can tell you from my own perspective as

 8   soon as I heard it I was concerned that it wasn't true, but I

 9   was not positive because I didn't have our notes of the

10   proffers of Mr. Brooks in front of me.  I wasn't completely

11   sure.

12          So we didn't stand up and raise an alarm bell at that

13   point because we weren't sure.  We weren't trying to act in bad

14   faith.  We were not trying to lull Mr. Bracy into a lie that we

15   could later hammer him with, and we certainly were not trying

16   to suborn perjury.  We just weren't confident.

17          I can say in other sentencings and pleas in this case,

18   when we have been sure that a defendant is not being truthful

19   with the Court, I have stood up, and in particular if your

20   Honor remembers the guilty plea of Michael Brown --

21          THE COURT:  Yes.

22          MR. ENZER:  -- he tried to say that he was merely

23   present and a hanger on for two shootings, one of which in

24   which he was the shooter and one of which he ordered somebody

25   else.

H7jnbrah

1                I immediately told -- I stood up, I said it was a lie.

2      I told defense counsel, and they corrected it.  When we are

3      sure we do that.  If we are not, we don't.

4                This was not something done in bad faith.  That is the

5      record I want to make on that.

6                THE COURT:  OK.

7                MR. ENZER:  The second point that Mr. Kirton wade is,

8      he insinuated -- again, he didn't say it.  He seemed to

9      insinuate that the government has suppressed information

10     favorable to him.  That is the reference he made to Charles

11     Smith, witness No. 5.

12               THE COURT:  Yes.

13               MR. ENZER:  And what he said is we didn't turn it over

14     until he pointed out that we hadn't turned it over because he

15     had it in response to a subpoena.

16               Let me make the record career on that.

17               I have discussions with Mr. Kirton, including

18     correspondence that is written.  So, if there's ever a

19     proceeding about this, that correspondence will have to become

20     part of the record in such a proceeding, but the summary of it

21     is this.

22               Before this *Fatico* hearing, we turned over the 3500

23     and *Giglio* material for Mr. Brooks, who was the witness we

24     called.  In an abundance of caution, we reviewed our file and

25     we identified documents that memorialized statements to law

H7jnbrah

1    enforcement by anyone who witnessed the actual attack, who saw

2    all or a portion of it.

3           We identified those statements.  Some of them are

4    statements that were given to the New York City Police

5    Department, some of them are the New York City Police

6    Department didn't interview the person, but we ended up

7    interviewing them -- we the government, the United States

8    Attorney's Office -- in connection with trial preparation in

9    this case.  We pulled them together.  We turned it over.

10          Now, initially when we did that initial disclosure,

11   which I think was on July 12, we found witness, four witnesses,

12   1 through 4, and we missed witness 5.

13          Mr. Kirton on Monday evening called me and said:  I

14   have another one that you didn't turn over, Charles Smith.

15   Take a look at it, think about it.  Let us know what you want

16   to do.  I re-examined our file.

17          We did in our file have the Charles Smith -- that's

18   witness 5 -- note.  I just had inadvertently missed it.  So I

19   sent Mr. Kirton an e-mail explaining we missed it, but that

20   should have been turned over and now you have what we have

21   found.

22          So we have not suppressed any information that they

23   are entitled to, and we have not acted in bad faith in any way.

24   I don't think he expressly said that, but I want to make sure

25   that the record is clear on that.

H7jnbrah

1      THE COURT:  OK.

2      Mr. Kirton, this is all really a sidelight, but go

3  ahead.  If you needed more time, you should have asked for more

4  time.  I don't think that's what you were asking for, but go

5  ahead.

6      MR. KIRTON:  No, your Honor.

7      We sent out a letter pursuant to an e-mail, an e-mail

8  pursuant to *Kyles v. Whitley* asking for any statements by any

9  interviewed witness that was inconsistent with the government's

10  the government witness's proposed testimony.  So we received

11  the notice of the four witnesses referenced by the government.

12  We did not receive witness No. 5.

13      Technically it was not a violation of *Kyles v. Whitley*

14  because they did not formally respond to my request pursuant to

15  *Kyles v. Whitley*.  So, even though they did not initially turn

16  over information about witness No. 5, they did after I alerted

17  them of the problem.

18      So I didn't say a bad faith because had they responded

19  and then been confronted with the information, I think it may

20  have been bad faith, but that did not happen.  They actually,

21  after they were alerted by me, they responded by turning over

22  the information concerning witness No. 5 as well as their final

23  response to my *Kyles v. Whitley* request.

24      THE COURT:  I don't find any bad faith in any of that.

25  It sounds to me like it was inadvertently not turned over, and

H7jnbrah

1   you had the witness and I signed the subpoena for the witness

2   last week.  So, to the extent you wanted Mr. Smith here, you

3   could have had him.  That was a defense decision.  So I think

4   we're past this now.

5           I don't find any bad faith on the government's part.

6           Mr. DuBoulay, have you and your client read the

7   presentence report, dated May 18, 2017?

8           MR. DuBOULAY:  We have, your Honor.

9           THE COURT:  Have you discussed it with each other?

10          MR. DuBOULAY:  I have.  We discussed it.

11          THE COURT:  Mr. Bracy, did you read the presentence

12   report?

13          THE DEFENDANT:  Yes, ma'am.

14          THE COURT:  Did you discuss it with your lawyer?

15          THE DEFENDANT:  Yes, ma'am.

16          THE COURT:  All right.

17          Are there any objections to the report?

18          MR. DuBOULAY:  No, your Honor.

19          THE COURT:  The presentence report will be made part

20   of the record in this matter and placed under seal.  If an

21   appeal is taken, counsel on appeal may have access to the

22   sealed report without further application to this Court.

23          I received a sentencing submission from the defense

24   dated June 23, 2017 that included a report from the mitigation

25   specialist and some certificates of training that Mr. Bracy has

H7jnbrah

1    completed at the MDC.

2              I received a June 26, 2017 letter that included a

3    letter from the defendant, letters from friends and family --

4    those of you who are here, if you wrote my a letter, thank you.

5    I read all your letters and letters from a number of academics

6    who had done research in Bracy's Bronx neighborhood.

7              Finally, I received a letter dated July 17, 2017.

8    That included a letter from Mr. Bracy's mother.

9              I received a letter from the government dated June 23

10   and July 18, as well as a submission dated January 5, 2017 that

11   laid out the assistant's view of the relative culpability of

12   this defendant relative to his codefendants.  That submission

13   placed Mr. Bracy in the top tier of culpability in the

14   assistant's view.

15             As to the July 18 letter, it included the autopsy and

16   crime scene pictures of Mr. Lora.

17             The government's request to file the crime scene

18   pictures and the autopsy under seal is granted.

19             Everything else has been filed on ECF, correct?

20             MR. ENZER:  Correct, your Honor.

21             THE COURT:  Mr. DuBoulay?

22             MR. DuBOULAY:  Yes, your Honor.

23             THE COURT:  The next step is the guidelines

24   calculation.

25             To family members who are here, please bear with me.

H7jnbrah

This sounds like an arithmetic class, but it's necessary.

The defendant pled guilty to one count of conspiracy to violate the racketeering laws.  The presentence report reflects a guideline level of 43, Criminal History Category III, which yields a guideline range of life imprisonment.

I find the correct guidelines calculation to be as follows:

We start with a racketeering guideline, which is 2E1.1.  It directs the Court to start with a base offense level of 19, or the level applicable to the underlying racketeering activity, whichever is greater.  In this case the racketeering activity that was stipulated to in the plea agreement is not the same as the racketeering activity that's discussed in the presentence report.

The plea agreement focused on the Lora homicide and attempted murder of a Courtlandt Avenue crew member in November of 2010, the assault at the MDC, and drug dealing.

The presentence report focuses on the homicide of Mr. Lora, an attempted murder of a CAC crew member that happened on May 22, 2015, which actually was what Mr. Bracy allocuted to, the MDC assault in 2016, and drug distribution. Each of these crimes is an individual deal.  The Moises Lora homicide occurred on April 16, 2012.  The defendant was 17 years old at the time, although he was almost exactly three months shy of his 18th birthday.

H7jnbrah

1          Under the racketeering guideline, I'm directed to the

2     relevant guideline for the crime, which would be the murder

3     guideline.  Because this would be a first degree murder under

4     2A1.1(a), the base offense level is 43.  It doesn't matter

5     whether a role adjustment is taken now or later, so I will take

6     it after the grouping calculation.  So the total for the Lora

7     murder is 43.

8          The next crime that I think is in the presentence

9     report is the attempted murder of a rival gang member on May

10    22, 2015.  The defendant was 20 years old at that point, almost

11    21.  Probation counted this as relevant conduct.  But pursuant

12    to 2E1.1, because this crime happened before the last overt act

13    of the racketeering offense that he pled guilty to, it should

14    not be counted as relevant conduct but instead should get

15    criminal history points.  I don't think it actually matters.

16    In the end you come out about the same, but I am not going to

17    count it as a grouped offense.

18          So group two is the attempted murder of a rival gang

19    member on November 22, 2010, when the defendant was 16.  We

20    start with the assault with intent to commit murder guideline,

21    which is 2A2.1.  Because I have no evidence or indication of

22    premeditation, the applicable guideline is 2A2.1(a)(2), which

23    is a base offense level of 27.  So the presentence report

24    doesn't consider this offense because the parties stipulated

25    that the victim sustained life-threatening injury.

H7jnbrah

1          So my question is, is this the shooting of

2     Mr. Blanding?

3          MR. ENZER:  Yes, your Honor.

4          THE COURT:  OK.  Pursuant to other events in this

5     case, I learned that that shooting ripped through

6     Mr. Blanding's scrotum, hit the femoral artery, and broke his

7     right femur and hip.  By any reasonable evaluation that is a

8     life threatening bodily injury, so the Court finds that

9     2A2.1(b)(1)(A) applies.  That's plus four.  That brings the

10    total for that shooting to 31.

11         Group 3 is the MDC assault on February 19, 2016.  The

12    defendant was 21 years old.  We start with the assault

13    guideline, which was 2A2.3(a)(1).  So that is a base offense

14    level of 7.  The victim sustained bodily injury so, pursuant to

15    2A2.3(b)(1)(A), plus 2 brings the total to 9.

16         The final group is drug dealing.  I go to the drug

17    guidelines.  The party stipulated that Bracy was responsible

18    for 2.8 to 5.6 grams of crack and less than one kilogram of

19    marijuana.  So, pursuant to 2D1.1(c)(13), that is base offense

20    level 14.  I then go to the grouping analysis pursuant to

21    3D1.4.

22         Group 1 is 43, group 2 is 31, group 3 is 9, and group

23    4 is 14.

24         The highest group gets one unit.  That's the Lora

25    homicide.  Because every other group is more than nine levels

1    away, that's no additional units.  Because those groups are

2    more than nine levels away, they are disregarded in the

3    grouping analysis, but they may provide a reason to sentence at

4    the high end of the guideline range.

5            One unit means I add no levels to the highest group.

6    The highest group is 43.

7            Bracy was a manager or supervisor of criminal activity

8    involving extensive criminal activity involving more than five

9    participants, so pursuant to 3B1.1(b) that is a plus three.

10           Mr. Bracy pled guilty and accepted responsibility for

11   his criminal conduct, but he did it shortly before trial, so he

12   only gets two acceptance points.  43 plus 3 minus 2 yields 44.

13   So the total adjusted offense level is 44.

14           In terms of criminal history, Mr. Bracy began his

15   criminal history early.  He has a January 2009 juvenile

16   adjudication for grand larceny.  That's one criminal history

17   point.

18           He has a November 2009 juvenile adjudication for

19   robbery.  That is also one criminal history point.

20           He has a 2015 conviction for attempted criminal

21   possession of a weapon.  I will note that that is a crime that

22   he allocuted to, and he acknowledged that it was actually an

23   attempted murder.  Nevertheless, it was three criminal history

24   points.

25           That brings me to a total of five criminal history

H7jnbrah

points.  Five criminal history points is Criminal History

Category III, level 44.  Criminal History Category III yields a

guideline of life.

         Are there any guidelines arguments that I have missed,

Mr. Enzer?

         MR. ENZER:  None from the government.

         THE COURT:  Mr. DuBoulay?

         MR. DuBOULAY:  No, your Honor.

         THE COURT:  In this case, there are bases for a

downward departure.

         The defendant served some time for the 2015 attempted

murder.  It's not counted as relevant conduct, but I would note

that.  But, more importantly, the murder of Mr. Lora occurred

while Mr. Bracy was a juvenile, although he was only barely a

juvenile.

         On the other hand, the circumstances of the shooting

on November 22, 2010 and the murder of Lora take those two

events out of the heartland of that type of activity.  While

only three people were shot in the shooting event of November

22, many more could have been.  It was just dumb luck that no

one got killed.

         The murder of Lora was committed in a particular

heinous manner, taking it out of the heartland of murders.

         Finally, the grouping analysis washes out both the

November 2010 attempted murder, the MDC assault, and the drug

H7jnbrah

dealing, all of which are deserving of punishment.

The Court just conducted a *Fatico* hearing on what I
think was the sole disputed factual issue of whether Bracy
himself participated in the attack on Lora.  By a preponderance
of the evidence I found that Bracy did personally participate
in the attack on Lora by kicking him, although it appears he
was not the person who kicked Mr. Lora in the head.

Are there any other factual issues in dispute,
Mr. Enzer?

MR. ENZER:  None from the government.

THE COURT:  Mr. DuBoulay?

MR. DuBOULAY:  No, your Honor.

THE COURT:  Is there any victim here to wishes to be
heard?

MR. ENZER:  No, your Honor.

The government has spoken with Mr. Lora's sister.
Mr. Lora's mother and one of his brothers wanted to be here,
but they are out of the country, so they are not here today,
but they have spoken with the government and conveyed -- I
should say this.  His sister has spoken with us and has
conveyed remarks that I will refer to.  In addition, I just
note that she and her brother came to the guilty plea of
Mr. Belle.

THE COURT:  Would the government like to be heard on
sentence?

H7jnbrah

1          MR. ENZER:  Yes, your Honor.

2          Thank you.

3          I am going to refer to a few exhibits which were

4   exhibits to the July 18 submission put in by the government,

5   Exhibits A through E.  And we are going to put them up on the

6   screen, if that's all right.

7          THE COURT:  Thank you.

8          MR. ENZER:  Let's start -- Mr. Pavlis, if you don't

9   mind, please put up Exhibit D and go to the last photograph.

10          I'm sorry, Exhibit C.

11          This is Exhibit C of our July 18 submission.  All the

12   way to the last one, the last photograph in this exhibit.

13   That's it.  Thank you.

14          This is a photograph of the courtyard where Mr. Lora

15   was killed.  In the photograph you can see in the center on the

16   pavement is a little blue thing.

17          THE COURT:  Yes.

18          MR. ENZER:  That blue thing is an evidence glove that

19   is on top of blood, Lora's blood after the stomping.  There are

20   little markers; you see a 2, a 3.  That's evidence that's been

21   marked by the police department.

22          You can see behind it is a playground where children

23   are supposed to be able to play in the Melrose housing

24   projects.  This is in the center of the Melrose housing

25   projects.  700 Morris Avenue is one of the buildings in it.

H7jnbrah

1    It's the building that Mr. Lora lived in.

2              This is supposed to be a place where people get

3    affordable housing, live their lives, go to work.  Their

4    children are supposed to be able to go and play, and they're

5    not supposed to fear for their safety or worry that their

6    children are going to be exposed to violence or be the victims

7    of violence.

8              Now, Mr. Lora was a member of a gang.  He was regarded

9    as kind of a mascot.  He is a little guy.  He was short.  He

10   was 90 pounds.  We don't know if he had a medical disorder, but

11   he was frail.

12             He had broken his leg before this incident.  He

13   rebroke it in this incident.  He was an extremely easy target.

14   He was not one of the top Courtlandt guys.  He was not an equal

15   rival for Bracy or for the other YGz who pummeled him.

16   Nonetheless, on April 16, 2012, Bracy and five or six or maybe

17   more other YG members ganged up on Lora and stomped him to

18   death right next to a playground.

19             The murder is far and away the most heinous and

20   despicable act of violence in this entire case, and this case

21   is filled with tragedy, depravity, senseless killing and

22   violence.

23             This is it.  This is the worst of all of the murders

24   for a variety of reasons.

25             The first reason, when you think about this murder,

H7jnbrah

there is no good reason for any homicide, at least not in this

case.  But when you look at, when you compare this murder let's

say to the murder of Curtis Smith, Terrance Williams, not

justified in killing Curtis Smith, but Terrance Williams, his

brother was killed, and he had been shot is in the stomach by

Courtlandt.  Not excusing it, but you can understand why

somebody in his position with his background would turn to

violence.

Bracy, he had been shot by Courtlandt.  But what

reason does he have to go with five, six or more other YG

members and literally kick and stomp this little kid until the

kid's skull cracked in enough places that he died?

What reason is there for this?

We heard the reason today.  Brooks testified.  They

were drunk and arguing about who had put the most work in.

That's why Lora's dead.  That's why his family will never see

him.  That's why Lora will never have children because these

guys wanted to know who had put the most work in.

Was this a worthy adversary?

Your Honor asked during the *Fatico* hearing, were there

Courtlandt guys at the MDC?  There weren't, not really.

The reason is our office in 2011 and 2012 did big

takedowns of multiple members of the Courtlandt Avenue Crew,

including Nathaniel Fludd.

They were prosecuted in front of Judge Pauley.  Most

1    of them got very lengthy sentences, and they were off the

2    street.  They weren't there.  The Courtlandt Avenue Crew had

3    been broken down to almost nothing by the time of this attack.

4            They, Bracy and his pals, did not attack Courtlandt

5    when they were at full strength.  They didn't go after their

6    equals, the guys who Bracy would really regularly go back and

7    forth with.  They are attacking the mascot, the little kid who

8    hangs around the Courtlandt gang, who everybody jokes -- and

9    Lora, our information is he was involved in criminal activity.

10   I am not trying to say otherwise.  But this was regarded as the

11   mascot.  He is somebody who is the face of Courtlandt, but he

12   is not their leader.  He is not their muscle.

13           So, in addition to being senseless, this murder was

14   cowardly.  You have to ask, when you see the evidence of how

15   this murder happened, what is going through Bracy's mind when

16   this all happens?

17           We heard from Brooks, which is based on Bracy's

18   statements, that Lora tripped.  He tried to run away, his leg

19   broke, and he tripped.

20           So, in that moment, is Bracy thinking how much

21   violence am I going to do?  Am I going to leave?

22           When him and Belle and the others start attacking

23   Lora, is Bracy thinking maybe we should stop now?  I wonder

24   what Lora's feeling as he screams out for help.

25           When the blood starts coming from Lora's head and

1   starts bleeding out on to the pavement, is he wondering, has he

2   had enough?

3          Did Bracy hear Lora's skill cracking over and over

4   again in the multiple places where it cracked as Belle jumped

5   up and down on Lora's head and kicked him in the head?

6          Did he think about whether or not Lora would survive

7   when they scurry off, leaving Lora bleeding on the pavement?

8          Did he consider any of these things?

9          I don't know.  But they speak to the seriousness of

10  this crime.

11         Also, did he think about the impact that this would

12  have on the people who saw it, the bloodstain there?

13         I am going to show your Honor later in my presentation

14  an article from the Daily News taken after -- the next day the

15  stain is still there.  Children, even if they didn't witness

16  this crime, would still go and play in that playground and

17  there is a bloodstain of what is left of Moises Lora.

18         Now, the defense submission, in the mitigation

19  submission and in their submission they talk about the violence

20  in the neighborhood and how this contributed to Bracy's

21  upbringing and how he became who he is.  But here he is

22  becoming the protagonist, the one who creates this environment

23  for others and a major factor in it.

24         This murder alone warrants or would easily warrant a

25  life sentence.  We are not seeking a life sentence, but the

H7jnbrah

1   Court would have every right to punish Bracy with a life

2   sentence for this murder and nothing else.

3           But this was not an isolated act.  This was a part of

4   a pattern of crime and violence that for Bracy started years

5   earlier and has continued even into his detention in this

6   federal racketeering case.

7           As your Honor just mentioned, he had juvenile cases

8   dating back I think to when he was around 14 or 15 years old.

9   That's years before this murder.

10          Then he joins the YGz gang.  He is not just a hanger

11  on.  He's not a low-level guy.  He's not a Noah.  He's not a

12  Moises Lora.  He is not just a mascot.  He is the leader of a

13  set.

14          Within the architecture of the overall gang, we call

15  that a manager or supervisor under the plea agreement.

16  Because, as your Honor heard, the leader of the gang is Juther

17  Perez.  He is above all of the sets.  Below him are the leaders

18  of the sets, managers or supervisors.  Bracy is one of them,

19  the Six Third YGz, the 163rd set.

20          He was personally hands-on involved in several acts of

21  violence before and after the murder.  Before the murder, you

22  have the Blanding shooting, one block from a middle school.

23          The YGz and Courtlandt get into a shootout and three

24  people are shot, Blanding, who nearly died, Bracy himself, and

25  an individual named Matthew Williams, another Six Third YGz

H7jnbrah

member under Bracy.  He is now in federal custody being

prosecuted in a case in front of Judge Sweet.  He was arrested

on July 5 of this year.

April 2012, now he is almost 18, and he participates

in the stomping murder.  And instead of being chastened by what

happened, pulling back from the gang, he continues his

involvement and goes on in May of 2015 to participate in a

shooting in broad daylight.

He gets called to a barbershop, because an associate

of the YGz who is close to him, a cousin and a mentor, is being

threatened by a rival, somebody who has beef with the YGz and

with Bracy.

And Bracy, in broad daylight on a busy street right in

front of a barbershop, where barbers are trying to do their job

and where customers are trying to get their haircut, gets into

a shootout in broad daylight and he hits the rival in the

scrotum.

I have spoken to a police officer who literally had to

retrieve a piece of the victim's testicle off of the sidewalk.

He pled out in the state to some lesser included offense and

thought probably he would do a couple of years and be right

back at it.

Then he got indicted in this federal case.  He

appeared in front of your Honor in December of 2015.  He

understood, or should have, that this was a serious matter.

H7jnbrah

1          One of the first things he does at the MDC is he

2     cohorts with his gang buddies, Belle and Brooks.

3          They call it jumping somebody.  What it really is is

4     an assault.  They assaulted Nathaniel Fludd, the Courtlandt

5     guy.

6          Why?  Fludd is tight with Noah, and he was worried

7     Fludd's going to do something to him because he is one of the

8     guys who killed Noah, so he wants to preempt it.  In this

9     attack, this assault, they hit Fludd with chairs, etc.

10          So all of that conduct is extremely serious.  Then, to

11     make matters worse, Bracy appears to have no remorse whatsoever

12     for what he has done.

13          As we set forth in our sentencing submission, on the

14     day of the murder, Bracy and his confederates were drunk.  They

15     got drunk on a particular mix of two alcohols, and we cite in

16     our submission Facebook messages that happened later where

17     Bracy, Reddick, and Belle are joking.  They got drunk again.

18     And he says, We're about to make a part two.  Laughing my YG

19     ass off, LMYAG.

20          That is not remorse.

21          Then he comes to court and he pleads guilty.  When

22     does he plead guilty?  Does he plead guilty right after he's

23     indicted?  No.  He gets the discovery.  He gets the enterprise

24     letter.  He gets our motions in limine, which spell out chapter

25     and verse who the cooperators are, what they can say, what they

H7jnbrah

1    can't say.

2            He knew -- if he didn't know already, and I think he

3    knew -- he knew even before that in limine submission who we

4    had and who we didn't.

5            How does he know that?  He knows who was with him for

6    the stomping murder.  He keeps tabs on who is in custody and

7    who is not.

8            Belle was involved, but he knows Belle is still at the

9    MDC, so Belle is probably not talking.

10           Anthony Reddick was involved, but he's communicating

11   with him, and he knows Reddick hasn't been arrested yet.  He's

12   probably not talking.

13           The others, he figures the government hasn't arrested

14   them.  They haven't been taken into federal custody.  They are

15   probably not talking to the feds.

16           The government can't prove I kicked Noah.  I am going

17   to lie.  I am going minimize what I did, and I hope I can get

18   away with it and get a lesser sentence.

19           So he lied in this courtroom.  He downplayed what he

20   did.

21           For all of those reasons, your Honor, we submit a very

22   lengthy sentence is necessary here for justice, to reflect the

23   seriousness of the conduct, to adequately reflect the nature

24   and characteristics of this defendant, this defendant, who has

25   no high school diploma, no GED, and virtually no job history.

H7jnbrah

1      His only contribution to society appears to be violence for a

2      gang, and that's about it.

3              In addition, it is important that he get a very

4      lengthy sentence for deterrence.  We asked our cooperating

5      witness who was on the stand to stand up and see if he could

6      point out any YG members.  There were two, at least two who

7      were in the courtroom earlier, and they left before we got to

8      that portion of the direct.

9              But my detective, Detective Jared Tepperman, who is

10     familiar with this investigation, noticed them, and we spoke

11     about them, Ron Gz and Terry Chapman.  They are members of the

12     YGz under Bracy.  They look up to him.

13             And I see another one right here, Tyrone Debose,

14     sitting right there, second to last row, all the way to the

15     right.

16             He knows that Matthew Williams from the Six Third YGz

17     was arrested because he was arrested with him in April of 2017.

18     Him and Matt Williams and another individual were arrested, and

19     a gun was recovered from Matthew Williams.

20             So this is somebody that members of this gang and

21     people who are considering joining the gang look to, and it's

22     important that a message be sent to them and to others who may

23     be considering this line of work, you engage in gang violence

24     you are going to be met with serious consequences.

25             It is also important to deter Bracy and to prevent him

H7jnbrah

1  from committing future crimes, because his pattern demonstrates

2  that he is a danger to society.  He's going to be for a very

3  long time, and he needs to be incapacitated until a point when

4  he is too old to continue this line of work.

5      I am now showing Government Exhibit A to our July 18

6  submission.  These are pictures of Noah before he was killed.

7      As I mentioned, Jessica Lora, that's Noah's sister,

8  she is not here today to speak.  But what I can say about the

9  impact that this crime had on her is, from speaking with her,

10 we know she was virtually Noah's mother.  She worked, she took

11 care of Noah, and she got the call when Noah was killed and was

12 devastated and checked in with the police year after year to

13 make sure that this cold case was solved.  She didn't give up

14 on it and, she did whatever she could to help because this

15 mattered to her and it matters to the community.

16     Another sense of the community impact of this murder,

17 we have included as Government Exhibit B to our July 18

18 submission an article from the Daily News.  I am not going to

19 read the whole article, but I am just going to point a few

20 things out.

21     You can see in the center a snapshot of the bloodstain

22 from where Noah was killed.  This says it was visible on

23 Wednesday in the Melrose housing projects.  This is at least a

24 day, probably more days after the murder.

25     Everyone who walked through that community had to look

H7jnbrah

at that.  You can read in the article there are quotes from

people in the community about the impact of this crime.

In one part it says, A large bloodstain marred the

pathway where Moises "Noah" Lora died just yards from a

playground.  Mothers pushing strollers spotted the gruesome

stain and led their children away.  Friends said the puddle was

about the same size as Lora himself.

It quotes an individual named Curtis Milton who's 28

and according to the article, Milton said, For more than five

years they have been having their back and forth shooting each

other, stabbing each other.  It's to the point where I don't

want to bring my kids over here.

Other person's quote, Kesha Graham, who is 40, and she

said, Youths can't visit a nearby laundromat or supermarket

because of the battles.  The kids stay in jail in their own

project, Graham said.  We're paying taxes for what?  I don't

pay taxes for kids to keep getting buried.

Later in the article it describes information provided

by a woman named Jennifer Gonzalez.  She says, Lora was small,

probably shorter than 5 feet and less than 100 pounds,

residents said.  Gonzalez said he had pins in his legs from his

past bone breaks.

He had a bop to him, made him look cute, said Latoya

Jones, 37.  They caught the weakest one.

For all these reasons, your Honor, a very serious

H7jnbrah

1    sentence needs to be imposed in this case.

2             How much?

3             The guidelines are life, but we are not asking for a

4    life sentence.  We are not asking for any specific sentence.

5    We leave it to the Court.  But there is some data -- this is

6    some information we have about what codefendants have gotten

7    and where Bracy stacks up to them.  I think that is the most

8    useful way to talk about this.

9             Of the murder defendants, the most useful comparison

10   between Bracy is Anthony Scott, Paul Gilbert, Terrance

11   Williams, Wendell Belle and Kareem Lanier.

12            Anthony Scott was the first murder defendant sentenced

13   by the Court.  He's in a tier of culpability much lower than

14   Bracy.  He received a 23-year sentence.  His 23 years followed

15   seven years that he had done in state custody on crimes that

16   were relevant conduct to his gang conduct.  So he effectively,

17   between the state custody and the federal sentence imposed in

18   this case, is going to do 30 years for his participation in the

19   YGz.

20            Bracy should get more than that.

21            Paul Gilbert.  He was a tier 2 defendant.  He was

22   sentenced to roughly 30 years of federal imprisonment, 365

23   months.  That followed a 72-month, or six-year sentence he had

24   done in state custody for a crime that was relevant conduct to

25   his gang conduct.  So, between his state custody and federal

H7jnbrah

1    custody, he will effectively serve approximately 36 years in

2    prison for his participation in the YGz.

3              Bracy should get more that.

4              Now let me talk about that.  Gilbert was above Bracy

5    in the gang.  We concede that.  But when you look at their

6    conduct, Bracy's is worse.  The other thing that is worse about

7    Bracy and meriting serious punishment is the way he has

8    conducted himself in terms of lying to the Court and showing a

9    lack of remorse.

10             Gilbert, his murder was a felony murder.  It was an

11   attempted robbery gone bad.  He wasn't the shooter, and he pled

12   guilty to it before he was charged with it.  He was informed

13   that a superseder was coming, and he admitted it before he was

14   charged with it.  That deserves serious consideration and it

15   was given to him.

16             In contrast Bracy doesn't come forward after the

17   murder, doesn't come forward after he's charged, doesn't come

18   forward after he gets the discovery, doesn't come forward after

19   he gets the enterprise letter.

20             Only after the in limine motion, when we are on the

21   brink of trial, does he come in.  And even when he does, he

22   lies, as we have shown today.  For that he should be given a

23   more serious sentence than what Gilbert got.

24             Terrance Williams was sentenced by the Court to 399

25   months for murder, the murder of Curtis Smith, among other

H7jnbrah

things, with the expectation that he will be given credit for
39 months that he had done in state custody basically for the
same murder.

So Terrance we concede is above Bracy in the gang.  In
fact, Terrance, as you heard, was the leader of the Morris
Avenue Gunnaz set, the MAG.  In the beginning, the Six Third
YGz were really a subset.  They were under Terrance.  Terrance
brought Bracy into the gang.  So in that sense Terrance is
above and worse than Bracy, but Bracy gets the green light to
make the Six Third YGz their own set.

Why?  Because of the shooting of Blanding, because he
put in work.  He got hit.  Blanding was almost killed.  That
was because he helped with that.  And Terrance admitted his
involvement in the Curtis Smith murder before he was charged
with it in this case.  He was told a superseder was coming and
he admitted it.

Again, Bracy did the opposite.  He waited until the
very last minute, and he lied about it when he did admit it.

That brings us to the tier 1 defendants, Wendell Belle
and Kareem Lanier.

Wendell Belle, as the Court has heard about, was
probably if not the most, one of the most culpable individuals
in the Lora murder.  He is the one jumping on Noah's head.
Belle has pleaded guilty to charges that effectively require
him to serve 39 years of imprisonment, nine years on a state

H7jnbrah

sentence arising from a shooting where he shot a rival gang

member steps in front of the Bronx criminal courthouse, and

then a consecutive term of 30 for gun charges that relate to

his gang involvement and the Noah murder.

THE COURT:  That's what he pled to in front of he me,

right?

MR. ENZER:  Correct.

So he pled to the gun charges with the 30, and that's

consecutive to the 9.  It is a difficult question who is worse

between them.  Probably Belle is worse if you are just looking

at their conduct.  Belle's worse in terms of his role in this

murder.

You can compare the Bronx courthouse shooting to the

barbershop shooting that Bracy does.  It's not great to shoot

somebody in the testicle in front of a barbershop.  It's

probably a lot worse to shoot somebody in front of the Bronx

criminal courthouse.

But when you look at how Bracy has conducted himself

in this case, including lying in his plea allocution, that is

not something that exists for Belle.  Belle moved to withdraw

his plea and then took that back.  So ultimately he's basically

where he started.

That's not what Bracy did.  He tried to pull a fast

one, and that warrants punishment.  But should he get more than

Belle or not, that is a difficult question, and we are not

H7jnbrah

1    offering an answer to that.

2         And Lanier, just so your Honor has a point of

3    reference, Lanier's conduct is worse.  There is just no

4    question about it.  Lanier is under Terrance Williams in the

5    Morris Avenue set, but he's up there.  He's high ranking.  And

6    he has conduct that touches four murders.  He's the shooter in

7    one.

8         He goes with Terrance to the incident that results in

9    Terrance shooting Curtis Smith, he provides a gun to somebody

10   else in the gang who kills a little kid, Davaughn Jackson, and

11   he is present and an accessory after the fact to the murder of

12   Tysheem Ferguson in the middle of the street.

13        So, his conduct, it's worse.  He waited pretty close

14   to trial.  What he pled to are charges that will effectively

15   require him to do a minimum of 40 years in prison, and his

16   guidelines sentence is 45 years and he can't argue for less.

17   That's because in 2012 he was arrested on a narcotics case that

18   stems from his role in drug deal for the YGz and pled to a

19   five-year mand. min.  And then in this case he pled to gun

20   counts that carry 35 years on top and a conspiracy count on top

21   that adds a little bit extra.  So that's how we goat to that

22   number.

23        What do you do with Bracy as compared to Lanier, again

24   a hard question, but certainly he should get more than Gilbert

25   and Williams.

H7jnbrah

1           With that, your Honor, I just want to -- we concede

2    that there are legitimate and serious mitigating circumstances

3    that have been pointed out by the defense submission.

4           Bracy has not had an easy life, and I am not saying

5    that if anyone was put in those circumstances that they would

6    do much better.  But no matter what your background, no matter

7    where you come from, everyone knows you cannot kill and

8    certainly you can't pummel to death a little, 90-pound, frail

9    16-year-old kid for no reason, just because you want to show

10   that you put in some work.  In any community, by any standards

11   and hardships they have faced, this was wrong, and the sentence

12   should say that.

13           THE COURT:  Thank you, Mr. Enzer.  Mr. DuBoulay.

14           MR. DuBOULAY:  Yes, hi.

15           Thank you, your Honor.

16           First of all, Judge, I would like to acknowledge the

17   family and friends who are here to support Mr. Bracy.

18           THE COURT:  OK.

19           MR. DuBOULAY:  They have come to just about every

20   court date.  We have a professor, she went outside.  His mother

21   is here, and she probably stepped outside also.

22           THE COURT:  Let me add my thanks to all the family

23   members.  I am sure that Mr. Bracy appreciates you taking time

24   to come.

25           MR. DuBOULAY:  Judge, the government has alluded to

H7jnbrah

1   the fact that there may be other people here who are YGz.

2                  THE COURT:  I'm sorry.  The government did what?

3                  MR. DuBOULAY:  Alluded to the fact that other people

4   in the audience were YGz.  That should not be held against

5   Mr. Bracy.  He did not arrange for these people to be here.

6   They probably were not here in the morning.  I don't know.  I

7   didn't see them.

8                  THE COURT:  It has no impact on my sentence of

9   Mr. Bracy that YG members are here.

10                 MR. DuBOULAY:  OK.  The thing is, it is a very

11  difficult thing to sentence, especially in a case like this,

12  where there's so much violence.  The hearing this morning I

13  think just complicates things even further for this Court.  We

14  acknowledge that issue.

15                 Apparently what drives the government here and what

16  drives the guidelines here is the horrendous killing of Moises

17  Lora.  I acknowledge that.  What I say today is not meant to

18  excuse or minimize that tragedy, because it is a tragedy.

19                 It is unfortunate.  It happened.  He has to live with

20  that.  Mr. Bracy is aware of the fact that he is facing a

21  significant period of time in jail.  He is extremely

22  remorseful.

23                 We have to deal with that.  It is what is before us.

24  But he should not be punished to solve all of the ills and

25  problems in the Bronx.

H7jnbrah

1          The government has alluded to many things here.  He's

2     had a pretty poor childhood, even from birth.  Because I

3     mentioned in my letter, not soon after that, the family took in

4     another family member who was not a good influence on him and

5     in fact was responsible for the shootings.

6          So once you decide to join a gang, which we admit he

7     joined a gang at an early age, it is a slippery slope.  You get

8     involved in things that sometimes you intend to and sometimes

9     the circumstance put you in that position to do.

10          I am not minimizing in his actions in this case.

11     There are certain things he did which he regrets, and he can't

12     go back to that now.

13          I still can't believe that he is in tier 1 compared to

14     what the government is saying -- they listed five or six people

15     here who have done things five times worse than Mr. Bracy has

16     done and they are in tier 2 and tier 3.

17          The government acknowledges they are worse than Bracy

18     but they put him in tier 2 for one reason, that is the Moises

19     Lora killing.  That is a great tragedy.  Let me address that.

20          We know what happened that day.  They didn't seek out

21     the weakest link.  They didn't seek out Moises.

22          The evidence is -- the facts, as I understand them are

23     that a few people were drinking, they got drunk.  Delly Dell,

24     or whatever his name is, had suggested they go do work.  That

25     is what I heard this morning.  And people went to that location

H7jnbrah

going somewhere else and happened to pass by these two

gentleman, Polo and Moises.

They didn't seek him out because he was weak.  They

didn't seek him out because he was small.  My client was 17 at

the time, and he was much smaller than he is now.  Since this

case has begun, he has probably gained 20 pounds.  He was a

much smaller and shorter individual himself.  He was 17 years

old.  I think Lora was 16 if I remember correctly.

This is not something where they intended to kill

somebody.  Somebody died, but this is not like in other

instances in this case where people have taken guns and gone

looking for gang members to shoot, to shoot in open view in the

public, and there are many people in this case who have done

just that.

THE COURT:  Including your client.

MR. DuBOULAY:  Well, we are talking about 2010?  In

that situation --

THE COURT:  In 2015.

MR. DuBOULAY:  OK.  Right.  That's true.

I will get around to that.

But, in any case, Judge, that's what drives this case,

Lora.  What we have here is -- I don't want to call it an

accident, because it wasn't an accident.  It was a horrible

thing, and they intended to beat this kid up.

I think the evidence came out -- we had a hearing

H7jnbrah

earlier in this case where Dell said, we didn't intend to kill

him, there was no intent to kill him.  It happened.

        The government tells us that my client participated.

The government's presentation basically says my guy

intentionally killed the guy.  That's basically what their

presentation says.

        We know from the facts that we have heard so far and

the admissions by one of the defendants in the case that he was

the one that stomped on the head.  He is the one that bragged

about killing him.  He said some of you guys just kicked, threw

a punch.  I am the one who killed him.  Even though you are

legally equally responsible and justifiably so, he shouldn't be

responsible for taking that ultimate step.

        The government talked about hearing the cracking of

the skull.  That was a horrible incident.  It probably was very

quick.  You are talking about drunken, testosterone-driven

teenagers, whose sense of responsibility and sense --

whose impulsivities just took over.

        I have seen some of the sentencing submissions

submitted to the Court.  I am sure the Court has read mine

also.  We talked about these kids that -- who don't have the --

have a lack of maturity.  They have an undeveloped sense of

responsibility leading to reckless behavior.

        I think that played a part in this.  Even in the study

by Dr. Steinberg, he says psychological maturity, measured by

H7jnbrah

impulsivity and risk perception, thrill seeking, resistance to

peer influence does not even begin until age 18 and ends

probably in the early 20s.  I am not saying that is an excuse.

But it is a factor in this situation.

Drunken --

THE COURT:  There is no doubt that I am going to take

into account the fact of Mr. Bracy's age at the time of the

Lora murder.

MR. DuBOULAY:  Thank you, Judge.

I know you alluded to the fact that he was barely

under a juvenile.  He was 17.

THE COURT:  He was almost 18.

MR. DuBOULAY:  He was almost 18.

He didn't have the best mentoring in the world.

Oftentimes when that happens, you are raised your peers.

He has admitted -- in my letter he has admitted how

many people in the neighborhood are in ganging.  The fight at

the MDC, Judge, occurred within three weeks of his -- it

happened in February actually, within three weeks of his

arriving at MDC.

So you are still in that mode at that time.  You are

still led by some people who are there.  But since that, since

then, he has not engaged in that type of behavior.

I see where even Mr. Brooks, who testified this

morning, listed a top five.  My client was not in the top five.

It was not brought out on direct.  I am sure your Honor has

read the 3500 material.  He says who the top five are.  He

doesn't list my client.

I understand there was some literature that was

recovered from Terrance William's room or cell where he lists

the top five.  My client is -- he doesn't list my client in the

top five.  He talks about the gang responsibilities and assigns

various tasks.  My client is not mentioned in any of that

literature.

What puts him in tier 1 is the Moises Lora homicide.

Your Honor, his involvement in that is clear.  But to say that

he was the driving factor, that he sought out Moises, that he

intended to kill this kid, I don't think that's the intention.

Is he culpable?  Is he guilty of that?  Yes.  But he

is certainly not the driving force in that.

The government alludes to, we know about the shooting

in May of 2015.  I think I explained it in my papers what

happened there.  That is not an excuse.  He did that, clearly.

He's apparently, at that time anyway, was beholden and felt

loyal to that individual and took part in that.  It was a very

stupid move.  He realized that.  He's here.

If you look at his activity in this case, the facts

the government talks about or asserts, compared to all of the

people the government talked about, Matthews, Belle, Terrance

Williams, Lanier, Paul Gilbert, his actions are less culpable

H7jnbrah

1    than any of those individuals.  The government even says they

2    are all more serious than him.  I cannot understand why they

3    would ask for more time than those individuals.

4         At the time -- he has a juvenile record that he had

5    when he was 14 or 15 years old.  He gets points for that.  Your

6    Honor may well be aware that there is -- the commission has

7    before it an amendment not even to include juvenile offenses

8    anymore.  It didn't pass with this past go-around, but they are

9    considering that.  He gets three points for the shooting of --

10        THE COURT:  It wouldn't matter.  Even if he had no

11   criminal history points, his guideline would still be life.

12        MR. DuBOULAY:  No question about it.  No question

13   about it.

14        Right now he's doing time for the shooting, the May

15   '15 --

16        THE COURT:  I thought he completed that sentence.

17        MR. DuBOULAY:  No, he did not.  He gets out in

18   December.

19        THE COURT:  OK.

20        MR. DuBOULAY:  So he's doing time for that right now.

21   And I would ask the Court to include that, consider that in

22   your sentencing, take that into consideration.  I think under

23   5G1.3 you should do that.  He pled to it, so it's obviously

24   relevant conduct.

25        THE COURT:  I didn't count it as relevant conduct.  I

H7jnbrah

1    counted it as the guidelines say to count it, as prior conduct.

2                MR. DuBOULAY:  Right.

3                I would ask your Honor to consider that also, since he

4    has pled to that, in your consideration of what the sentence

5    is.  That is three years that he is doing for that particular

6    incident.

7                The government alluded to the fact that on November 22

8    there was a shooting in the schoolyard.  He was not a shooter.

9    He was 16 years old at the time.  He was a kid.

10               THE COURT:  I'm sorry.  Which shooting was that?

11               MR. DuBOULAY:  The one where my client was shot.  I

12   think the government alluded to that in their presentation.

13               THE COURT:  That was a shootout where he got shot?

14               MR. DuBOULAY:  Yes.

15               THE COURT:  His crew was also shooting at the other

16   side.

17               MR. DuBOULAY:  I think it was Blanding that was shot

18   on one end of the park.  My client was shot in the schoolyard

19   itself going to that location.  Blanding apparently had already

20   been shot at that point.

21               The government talks about what is in the Facebook

22   posts.  My client is not bragging about what happened.  I think

23   that's their take on that.  I don't think what they say on

24   Facebook, at least my client's response has anything to do with

25   the Moises Lora situation.  There were other people talking

1   about how they were smashed, but for the government to say they

2   were particularly referring to Moises Lora I think is a

3   stretch.  My client has one post on that.  I think his Facebook

4   posts are not that -- indicative of that.

5         Quite simply, Judge, you have before you -- you have

6   the letters -- a person who has some worth.  As the professor

7   says, he was very helpful to them in posing the questions.  He

8   attended meetings.  He has some value.  He can contribute to

9   society.  He liked what he was doing.

10        They alluded to the fact that they were considering

11  even trying to get him to go back to school because they saw

12  his potential.  He is actually a pretty bright kid.

13        I would ask you not to take away the rest of his life.

14  I don't think it's necessary in this case.  I think he can

15  contribute to society.

16        He's involved in certain things that were very bad,

17  and he acknowledges that fact.  But he is a person who has a

18  son.  He's very close to his son.  I have witnessed that when

19  I've seen other clients.  I've seen him with his son in MDC.

20  He's very close to his son.  He has a loving and affectionate

21  relationship with his kid.  He has value.  That is probably one

22  of the most hurtful things for him, and he'll have to live with

23  that.  I have seen that interaction, and it's not cold at all.

24        The mere fact that those people, the academics write

25  the letters that they have will tell you he has to value, and

he should not be put away for life or until he's 70 years old
or anything of that nature.  I think he can contribute.

In comparing the sentences of other people in this
case, I understand the Lora situation driving this.  I don't
see him being tier 1.  I see him, compared to what -- I have
read the sentencing submissions of the government with the
other defendants.  Your Honor is probably more aware of it than
I am, because I forget these things pretty quickly.  But I have
seen where people who have got 30, 35 years have done things
much more substantial than my client, send people out to shoot
people, get caught going to shoot people, doing things that are
really way off the charts.

He was involved in bad things, but clearly he should
not be getting a sentence of 40 years or anything of that
nature, 35 years, compared to what these other people are
getting.

I think we forget that he was 16 or 17 when he
committed some of these acts.  He was 20 years old when he
committed another act.  He is 23 years old now.

He has value.  He has mother who loves him who is very
ill and only wishes he could get out before she passes away.
She is an extremely ill woman.

I ask your Honor to take into consideration his youth,
his actual role in the Lora murder.

It is a complex situation, a very difficult situation

H7jnbrah

```
 1   to sentence somebody, but I ask your Honor to temper justice

 2   with mercy in this case and realize that this is a human being.

 3          Also, we cannot bring back Moises, but -- he will have

 4   to spend a significant amount of time in jail, but I don't

 5   think -- I think his sentence range should not be any more than

 6   Anthony Scott, who is in a similar situation.  The government

 7   talked about one individual who took a plea.  I am not sure if

 8   it was Gilbert, but Gilbert, I'm not sure if he had two murders

 9   or what it was --

10          THE COURT:  I don't --

11          MR. DuBOULAY:  It may not have been.

12          The one murder?  OK.

13          He's the one who pled guilty because the government

14   said they were going to go capital on him.  And he pled guilty.

15   I don't think my client is in that category.

16          THE COURT:  I don't think that is quite what the

17   government said.

18          MR. DuBOULAY:  Well, that is how I interpreted it.

19          They didn't say that.  I am just talking about my

20   knowledge, talking to defense lawyers.

21          But, in order to avoid that process, he took his plea.

22   I don't think my client, as the government concedes, the four,

23   five, six people that they have talked about, my client is not

24   at that level.

25          Then Moises Lora is a tragic, tragic situation, but I
```

H7jnbrah

1   think your Honor should -- and I think your Honor will --

2   consider all the factors involved, how he was led, and why he's

3   here.

4           Thank you, your Honor.

5           THE COURT:  Thank you, Mr. DuBoulay.  Mr. Bracy, would

6   you like to be heard?

7           THE DEFENDANT:  Yes, ma'am.

8           THE COURT:  You have the floor.

9           THE DEFENDANT:  Excuse me, your Honor.  I'm extremely

10  nervous.  I would like to read from my paper.

11          THE COURT:  OK.  If you are going to read something,

12  please read very slowly.

13          THE DEFENDANT:  No problem.

14          First and foremost, I like to extend my deepest

15  apologies to the Moises family.  The event that occurred on

16  April 16, 2012, was a mistake.  It was never my intention to

17  take Moises' life.  We were kids fighting, no weapons involved,

18  and I was unaware of his illness.

19          THE COURT:  I'm sorry.  It was kids, there were no

20  weapons involved and what?

21          THE DEFENDANT:  I was unaware of his illness.

22          THE COURT:  You were unaware of his illness?

23          THE DEFENDANT:  Yes.

24          The day of the incident, I wasn't in the right state

25  of mind.  I was intoxicated.  The day not only changed my life,

H7jnbrah

but the family of Moises' life as well.

I would like to apologize to the family for putting them through this situation as well as thank -- excuse me -- I'm sorry. I would like to apologize to my family for putting them through this situation as well as thank them for supporting me and not turning their backs.

The outcome of April 16 was not planned or meant to happen as it did. The results of not thinking -- excuse me. The results of not using better judgment and reacting without real thought is the reason I'm here today. Ever since that day I have always asked God to forgive me for my mistakes more than ever. The value of life is precious, and never have I intentionally meant to play a role in taking a person's life.

I am here today, your Honor, to ask that you please have leniency in determining my sentence.

During my incarceration I lost a lot in a very short time. I lost my freedom, my right to privacy, and pieces of my sanity.

And, most of all, my biggest loss has been not being able to raise my only son and the fact I cannot be there for him. I can't express enough how truly and deeply sorry I am for what has happened. Again, it wasn't my intention to get into a fight that day.

Your Honor, I'm here today speaking in front of your Court not only to express my sorry and to ask for leniency, but

H7jnbrah

1    to ask that you give me a chance to be in my any family's life

2    as well as my son's.

3            I ask that you impose a sentence to reflect on my

4    mistakes, but short enough to be able to get back to society

5    without any difficulty.

6            I would again like to extend my apologize to the

7    Moises family.  I seriously ask them for forgiveness for my

8    role causing the heartache and pain they are experiencing.  I'm

9    sorry.

10           THE COURT:  Thank you, Mr. Bracy.

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  Mr. Bracy, federal law requires me have to

13   consider the nature and circumstances of the offense and the

14   history and characteristics of the defendant.

15           In terms of you, I have considered your history and

16   your characteristics.  I start with the fact that you were

17   dealt with a very tough hand from birth.  You were born to a

18   crack addicted mother, and you were promptly placed in foster

19   care.

20           You have had no real connection to your biological

21   father, and you were sexually abused by one of your mother's

22   boyfriends.  You grew up poor in a gang-infested neighborhood.

23           On the other hand, at some point your mother got her

24   act together and she's been sober and clean for a long, long

25   time.  She became a community activist.  She really became a

H7jnbrah

1    very good role model for you.

2              Your involvement in the criminal justice system

3    started when you were young.  You did 18 months in Children's

4    Village, which seemed to have no positive impact on your

5    behavior.

6              Although you also got involved in community activism,

7    you have not graduated from high school, you don't have a GED,

8    and you have no employment history.  Your family tells me that

9    you are a great guy and that you really love your child.

10             Numerous letters, both from your family members and

11   from the researchers who were doing criminal justice research

12   in your neighborhood, attest to your intelligence and your good

13   heart.

14             I have to say that my impression from having read the

15   letters from the researchers and knowing what the evidence is

16   in this case and the horrors that the Young Gunners imposed on

17   that neighborhood and your role in that gang is that you

18   entirely snowed the researchers.

19             Do you know what that means?

20             THE DEFENDANT:  No, ma'am.

21             THE COURT:  It means you sold them a bill of goods.

22   You persuaded them that you were someone that you are not.

23   That is what it means to snow someone.

24             Notwithstanding that, if I saw any indication that the

25   Tyrell Bracy that they saw was the Tyrell Bracy who is in front

H7jnbrah

of me, I would be affected by it.

Your family presses the fact that you love your little
boy.  The presentence report says that your little boy is four
years old, so that means he must have been born in around 2013.
You've never been employed, so what I know is that, even though
you bore a child, you brought a child into this world, that you
did not care enough about him to get legitimate employment so
that you could support the child.

Children aren't just fun to bounce on your knee.
They've got to be fed, they've got to be clothed, they've got
to be housed, they've got to be taken to the doctor.  All that
costs money.  In order to support a child, you need a job.

More critically than the fact that you took no
affirmative act in your life when your child was born is you
did not disassociate yourself from the gang.  In fact, you
committed another attempted murder after the birth of that
child.  That is not the act of someone who is trying to set a
good example.  That is not the act of someone who is incredibly
remorseful for the death of Noah.

That's particularly so because as you admitted when
you pled guilty your reason for attacking the guy outside the
barbershop was he had intimidated someone who was close to you.

Mr. Bracy, it is a sad state of affairs that a person
acting in an intimidating way, whatever that may mean to you,
translates in your head to that means that person is worthy of

H7jnbrah

being killed.

I have also considered the environment that you grew up in, Mr. Bracy, and I've considered the positive impression that you made on the social scientists who wrote me on your behalf.

It was an impressive group of letters.  Although I do believe that you have snowed the researchers, the letter tells me that there is another side of you.  The issue for my sentencing is which Bracy is the real one.  Is it the sweet, thoughtful young man who the researchers dealt with, or is it the thug who helped kick a 16-year-old boy to his death?

You joined this gang in 2009 by your own admission. That's what you told me when you pled guilty.

By 2011, when the researchers were conducting their research, you already had two juvenile adjudications, and you had participated in a wild shootout where it was only dumb luck that no one got killed.

One of the researchers who wrote me urging leniency wrote that you made poor choices.  "Following and trying to protect neighborhood friends, Bracy is not that much different than many young men had his age who are loving and loyal.  He is not a young man who is in endless trouble growing up or had a long history of fighting or hurting people."

I beg to disagree.  Putting aside what happened to Mr. Lora for just a moment, Mr. Bracy shot at a man in 2015

H7jnbrah

1    when he was 20 years old, not out of loyalty, but because the

2    other guy was, quote, intimidating his friend.  He got into a

3    major shootout when he was 15 on the streets in the Bronx for

4    no good reason.

5         I refuse to believe that most of the young men in this

6    country, including young men who grow up in poverty in that

7    very neighborhood, value life so little that they are willing

8    to kill for nothing, and I refuse to believe that most young

9    men in that neighborhood are so depraved that they would attack

10   and participate in kicking a 90-pound weakling to death.  That

11   is not the result of poverty, and it's not the result of the

12   New York Police Department's stop-and-frisk policy.  That is

13   the result of a depraved heart.

14        Taking into account that evaluation of the defendant,

15   federal law requires me to impose a sentence that is reasonable

16   and no greater than necessary to accomplish the various goals

17   of sentencing.  I have considered had all of the required

18   factors.

19        First off is the seriousness of the offense.

20   Mr. Bracy, you have been convicted of one of the most serious

21   federal offenses.  The Young Gunners gang, which you were a

22   high-level leader of and which you acknowledge being a part of

23   for years, made life absolutely awful in that area of the

24   Bronx.

25        While you and your buddies were shooting at each other

H7jnbrah

and brawling in the street and selling drugs and kicking people
to death, there were other people in that community who were
trying to live a decent life.  They were trying to raise their
children, they were trying to go to work, take their children
to school, and you made their life hell.  There is no other way
of describing it.

I find the portrayal of you by the researchers to
actually make your behavior more serious than some of your
buddies who also did terrible things.  Based on their letters,
you actually thought about what was going on in your
neighborhood.  You were able to articulate what the problems in
the neighborhood were.  Those conversations had to have
included a discussion of the dangers and the horrors of street
gangs.  They had to.  Those people were too smart not to have
discussed that with you.

And yet you remained in the gang, rising to the level
of the head of a subset, presumably lying regularly to the
researchers to portray yourself as just the innocent victim of
overzealous policing.  I'm not saying that you didn't get
stopped and frisked when you shouldn't have been, but you
didn't become who you are because of the New York City Police
Department.

I would also note that, in terms of the seriousness of
the offense, the murder of Noah was not a heat-of-the-moment
idiocy.  You and your buddies, OK, you were drinking.  You know

H7jnbrah

what, we have all been drinking.  We've all been drunk.  We
don't all grab somebody and beat him to death.  You can't
excuse this for having imbibed alcohol that day.  You and your
buddies intentionally went into rival territory looking for
trouble to so what big men you were to show that you could do
work for your gang.

So what did you do?  You found someone.  That's
depraved.  People don't hunt for other people to hurt.  That is
not what people are supposed to do.

That would be depraved conduct by itself, that you
went looking for trouble to go hurt somebody, and it would
justify a long sentence, even if you yourself never kicked
Lora.

But you did.  You kicked a 90 pound boy who, running
from you, fell.  He could not get up to run away.  Your buddy
Belle stomped on his head, and you kicked his body.  That is
depraved conduct whether you are 17 years old or whether you
are 22 years old.

The second factor is the need to promote respect for
the law.  I see no respect from this defendant.  Not to repeat
myself, but I am struck by the fact that you are 22 years old,
you have no legitimate work history, you have a child who needs
financial and emotional support, and yet that did not motivate
you to do anything to consider getting a job.

You have had positive role models.  Your mother got

H7jnbrah

1    clean from drugs and became a community activist.  You had

2    high-level attention from social science researchers who

3    thought you were college material.  None of that affected your

4    behavior at all.  I think it didn't affect it because you have

5    no respect for the notion of living within the rules of

6    society.

7              I have considered the need to provide just punishment

8    for this offense while avoiding unwarranted disparities.  I

9    have taken into account the fact that there are about 30 YGz to

10   sentence, and you are towards the top in terms of culpability.

11             The fact that the assistants put him in the top tier

12   is not dispositive, Mr. DuBoulay.  He was the leader of a set.

13   That's important.  That puts him at the top -- towards the top

14   of the culpability stack.

15             I have to date sentenced three Young Gunners who were

16   responsible for a murder, Mr. Scott, Mr. Gilbert and

17   Mr. Williams.

18             Scott and Gilbert were both responsible for felony

19   murders, Scott when he was only 16 years old.

20             Williams was responsible for a murder of a bystander

21   committed when he was 18, almost 19.

22             Their sentences ranged from 278 months to 399 months.

23   The 399 months is going to get credit for a prior sentence, so

24   it's really 360 months.  So that's 278 to 360 months.

25             I have considered the need to deter criminal conduct.

H7jnbrah

1    I am very concerned about Mr. Bracy's propensity for violence.

2    He's been involved in shooting at people and hurting people

3    since he was a teenager.  I acknowledge that teenagers and

4    young adults do not have particularly good judgment.

5          There is no indication that Mr. Bracy's judgment or

6    ability to abide by the rules of society have improved with

7    age.  Indeed, despite the letter from Mr. Torre that indicates

8    Bracy has demonstrated good behavior in jail, he has not.  I

9    don't know about what happened.  I don't know what his

10   disciplinary record is in state jail, but he has multiple

11   disciplinary incidents at the MDC, including assaulting a

12   fellow prisoner.

13         I do not accept that that assault was a matter of

14   adjusting to the federal system.  I see it as indicative of a

15   propensity for violence and a desire, even in prison, to

16   maintain his status as a high-level gangster.

17         In terms of general deterrence, I think it is

18   important to send a message far and wide that this sort of

19   organized criminal conduct that terrorizes and destroys

20   neighborhoods will not be tolerated.  Men and boys, and that's

21   who are members of the YGz, need to understand and, more

22   importantly, their sisters and their mothers and their cousins

23   need to understand that they need to advise them to stay away

24   from gangs, because otherwise they are going to be spending

25   very lengthy terms, not months, but years in jail.

H7jnbrah

          I have considered the need to protect the public from
the defendant.  This defendant fired a gun on more than one
occasion attempting to kill rival gang members, and on one
occasion for no reason attacked and kicked to death a rival.

          I appreciate the argument that long sentences can be
counterproductive.  But I also have to impose a sentence that
is long enough to give this defendant the time to mature to the
point, I hope, where he will not be so violent and so dangerous
to those around him, including innocent bystanders who could be
killed.

          If this were just a matter of making poor choices, it
would be different.  But I keep coming back to the fact that
the murder of Noah was a particularly depraved homicide.

          Even if he hadn't died, the notion that you would kick
someone literally who is down, who cannot run away from you,
what were you thinking?

          That level of depravity is not just a matter of being
young, it is not just a matter of growing up in a bad
neighborhood without positive role models.  It reflects a lack
of empathy.

          Mr. Bracy, do you know what empathy is?

          THE DEFENDANT:  No, ma'am.

          THE COURT:  Empathy is putting yourself in someone
else's shoes.  Empathy is what keeps people usually from
intentionally harming other people, because you think, Well,

how would I feel if I was in that position?

You need empathy.  You need to put yourself in the shoes of other people.  So how would you feel if you were Noah, and you were tackled and you were kicked to death?  Or forget if you were Noah.  How about if it was somebody who you loved?  That is what you need to think about.  If people are empathetic, it is a brake on violent behavior.  So, in addition to learning what the word is, Mr. Bracy, you need to develop empathy.

I have considered the need to provide the defendant needed educational opportunities.

Mr. Bracy, I am not going to sentence you to life.  You are going to get out of jail at some point.  You need to get a marketable skill so that you can become gainfully employed when you get out of jail.  There is no reason why you cannot get a GED if you put your mind to it.  According to the researchers, you are a bright young man.  According to Mr. DuBoulay, you are a bright young man.

There is absolutely no reason why you should not have a GED by now.  But you also need to learn a trade.  Use your time productively in prison.  Take advantage of whatever programs they have so that you can learn to do something other than dealing drugs so that when you get out of prison you can get a job and support yourself.

If Noah's family were present, I would tell the family

that if a life sentence of Mr. Bracy would bring back Noah I
would sentence him to life.  I don't think Noah was an angel,
but Noah didn't deserve to be kicked to death.

As I have indicated, I've sentenced three Young
Gunners for murder.

Here's how I see it Mr. Enzer.

Scott got 278 months, but he did not intend to kill
anyone.  It is a felony murder, and it was committed when he
was just 16.  While I appreciate the psychology studies, the
reality is that a 16-year-old is substantially less mature than
a young man who is almost 18.

Gilbert got 365 months.  His one murder was a felony
murder associated with a robbery, but his criminal conduct
occurred when he was in his 20s.  All in all his criminal
conduct is somewhat less serious, but he was older and he had a
more extensive criminal history.

Williams killed a bystander after attempting to kill a
rival gang member.  The murder was committed when he was almost
19.  He had fairly limited criminal history, and he received
399 months with the direction that BOP should credit him for 33
months, which would take him to a total of 360 months, or 30
years.

So that is all of what I am taking into account.

I am agonizing and have agonized about where is the
right place to put you, Mr. Bracy.

H7jnbrah

1          Taking all of that into account, I am going to

2     sentence this defendant to the custody of the attorney general

3     for 396 months.  That's 33 years.

4          You will, if you behave yourself in jail, get out

5     about the time you are 50, which is time to live a long and

6     successful life.

7          I am imposing five years of supervised release on

8     Count One.

9          There are mandatory conditions of supervised release,

10    Mr. Bracy:

11          You may not commit another crime;

12          You may not illegally possess a controlled substance;

13          You can't possess a gun or any destructive device;

14          You must cooperate in the collection of DNA.

15          I am not ordering drug testing because drug treatment

16    is going to be required.

17          In addition to the standard conditions of supervision,

18    I am imposing the following special conditions:

19          You must submit your person, residence, place of

20    business, vehicle, electronic devices or other premises under

21    your control to search if the probation officer has a

22    reasonable belief that contraband or evidence of a violation of

23    the conditions of release may be found there.  Any search must

24    be conducted at a reason time and in a reasonable manner.

25    Failure to submit to a search may be grounds for revocation,

H7jnbrah

1    and you must inform any other residents that the premises may

2    be subject to search pursuant to this condition.

3           You must participate in outpatient drug treatment as

4    directed by the probation officer.  The program may include

5    testing to determine whether you have reverted to the use of

6    drugs or alcohol.  You must contribute to the cost of services

7    based on your ability to pay or the availability of third-party

8    payments.  I'm authorizing the release of available drug

9    treatment evaluations and reports including the presentence

10   report to the substance abuse provider.

11          The defendant must participate in outpatient mental

12   health treatment as directed by the probation office.

13          The defendant must continue to take prescribed

14   medication unless otherwise instructed by the mental health

15   provider.  You must contribute to the cost of services based on

16   your ability to pay or the availability of third-party

17   payments.  The Court authorizes the release of available

18   psychological and psychiatric evaluations and reports,

19   including the presentence report, to the health care provider.

20          The defendant must report to the nearest probation

21   office within 72 hours of release and will be supervised by the

22   district of residence.

23          Is there a forfeiture count?

24          MR. ENZER:  There is.  The government does not seek

25   forfeiture.

H7jnbrah

1            THE COURT:  The forfeiture is dismissed.

2            I am not going to impose a fine because I find there

3     is no ability to pay.

4            I have to impose a $100 special assessment.

5            Are there any open counts?

6            MR. ENZER:  There are.

7            The government moves to dismiss them.

8            THE COURT:  The open counts are dismissed.

9            Mr. DuBoulay, do you have any request regarding

10    designation?

11           MR. DuBOULAY:  Yes, your Honor.

12           I would ask, one, that he be in prison someplace close

13    to New York City for his family.

14           Judge, I have a further request that the time that he

15    spent in, almost 36 months, be credited against this time

16    pursuant 5G1.3.  I think it's something he pled to, and I think

17    it's part of your calculation.

18           THE COURT:  It was part of my calculation that he was

19    not going to get credit for it.

20           My sentence was imposed on the theory that this is his

21    sentence in the federal case, and I am not assuming he's

22    getting credit for his state time.

23           MR. DuBOULAY:  Could you order that the sentence be

24    imposed immediately so that it can run concurrent with the last

25    six or seven months of the other sentence?

H7jnbrah

1          THE COURT:  I can do that.

2          Your request is only going to be designated close to

3    New York City.

4          MR. DuBOULAY:  Correct, Judge.

5          THE COURT:  Mr. Bracy, to the extent you have not

6    given up your right to appeal through the agreement you entered

7    into with the government in connection with your guilty plea,

8    you have the right to appeal.

9          If you are unable to pay the cost of an appeal, you

10   may apply for leave to appeal in forma pauperis.  The notice of

11   appeal must be filed within 14 days of the judgment being

12   entered.

13         Anything further from the government, Mr. Enzer?

14         MR. ENZER:  Nothing from the government.

15         Thank you, your Honor.

16         THE COURT:  Mr. DuBoulay?

17         MR. DuBOULAY:  No, your Honor.

18         THE COURT:  All right.

19         Thank you, all.

20         (Adjourned)

21

22

23

24

25

```
                        INDEX OF EXAMINATION

Examination of:                               Page

Direct By Ms. Castellano . . . . . . . . . . . . 6

Cross By Mr. Kirton  . . . . . . . . . . . . .78

Redirect By Ms. Castellano . . . . . . . . . 105

Recross By Mr. Kirton  . . . . . . . . . . . 111

                        GOVERNMENT EXHIBITS

Exhibit No.                                 Received

 1 through 22 and 37  . . . . . . . . . . . . . 4

31, 32, 34 and 36  . . . . . . . . . . . . . . 5

35   . . . . . . . . . . . . . . . . . . . .72

30   . . . . . . . . . . . . . . . . . . . .76

38   . . . . . . . . . . . . . . . . . . . 117

                        DEFENDANT EXHIBITS

Exhibit No.                                 Received

A   . . . . . . . . . . . . . . . . . . . . .86

B   . . . . . . . . . . . . . . . . . . . . .87

C and D   . . . . . . . . . . . . . . . . . 120
```